1  Jonathan M. James, Bar No. 012204
   Perkins Coie Brown & Bain P.A.
2  2901 North Central Avenue, Suite 2000
   Phoenix, Arizona  85012-2788
3  Telephone:  (602) 351-8000
   Facsimile:  (602) 648-7032
4  jjames@perkinscoie.com

5  Susan E. Foster, *(Pro Hac Vice)*
   Chun M. Ng *(Pro Hac Vice)*
6  Perkins Coie LLP
   1201 Third Avenue, Suite 4800
7  Seattle, Washington  98101-3099
   Telephone:  (206) 359-8000
8  Facsimile:  (206) 359-9000
   sfoster@perkinscoie.com
9  cng@perkinscoie.com

10
   Attorneys for Plaintiff/Counterdefendant
11 TriQuint Semiconductor, Inc.

12

13              **UNITED STATES DISTRICT COURT**

14                    **DISTRICT OF ARIZONA**

15 TriQuint Semiconductor, Inc., a Delaware        No. 09-01531-PHX-JAT
   corporation,
16
                    Plaintiff/Counterdefendant,    **TRIQUINT'S OPPOSITION TO**
17                                                  **AVAGO'S MOTION TO DISMISS**
        v.
18
   Avago Technologies Limited, a Singapore
19 corporation; Avago Technologies U.S., Inc.,
   a Delaware corporation, Avago Technologies
20 Wireless IP (Singapore) Pte., Ltd., a Singapore
   corporation,
21
                    Defendants/Counterclaimants.
22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 2

III.   LEGAL DISCUSSION ...................................................................................... 5

       A.    Motion to Dismiss Standards ................................................................. 5

             1.    Not Every Fact Supporting a Claim Must Be
                   Pleaded ........................................................................................ 5

             2.    Allegations Outside TriQuint's Counterclaim
                   Must Be Disregarded .................................................................. 5

             3.    Federal and Ninth Circuit Law Apply ........................................ 6

       B.    TriQuint Has Stated a Claim for Relief Under Section 7
             of the Clayton Act ................................................................................. 6

             1.    Legal Framework ........................................................................ 7

             2.    TriQuint Has Adequately Alleged a Clayton 7
                   Violation ..................................................................................... 7

       C.    TriQuint Has Stated a Claim for Relief Under Section 2
             of the Sherman Act ................................................................................ 9

             1.    Legal Framework ...................................................................... 10

             2.    Avago's Anticompetitive Scheme Violates the
                   Sherman Act .............................................................................. 11

             3.    Avago's Patent Portfolio Offers It No Protection
                   Under the Facts Here ................................................................ 12

                   a.    Avago's Actions Are Part of a Broader
                         Monopolistic Scheme ...................................................... 14

                   b.    Avago's Licensing Efforts Illegally
                         Extend the Grant of Its Patents and are
                         Not Subject to Protection ................................................ 15

       D.    TriQuint Has Adequately Alleged Antitrust Standing ........................ 17

             1.    Legal Framework ...................................................................... 17

             2.    TriQuint Has Sufficiently Alleged Antitrust
                   Injury as Both a Consumer and a Competitor ........................... 18

             3.    TriQuint's Injuries Were Directly Caused by
                   Avago's Antitrust Violations and Are Not
                   Speculative ................................................................................ 20

       E.    Judicial Economy Is Not Served by Avago's Request
             for Bifurcation and Stay ...................................................................... 23

IV.    CONCLUSION ................................................................................................ 25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946) .................................................. 10

5

*Amarel v. Connell*, 102 F.3d 1494  (9th Cir. 1996).......................................................... 20

6

*Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir.

7

1999) ............................................................................................................................... 19

8

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)............................................................................ 5

9

*Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572

(Fed. Cir. 1990) ............................................................................................... 13, 14, 15

10

*Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328

11

(1990)............................................................................................................................... 19

12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 5

13

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982)............................................. 10

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir.

14

2007) ............................................................................................................................... 11

15

*Burge v. Freelife Int'l, Inc.*, 2009 WL 3872343 (D. Ariz. Nov.

16

18, 2009) .......................................................................................................................... 5

17

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir.

1992) ............................................................................................................................... 10

18

*Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690

19

F.2d 1240 (9th Cir. 1982) ............................................................................................ 14

20

*Community Publishers, Inc. v. DR Partners*, 139 F.3d 1180

(8th Cir. 1998) ................................................................................................................. 7

21

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S.

22

690 (1962) ....................................................................................................................... 10

23

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99

F.3d 937 (9th Cir. 1996) ............................................................................................... 11

24

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009) ........................................................... 5

25

*Dairy Foods Inc. v. Dairy Maid Prods. Coop.*, 297 F.2d 805

26

(7th Cir. 1961) ......................................................................................................... 11, 22

27

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d

1147 (1st Cir. 1994)....................................................................................................... 12

28

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d
1547 (Fed. Cir. 1997) ....................................................................... 7, 20, 21

5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451
(1992).......................................................................................................... 10

6

*Erickson v. Pardus*, 551 U.S. 90 (2007).......................................................... 5

7

*Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369 (Fed Cir. 2003) ........................ 25

8

9

*Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745 (10th
Cir. 1999) ................................................................................................... 19

10

*Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367 (9th
Cir. 2003)............................................................................................... passim

11

*Hydranautics v. Filmtec Corp.*, 70 F.3d 533 (9th Cir. 1995)............................ 24

12

13

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F.Supp.2d
1084 (N.D. Cal. 2007) ................................................................................ 15

14

*Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d
1195 (9th Cir. 1997) ................................................................................... 12

15

16

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir.
2003)........................................................................................................... 16

17

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d
1323 (Fed. Cir. 2008) ................................................................................. 16

18

19

*In re Indep. Servs. Org. Antitrust Litig.*, 203 F.3d 1322 (Fed.
Cir. 2000)................................................................................................... 1, 6

20

21

*In re Indep. Servs. Org. Antitrust Litig.*, 964 F. Supp. 1479 (D.
Kan. 1997), *aff'd*, 203 F.3d 1322 (Fed. Cir. 2000) ........................................ 13

22

*In re Innotron Diagnostics*, 800 F.2d 1077 (Fed Cir. 1986) ........................... 24

23

*In re Matter of Amgen Inc.*, 134 F.T.C. 333 (2002) ........................................ 22

24

*In re Matter of Chevron Corp.*, 140 F.T.C. 100 (2005) ................................... 22

*In re Matter of Ciba-Geigy Ltd.*, 123 F.T.C. 842 (1997) ............................. 9, 22

25

26

*In re Matter of Roche Holding Ltd.*, 1990 WL 606607 (Compl.
¶ VII (e)) (Aug. 1990) ................................................................................ 22

27

*In re Theodor Groz & Sohne*, 972 F.2d 1352, 1992 WL
188908 (Fed. Cir. May 18, 1992) ................................................................ 24

28

1
2

# TABLE OF AUTHORITIES
### (continued)

Page

3
4
*Kobe v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837 (1952)...................................................................... passim

5
*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ........................................... 10

6
*Matsushita Elec. Indus. Co., Ltd. v. CMC Magnetics Corp.*, 2007 WL 219779 (N.D. Cal. Jan. 29, 2007)..................................................... 24

7
8
*Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983), *disavowed on other grounds*, *Deauville Corp. v. Federated Dept. Stores*, 756 F.2d 1183 (5th Cir. 1985)................................. 19

9
10
*Netflix, Inc. v. Blockbuster, Inc.*, 2006 WL 245717 (N.D. Cal. Aug. 22, 2006) ........................................................................................... 24

11
12
*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ............................................................................................. 6

13
*Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739 (9th Cir. 1984) ................. 11, 17

14
*R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir. 1989)................................................................................................................ 7

15
16
*Rex Chainbelt Inc. v. Harco Prods. Inc.*, 512 F.2d 993 (9th Cir.), *cert. denied*, 423 U.S. 831 (1975) .......................................................... 14

17
*SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981) .............................. 12

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993)................................. 10

18
*Standard Oil Co., Ind. v. United States*, 283 U.S. 163 (1931) ......................... 16

19
20
*State of Cal. v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*, 495 U.S. 271 (1990).......................................... 7

21
*United States v. Aluminum Co. of Am.*, 148 F.2d 416 (2d Cir. 1945)................................................................................................................ 10

22
23
*United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586 (1957)................................................................................................................ 7

24
25
*United States v. El Paso Natural Gas Co.*, 376 U.S. 651 (1964)................................................................................................................ 8

*United States v. Griffith*, 334 U.S. 100 (1948) .................................................. 13

26
*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ........................ 1

27
*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ......................... 7

28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963) .............................................. 14, 16

*United States v. Syufy Enter.*, 903 F.2d 659 (9th Cir. 1990) ................................. 7

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) ............................................. 16

*United States v. Westinghouse Elec. Corp.*, 648 F.2d 642 (9th
    Cir. 1981) ................................................................................................. 12

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d
    1341 (Fed. Cir. 2004) ................................................................................ 6

*Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294 (11th
    Cir. 2003) ................................................................................................. 16

*Watkins v. Yavapai County*, 2009 WL 3837367 (D. Ariz. Nov.
    17, 2009) ................................................................................................... 5

*Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428 (9th
    Cir. 1985) ................................................................................................. 6

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100
    (1969) .............................................................................................. 16, 17, 21

**Statutes**

15 U.S.C. § 15(a) ....................................................................................................... 17

15 U.S.C. § 18 .............................................................................................................. 7

15 U.S.C. § 26 ............................................................................................................ 17

**Regulations and Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................... 5

**Other Authorities**

Areeda et al., *Antitrust Law* (3d ed. 2006) ................................................... 20, 22

1

## I.   INTRODUCTION

2    Avago's illegal acquisition activity and its efforts to exclude competitors is exactly the

3  type of conduct the antitrust laws are intended to prevent, and as a customer and a targeted

4  competitor, TriQuint is precisely the right plaintiff to bring this action.

5    As part of a monopolistic scheme to foreclose competition and maintain its monopoly

6  position, Avago engaged in a campaign to acquire BAW related assets and businesses from

7  Infineon and others, resulting in its possession of substantially all of the BAW Technology

8  Market and 90% of the PCS CDMA Duplexer Market (collectively, "Markets").  Using these

9  assets, Avago has sought to further foreclose competition in the PCS CDMA Duplexer

10  Market and to maintain its monopoly in the BAW Technology Market by eliminating

11  TriQuint's source of supply of BAW dies (which are used to make BAW duplexers), chilling

12  the marketplace and using its illegally acquired assets to prevent competition and to compel

13  illegal agreements not to compete.

14    Recognizing the overwhelming weakness of its case on the merits, Avago's Motion to

15  Dismiss focuses on claims of immunity and weak procedural arguments.  Specifically, Avago

16  seeks to immunize its illegal acquisitions and its related anticompetitive efforts in the cloak of

17  protected patent activity and asserts that TriQuint, as a competitor, does not have standing to

18  sue.  However, this case is not focused on Avago's efforts to exercise its *lawfully* acquired

19  patents rights.  It is focused on Avago's *illegal* acquisitions and its use of those illegally

20  acquired assets (including *illegally acquired patents*) to foreclose competition as part of a

21  predatory scheme to monopolize.  Contrary to Avago's assertion: "[i]ntellectual property

22  rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Org. Antitrust*

23  *Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).  Any argument in opposition "is no more correct

24  than the proposition that use of one's personal property, such as a baseball bat, cannot give

25  rise to tort liability." *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001).

26  Avago's antitrust standing argument is equally unavailing and ignores TriQuint's status as a

27  customer of Infineon—indeed the largest purchaser of Infineon BAW dies—and its standing

28  as the only remaining competitor and a direct target of Avago's anticompetitive conduct.

1    Avago's Motion also improperly isolates each of TriQuint's allegations and argues why
2    that alleged act alone does not state an antitrust claim.  However, it is black letter antitrust law
3    that courts must evaluate a monopolist's conduct *as a whole*, not whether each specific act,
4    alone, violates the antitrust laws.  When properly viewed (as a whole), there can be little
5    doubt about the anticompetitive intent and impact of Avago's conduct.

6    Because TriQuint has sufficiently alleged claims under the Clayton and Sherman Acts
7    and has established antitrust standing, Avago's Motion must be denied.  Avago's request for
8    bifurcation and stay should also be denied because TriQuint's antitrust claims are not
9    dependent upon the outcome of the patent case (in fact, the reverse) and thus judicial
10   economy would not be served.

## II.    BACKGROUND

12   Avago and TriQuint both manufacture and sell BAW duplexers.  BAW duplexers are
13   used in mobile telephone handsets to prevent interference between the transmit and receive
14   signals and are critical to the performance of the radio portion of the handset.  Because of
15   their superior performance and ability to meet stringent technology standards, BAW
16   duplexers are *the* technology of choice for high performance applications and the only
17   technology sufficient to meet the higher technology standards of PCS CDMA duplexer
18   applications.  TriQuint's Counterclaim ("CC") ¶¶ 22-24.

19   Avago introduced its first BAW duplexer in August 2001 and for many years was the
20   sole commercial provider of BAW duplexers to mobile telephone handset manufacturers.  CC
21   ¶ 26-29.  Its position as the sole provider of BAW duplexers was subsequently challenged by
22   two new entrants, Infineon and then TriQuint.  While Infineon, Avago and TriQuint each
23   produced and sold BAW duplexers, only Avago and Infineon produced BAW dies, a
24   necessary component of BAW duplexers.  CC ¶¶ 11, 26-27.  TriQuint acquired its BAW dies
25   from Infineon, the only commercial provider of BAW dies (Avago produced BAW dies
26   solely for its internal use).

27   Recognizing that its monopoly position was at risk from this new entry, Avago

28

immediately commenced a concerted campaign to acquire BAW assets and technology, deprive competitors of necessary inputs and foreclose competition.  In furtherance of this scheme, Avago acquired several BAW-related patents from Nokia (a venture partner of Infineon) and Northrop Grumman.  Thereafter, in September 2008, Avago acquired the entire BAW product business (including the BAW-related patents) of its erstwhile competitor, Infineon.  CC ¶¶ 32-33, 41.

These acquisitions had a profound impact on the competitive landscape.  By Avago's own admission, the Infineon acquisition resulted in the "#1 supplier" in the market (Avago), acquiring the "#2 supplier" (Infineon).  CC ¶ 35.  Prior to the acquisition, Avago asserted that it was the largest provider of PCS CDMA duplexers with over 80% market share.  Today, it is estimated that Avago has at least 90% market share, leaving TriQuint (for now) as the only remaining provider of BAW duplexers to the PCS CDMA Duplexer Market.  CC ¶¶ 52, 62.

Avago's market power alone is sufficient to condemn Avago's acquisition activity.  However, it is its post-acquisition conduct that most starkly illustrates both Avago's anticompetitive intent and the anticompetitive effect caused by its activity.  Most notable is the fact that, simultaneous with its announcement of the Infineon acquisition, Avago announced that it was shutting down the entire Infineon BAW filter business (dies and duplexers).  The value of the transaction to Avago was clearly not in the ongoing business,[1] but rather in Avago's ability to: (1) eliminate one of its two PCS CDMA duplexer competitors (Infineon);  (2) eliminate (or try to eliminate) its only remaining competitor (TriQuint) by foreclosing TriQuint's (and other potential entrants') access to the only available source of BAW die; and (3) amass a patent portfolio that not only accumulated substitutable technology (e.g. Infineon BAW die technology and Avago BAW die technology) but, according to Avago, had a blocking effect that would prevent TriQuint and other new entrants from making their own BAW dies and duplexers.  To make sure that mobile handset

---

[1] The acquisition price paid by Avago was also significantly higher than that offered by all other bidders and reflected the premium that Avago placed on its ability to buy and preserve its market power and engage in monopolistic conduct.  CC ¶ 34.

manufacturers and potential competitors "got the message," Avago announced to the industry that by virtue of the acquisitions, Avago had acquired a patent portfolio that covered all necessary elements of BAW filters, making Avago the only "safe" source of BAW products and placing customers at risk if they purchased from any other provider.  CC ¶¶ 35, 38.

With TriQuint as its only remaining competitor, Avago's conduct directly affected and targeted its sole remaining rival.  Avago's decision to shut down Infineon and deprive TriQuint of the only available source of commercial BAW dies dealt TriQuint a tremendous blow.  But, TriQuint was down, not out, and in an effort to continue to compete, TriQuint proceeded to ramp up efforts to develop its own BAW technology, ultimately introducing its new BAW filters to market in the third quarter of 2009.  CC ¶¶ 14, 39.  Upon learning of TriQuint's efforts and in a further effort to eliminate TriQuint and prevent competition, Avago used its illegally acquired patents to threaten TriQuint and its customers with patent infringement litigation, ultimately resulting in this lawsuit.  Notably, eight of the ten BAW patents Avago is asserting against TriQuint in this case were acquired from Infineon and Nokia as part of Avago's predatory scheme to monopolize.  CC ¶ 16.

Avago's efforts were not limited to TriQuint.  Indeed, using its illegally acquired BAW patent portfolio, Avago threatened and coerced other potential competitors from the market and most recently acquired BAW patents from Skyworks, another potential competitor.  CC ¶¶ 40-42.  However, its monopolistic intent is perhaps best summed up by its licensing demand to TriQuint:  While TriQuint (and presumably others) can continue to sell BAW products outside of the PCS CDMA Duplexer Market, it must agree not to compete in Avago's monopolistic sweet spot, the PCS CDMA Duplexer Market.  CC ¶¶ 15, 40.

With its monopolistic position threatened by new competition, Avago has aggressively and relentlessly sought to eliminate competition and extinguish even the flicker of potential entry.  It has almost been successful and the harm to TriQuint, competition and consumers from Avago's acquisition activity and ongoing anticompetitive conduct is clear.

### III.    LEGAL DISCUSSION

**A.    Motion to Dismiss Standards**

**1.    Not Every Fact Supporting a Claim Must Be Pleaded**

On a motion to dismiss, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) (internal quotation omitted).  Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 90, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Consequently, to avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "Facial plausibility exists if the pleader pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burge v. Freelife Int'l, Inc.*, 2009 WL 3872343, *4 (D. Ariz. Nov. 18, 2009) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  "A complaint should only be dismissed if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Watkins v. Yavapai County*, 2009 WL 3837367, *1 (D. Ariz. Nov. 17, 2009) (citing *Twombly*, 550 U.S. at 555).

Avago's musings about every imaginable allegation that TriQuint did not include in its Counterclaim and its efforts to impose a Rule 9(b) standard for fraud is improper and irrelevant.  Because TriQuint pleaded enough facts to state claims to relief that are plausible on their face, Avago's Motion should be denied.

**2.    Allegations Outside TriQuint's Counterclaim Must Be Disregarded**

On a motion to dismiss, the Court cannot consider facts outside those pleaded in TriQuint's Counterclaim. *Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th

Cir. 1985).  Avago's "Factual Background" is replete with alleged "facts" that are not set forth in TriQuint's Counterclaim, including accusations relating to the technology, the market, Infineon's supposed rationale for pursuing a divestiture (the loss of its largest customer, TriQuint) and the timing and status of TriQuint's development efforts.  However, there are no such allegations in TriQuint's Counterclaim, nor can they be inferred.  These and any other assertions by Avago not alleged in TriQuint's Counterclaim must be disregarded by the Court.

### 3. Federal and Ninth Circuit Law Apply

Contrary to Avago's assertion, both Federal and Ninth Circuit law apply to TriQuint's antitrust claims.  Because the Federal Circuit has sole appellate responsibility for the development of patent law, the Federal Circuit has jurisdiction for resolution of patent issues. *In re Indep. Serv. Org.*, 203 F.3d at 1325.  Whether a patentee's conduct is "sufficient to strip a patentee of its immunity from the antitrust laws" is also a question of Federal Circuit law. *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed. Cir. 1998) (en banc).  However, with respect to the remainder of the antitrust inquiry, the law of the regional circuit in which the district court sits applies, in this case the Ninth Circuit.  *Id*.  Therefore, elements of a violation, relevant market, market power, standing (including competitive injury) and damages are resolved pursuant to Ninth Circuit law. *Id*.; *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1355-57 (Fed. Cir. 2004).

### B. TriQuint Has Stated a Claim for Relief Under Section 7 of the Clayton Act

Avago's accumulation of a patent portfolio that it contends covered elements necessary to compete and which reduced PCS CDMA duplexer manufactures from three to two (Avago and TriQuint) and commercial BAW die manufacturers from one to zero is the epitome of a Clayton violation.  Indeed, given Avago's significant market shares, a violation is presumed as a matter of law.  Recognizing its acquisitions are presumptively illegal, Avago seeks to avoid liability by asserting: (a) the acquisitions only harmed TriQuint, not "competition," and (b) Avago did not acquire the patents with "the intent to substantially lessen competition." Mot. at 19-21.  Both arguments misapprehend and inaccurately apply the Clayton Act.

1    **1.    Legal Framework**

2        Section 7 of the Clayton Act prohibits mergers or acquisition "in any line of commerce

3   or in any activity affecting commerce in any section of the country, [where] the effect of such

4   acquisition may be substantially to lessen competition or to tend to create a monopoly."  15

5   U.S.C. § 18.  Section 7 applies to a wide variety of acquisitions of stock and assets and the

6   acquisition of patent rights fall clearly within the purview of Section 7.[2]  An acquisition is

7   presumed to substantially lessen competition if the transaction will lead to high market share

8   and undue concentration in the market.  *United States v. Syufy Enter.*, 903 F.2d 659, 664

9   n.6 (9th Cir. 1990) (recognizing that "evidence of a high market share establishes a prima

10  facie antitrust violation"); *State of Cal. v. Am. Stores Co.*, 872 F.2d 837, 842 (9th Cir. 1989),

11  *rev'd on other grounds*, 495 U.S. 271 (1990) (same).  Where "concentration is already great,

12  the importance of preventing even slight increases in concentration and so preserving the

13  possibility of eventual deconcentration is correspondingly great."  *United States v.*

14  *Philadelphia Nat'l Bank*, 374 U.S. 321, 365 n.42 (1963).  Even absent a presumption,

15  evidence of anticompetitive behavior after the transaction may be relied upon to establish a

16  violation.  *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 597-607 (1957).

17   **2.    TriQuint Has Adequately Alleged a Clayton 7 Violation**

18       Avago's acquisition of Infineon's BAW assets and its acquisition of the other BAW

19  patents is presumptively illegal because it resulted in Avago obtaining substantially all of the

20  BAW Technology Market (and, according to Avago, all of the patents necessary to compete)

21  and at least 90% of the PCS CDMA Duplexer Market.  *Community Publishers, Inc. v. DR*

22  *Partners*, 139 F.3d 1180, 1184 (8th Cir. 1998) (post-merger market share of 84% presumed to

23  violate Section 7); *R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 108 (2d Cir. 1989)

24  (post-acquisition market share of 84% raises a presumption of illegality).  Moreover, high

25  entry barriers—Avago's illegally acquired BAW patent portfolio, Avago's threats of

26

27       [2] *See, e.g., Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547,
    1557 (Fed. Cir. 1997), *overruled on other grounds*, *Cybor Corp. v. FAS Tech., Inc.*, 138

28  F.3d 1448, 1454-55 (Fed. Cir. 1998).

infringement actions, Avago's unwillingness to license on lawful terms, and FCC certification (CC ¶¶ 40, 56, 58, 62, 64)—ensure that Avago can exercise its market dominance without constraint.  Therefore, TriQuint has sufficiently stated a Clayton Act violation.

Avago's allegation that TriQuint has not adequately alleged an adverse effect on market-wide competition is unavailing.  First, the cases Avago cites are not Clayton 7 cases, but Sherman Section 1 cases discussing the adverse effect on competition required for a rule of reason violation.  The standard under the Clayton Act is whether the acquisition "may threaten a substantial lessening of competition."  Second, these cases are inapposite as they address a manufacturer's elimination of a distributor—not a competitor.  Exclusion of a competitor is the essence of a lessening of competition and is actionable under either standard as it results in fewer choices for consumers and higher prices.  *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 661-62 (1964).  *Cf. Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367, 374-75 (9th Cir. 2003).  Regardless, as discussed above, a substantial lessening of competition is presumed from Avago's high market shares.

Even if there were no presumption, the fact that the acquisitions led to a lessening of competition is apparent.  CC ¶¶ 51-52, 56-57, 59-60, 62, 68.  In its Motion, Avago focuses solely on TriQuint's allegation that Avago acquired and then discontinued TriQuint's source of supply, and argues that this is an injury only to TriQuint and not to competition.  While TriQuint's allegations are actually much broader, Avago is mistaken as Avago's acquisition of Infineon's BAW business and the elimination of the Infineon BAW line caused injury to both TriQuint and to competition.[3]  *Id*.  Not only was the Infineon BAW line eliminated but along with it, TriQuint's source of supply.  TriQuint ultimately developed its own BAW dies, but only at considerable effort and expense.  Moreover, its new duplexer was not available in time for the launch of several new handsets, and for almost a year customers had only a single source of supply, Avago.  TriQuint's resulting lost sales and customers' lack of a competitive

---

[3] The Infineon acquisition also affected the BAW Technology Market, the BAW die market and the PCS CDMA Duplexer Market by accumulating patents claimed by Avago to be essential for competition, accumulating substitutable products and technologies and enabling Avago to foreclose competitors and new entry.

1   alternatives to Avago were each the direct result of a lessening of competition from the

2   acquisitions.  CC ¶ 62.  Avago's decision to discontinue Infineon's BAW die line also affected

3   potential competitors who (like TriQuint) would previously have been able to purchase BAW

4   die from Infineon in order to compete with Avago but, because of the acquisition and Avago's

5   decision to discontinue the line, must now seek to develop their own BAW dies in order to

6   compete in the PCS CDMA Duplexer Market.  *In re Matter of Ciba-Geigy Ltd.*, 123 F.T.C.

7   842, 852 (1997) (merger violated Section 7 of Clayton Act, in part, where it would require

8   new entrants to invent around merged firm's patents and enter technology market-in order to

9   compete in the product market).  And of course, as a direct result of Avago's conduct, handset

10   manufacturers' freedom of choice has been drastically limited to only two suppliers and they

11   are no longer able to purchase Infineon BAW duplexers or dies or TriQuint duplexers with

12   Infineon BAW dies.

13        Avago's remaining argument asserts that TriQuint cannot show a substantial lessening

14   of competition because "[b]y TriQuint's own admission it continues to sell BAW devices for

15   use in the PCS CDMA band."  Mot. at 21.  Avago's argument ignores the fact that it has

16   specifically sought to prevent TriQuint from *continuing* to sell its competing product by first

17   trying to coerce TriQuint to exit the PCS CDMA Duplexer Market as a condition of granting

18   TriQuint a license to Avago's BAW patents, and then, when TriQuint refused, asserting

19   against TriQuint the very same illegally acquired patents that are the subject of TriQuint's

20   Clayton Act claim and seeking an injunction that would bar TriQuint from continuing to sell

21   its BAW duplexers.  Avago's acquisition activity is not only presumptively illegal but has had

22   a clear and demonstrably negative effect on competition.

23   **C.    TriQuint Has Stated a Claim for Relief Under Section 2 of the Sherman Act**

24        TriQuint has sufficiently alleged that Avago employed an anticompetitive scheme to

25   destroy competition and acquire and maintain monopolies in the Markets.  Avago's effort to

26   immunize its predatory conduct by resort to patent law, *Noerr* immunity and improper

27

28

1  parsing of TriQuint's allegations is to no avail.[4]  Neither attach to Avago's conduct because

2  such protection applies only to "lawfully acquired" patents and does not apply to the initial

3  acquisition of, or actions based on or made possible by, any such illegally acquired patents.

4  Even if legally acquired, no such protection applies to conduct that is part of a scheme that

5  violates the antitrust laws or seeks to impermissibly extend the grant of Avago's patents.

6       **1.  Legal Framework**

7       Section 2 of the Sherman Act prohibits monopolization and attempted monopolization

8  in interstate trade or commerce.  15 U.S.C. § 2.[5]  Contrary to Avago's unsupported assertion

9  that each of its alleged acts of misconduct is to be reviewed in isolation, the law actually

10  requires that when determining antitrust liability based on a collection of factual allegations,

11  "the courts must look to the monopolist's conduct taken as a whole rather than considering

12  each aspect in isolation."  *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (citing

13  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see also Am.*

14  *Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) ("It is not of importance whether the

15  means used to accomplish the unlawful objective are in themselves lawful or unlawful….[I]f

16  they are part of the sum of the acts which are relied upon …they come within its

17  prohibition."); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)

18  ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while

19  refusing to consider their overall combined effect.").[6]

20      [4] Avago also asserts that liability should not attach because it did not make the
acquisitions or engage in the subject conduct for "anticompetitive or exclusionary

21  purposes."  Mot. at 21.  However, a claim for monopolization does not require "any
'specific,' intent" because "no monopolist monopolizes unconscious of what he is doing."

22  *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 432 (2d Cir. 1945).  A claim for
attempted monopolization does require specific intent.  As set forth *supra*, TriQuint has

23  adequately alleged such intent.

24      [5] A monopoly claim requires proof of two elements: (1) the possession of
monopoly power in the relevant market, and (2) the willful acquisition or maintenance of

25  the power.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).  A
claim for attempt to monopolize requires proof that: (1) the defendant has engaged in

26  predatory or anticompetitive conduct with (2) the specific intent to monopolize and (3) a
dangerous probability of achieving monopoly power.  *Spectrum Sports, Inc. v. McQuillan*,

27  506 U.S. 447, 456 (1993).

28      [6] Courts have routinely upheld the validity of overall anticompetitive scheme
claims.  *See, e.g., Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483 (1982) (court

**2.     Avago's Anticompetitive Scheme Violates the Sherman Act**

As the dominant market participant (an allegation that Avago does not contest), Avago sought to secure its power in the BAW Technology Market by obtaining a monopoly through illegal acquisitions (as discussed above), which it then used to exclude competition.  The illegal acquisitions were integral to this predatory scheme because they allowed Avago to cut-off supply of BAW die to actual and potential competitors such as TriQuint, thereby reducing competition.  The acquisitions also allowed Avago to use its illegally acquired BAW patents to foreclose competition by threatening actual and potential competitors with patent infringement litigation and demanding that actual or potential competitors agree not to compete with Avago in the PCS CDMA Duplexer Market.  Avago further sought to chill the marketplace by advertising the size and breadth of its newly-acquired patent portfolio and raising the specter of patent litigation (and disruption of supply) if customers purchased from anyone other than Avago.

Analyzing Avago's alleged conduct as a whole, as the Court must, it is clear that TriQuint has sufficiently alleged a violation of the Sherman Act.  Indeed, it is precisely these types of allegations that courts have previously found sufficient to support a Sherman Act claim.  *See, e.g.*, *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.,* 99 F.3d 937, 950, 952 (9th Cir. 1996) (Sherman Section 2 claim sufficient where based on allegations that defendant used monopoly power to exclude competition); *Dairy Foods Inc. v. Dairy Maid Prods. Coop.*, 297 F.2d 805, 807-08 (7th Cir. 1961) (Sherman Act claim alleged where plaintiffs pooled patents and then used those patents to threaten competitors with infringement actions if they did not agree to licenses that would deprive them of the opportunity to compete); *Kobe v. Dempsey Pump Co.*, 198 F.2d 416, 423 (10th Cir.), *cert. denied*, 344 U.S. 837 (1952) (Sherman Act violated where defendant engaged in a plan of

---

held, in part, that McCready was entitled to sue under the Sherman Act because McCready had sufficiently alleged that Blue Shield pursued a purposeful anticompetitive scheme to exclude competition); *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 745-46 (9th Cir. 1984) (plaintiff suffered antitrust injury where he was fired as a result of an anticompetitive scheme); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) (plaintiff sufficiently alleged anticompetitive scheme in violation of Section 2).

1   monopolization by acquiring all present and future patents relevant to an industry, obtained
2   covenants not to compete from sellers, publicized its infringement suits throughout the
3   industry, and threatened suit against others).

4          Even relying on Avago's patent acquisitions alone, TriQuint has sufficiently alleged a
5   Sherman Act claim.  A patentee may not attempt to monopolize an industry by acquiring all
6   present and future patents relevant to that industry.  *United States v. Westinghouse Elec.*
7   *Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) (citing *Kobe*, 198 F.2d at 422-24).  As a result,
8   patent acquisitions violate Section 2 when "the dominant competitor in a market acquires a
9   patent covering a substantial share of the same market that he knows when added to his
10  existing share will afford him monopoly power." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195,
11  1205 (2d Cir. 1981).  This is exactly what Avago has done here.  In such a case, "the
12  magnitude of the transgression of the antitrust laws' proscription against willful aggregations
13  of market power outweighs substantially the negative effect …. upon the patent system." *Id.*

14         As such, Avago (carefully) avoids alleging that TriQuint has not adequately alleged a
15  Section 2 violation based on Avago's acquisition activity (including its patent acquisitions),
16  nor even its discontinuation of the BAW line.  Instead, Avago seeks to isolate its ongoing use
17  of the illegally acquired assets and declare that such activity is not subject to attack.  As
18  demonstrated below, its argument is without merit.

19         **3.      Avago's Patent Portfolio Offers It No Protection Under the Facts Here**

20         A patentee's rights are not unlimited.  Where the acquisition of a patent "itself is
21  unlawful, the subsequent exercise of the ordinarily lawful exclusionary power inherent in the
22  patent would be a continuing wrong, a continuing unlawful exclusion of potential
23  competitors." *SCM Corp.*, 645 F.2d at 1206; *see also Image Technical Servs., Inc. v.*
24  *Eastman Kodak Co.*, 125 F.3d 1195, 1216 (9th Cir. 1997) ("a patent offers no protection if it
25  was unlawfully acquired"); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147,
26  1186 (1st Cir. 1994) (exception from antitrust scrutiny "inoperable if the patent was
27  unlawfully 'acquired'").  *Cf. In re Indep. Servs. Orgs. Antitrust Litig.*, 964 F. Supp. 1479,
28

1488-89 (D. Kan. 1997) (noting that "where a patent has been *lawfully acquired* subsequent conduct under the patent laws cannot trigger any liability under the antitrust law"), *aff'd*, 203 F.3d 1322 (Fed. Cir. 2000).  TriQuint has repeatedly alleged and demonstrated that Avago's patents were illegally acquired.  As a result, Avago's patent enforcement and licensing activities premised on those patents, or made possible by the accumulation of those patents, are also illegal and are not protected by patent laws or *Noerr* immunity.[7]

Additionally, as the Federal Circuit has made clear, the use of even lawfully acquired patent rights is not without limits:

> "[A] patent owner may not take the property right granted by a patent and use it to extend his power in the marketplace improperly, i.e., beyond the limits of what Congress intended to give in the patent laws.  The fact that a patent is obtained does not wholly insulate the patent owner from the antitrust laws.  When a patent owner uses his patent rights not only as a shield to protect his invention, but as a sword to eviscerate competition unfairly, that owner may be found to have abused the grant and may become liable for antitrust violations when sufficient power in the relevant market is present."

*Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) (internal citations omitted); *see also United States v. Griffith*, 334 U.S. 100, 107 (1948) ("the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.").  Accordingly, a patent owner violates the antitrust laws when its patent enforcement is part of an overall scheme to use the patent to violate antitrust laws, *Atari*, 897 F.2d at 1576-77 (citing *Kobe*, 198 F.2d at 423), or when use of a patent exceeds the terms of the patent grant, *id*. at 1576.

Here, Avago's patent enforcement efforts are not subject to any protection because they are reliant on and were made possible by Avago's illegal accumulation of substitutable

---

[7] Avago complains that TriQuint has not alleged that the patent claims are baseless and thus subject to the sham exception to *Noerr.*  Mot. at 16, 18.  As noted, however, *Noerr* immunity only applies to enforcement of *legally acquired* patents not *illegally acquired* patents; thus there is no need to engage in this analysis.  Additionally, Avago's argument on this point is belied by its own Motion.  Avago bemoans TriQuint's reference to assertions of Avago's "illegally acquired" patents (Mot. at 19 n.13) but apparently misunderstands their import:  if Avago acquired its patents illegally, any patent enforcement actions based on those illegally acquired patents are, *ipso facto*, baseless.

1   and assertedly blocking patents.  Without its illegally acquired patents, Avago would not have

2   had a sufficiently high share of the BAW Technology Market (including alleged essential and

3   substitute technologies) to meaningfully threaten patent enforcement, chill innovation,

4   eliminate competition, and demand non-compete agreements.  The fact that 8 of the 10

5   patents asserted in this lawsuit were acquired as part of Avago's illegal acquisition activity is

6   evidence of the general importance of the illegally acquired patents.  As such, even Avago's

7   efforts with respect to the rest of the portfolio remain subject to antitrust scrutiny because its

8   patent related conduct is part of a scheme to monopolize and Avago has sought to extend the

9   scope of its patents beyond their lawful grant.

10          **a.     Avago's Actions Are Part of a Broader Monopolistic Scheme**

11          Although *Noerr* immunity generally shields patent enforcement efforts from antitrust

12   liability, the immunity is not boundless.  There are several exceptions.  The Federal Circuit,

13   relying on *Kobe v. Dempsey Pump Co.*, 198 F.2d 416 (1952), has recognized the antitrust

14   scheme exception to *Noerr* immunity, as has the Ninth Circuit.  *Atari*, 897 F.2d at 1576-77;

15   *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1264 (9th Cir.

16   1982) (where otherwise protected litigation is part of broader scheme, *Noerr* immunity does

17   not apply).  Thus, contrary to Avago's argument, whether or not the infringement actions had

18   or were understood to have merit is irrelevant where they were part of a predatory scheme.

19          Instead, in such cases it is the predatory intent behind these actions *and* their use as

20   part of a scheme to accomplish such intent that renders patent infringement actions violative

21   of the Sherman Act.  *United States v. Singer Mfg. Co.*, 374 U.S. 174, 195 (1963) (patent

22   enforcement activities whose purpose was to restrain trade violated Sherman Act); *Clipper*

23   *Exxpress*, 690 F.2d at 1264 (9th Cir. 1982) (no immunity when part of overall scheme); *Rex*

24   *Chainbelt Inc. v. Harco Prods. Inc.*, 512 F.2d 993, 1003, 1005 (9th Cir.), *cert. denied*, 423

25   U.S. 831 (1975) (although plaintiff had a bonafide belief in its patent enforcement actions,

26   plaintiff violated Sherman Act when enforcement actions part of a scheme to restrain trade in

27   an unpatented market); *Kobe*, 198 F.2d at 425 (despite good faith belief that patents were

28

infringed, fact that its enforcement actions were part of monopolistic scheme to eliminate competition caused such actions to violate the Sherman Act).

TriQuint's Counterclaim clearly brings Avago's conduct within the antitrust scheme exception to *Noerr* immunity.  TriQuint repeatedly alleged that Avago's patent enforcement actions were an integral part of its scheme to monopolize and reduce competition in the Markets.  Regardless of whether Avago's patent enforcement efforts had any merit, which they did not, it is the predatory intent behind these actions, to eliminate competition, in combination with an anticompetitive scheme, that renders Avago's actions unlawful.  Avago's enforcement actions are "no more than a part of the original plan [to obtain and maintain a monopoly] and was designed to nip [any] competitive threat in the bud." *Kobe*, 198 F.2d at 424.

In *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F.Supp.2d 1084, 1090-91 (N.D. Cal. 2007), the antitrust defendant/patent plaintiff argued that the Federal Circuit (if a matter of Federal Circuit law) had not and would not accept an antitrust scheme exception to *Noerr* immunity.  The court disagreed, determining that the Federal Circuit would recognize the exception, consistent with its statements in *Atari*, but may require that the violation be causally connected to the subsequent enforcement action.  Even applying this standard, however, TriQuint can show an express linkage as Avago sought to acquire a blocking portfolio so as to exclude competitors and it is the portfolio that is being asserted as part of Avago's enforcement and litigation efforts.  Therefore, regardless of the standard applied, Avago cannot shield its anticompetitive enforcement activities (even of its lawfully acquired patents) from the purview of antitrust law.

### b.   Avago's Licensing Efforts Illegally Extend the Grant of Its Patents and are Not Subject to Protection

Avago's attempt to obtain an illegal agreement from TriQuint (and presumably other potential entrants) not to compete in the PCS CDMA Duplexer Market is further subject to antitrust scrutiny because Avago's conduct was not limited to the legitimate exclusionary scope of its patents—preventing the sale of existing or future infringing devices.  Instead,

1    Avago sought complete protection from competition in the PCS CDMA Duplexer market—

2    regardless of the existence of noninfringing alternatives.[8]  The Supreme Court has recognized

3    that agreements not to compete and horizontal market allocation agreements between

4    competitors are among the most pernicious.  *United States v. Topco Assocs., Inc.*, 405 U.S.

5    596, 608 (1972).  The Supreme Court has further emphasized that a patent holder "may not

6    condition the right to use his patent on the licensee's agreement ….not to purchase, use, or

7    sell, another article of commerce not within the scope of his patent monopoly."  *Zenith Radio*

8    *Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136 (1969).   If the patent licensing

9    agreement extends beyond the patentee's rightful patent protections, the agreement is subject

10   to antitrust scrutiny.  *Singer Co.*, 374 U.S. at 194 (patent settlement agreement containing

11   cross-licenses went beyond protection of patents to foreclose other competitors); *In re*

12   *Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323, 1334-35 (Fed. Cir. 2008)

13   (acknowledging validity of *per se* standard in *In re Cardizem CD Antitrust Litig.*, 332 F.3d

14   896, 907-08 (6th Cir. 2003), where patent agreement provided that competitor would not

15   market non-infringing alternatives but applying rule of reason analysis to assess allegedly

16   anticompetitive patent settlement agreement); *Valley Drug Co. v. Geneva Pharm., Inc.*, 344

17   F.3d 1294, 1312 (11th Cir. 2003) (citing *Standard Oil Co., Ind. v. United States*, 283 U.S.

18   163, 175 (1931)) ("[a]ny provisions of the Agreement [] found to have effects beyond the

19   exclusionary effects of Abbott's patent may then be subject to traditional antitrust analysis to

20   assess their probable anticompetitive effects in order to determine whether those provisions

21   violate" the Sherman Act).

22         Avago's patent licensing terms exceed the exclusionary scope of its asserted patents.

23   As stated in the Counterclaim, Avago demanded TriQuint agree not to compete in the PCS

24   CDMA Duplexer Market for a period of three years as a condition to a patent license.  CC

25   ¶¶ 15, 40.  While Avago asserts that it has acquired all of the patents necessary to compete,

26   _____

27         [8] The fact that Avago would seek such an agreement is consistent with its separate statements to customers that as a result of the Infineon acquisition and presumably its other patent acquisitions it now controls all essential technology within the market.  This

28   is not only evidence of the acquisitions' illegality but Avago's anticompetitive intent.

TriQuint has alleged that at least some competition can still exist within the PCS CDMA Duplexer Market. CC ¶¶ 82-89. By demanding that TriQuint exit the PCS CDMA Duplexer Market, Avago seeks to extend its BAW patents to foreclose all competition in a market regardless of whether such competition infringes Avago's patents. Such conduct is not protected by the patent laws and is condemned as an unlawful agreement not to compete.

## D.   TriQuint Has Adequately Alleged Antitrust Standing

TriQuint has sufficiently pleaded antitrust standing as both a consumer and a competitor of Avago, and as a direct result of Avago's illegal conduct has suffered injuries that the antitrust laws were intended to prevent.

### 1.   Legal Framework

Section 4 of the Clayton Act provides for recovery of damages by "any person....injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15(a). Section 16 of the Clayton Act permits injunctive relief on behalf of any person "threatened [with] loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. Here Avago asserts that, as a competitor, TriQuint has not suffered antitrust injury, and that TriQuint's injury is both indirect and speculative.

Contrary to Avago's claims, in order to have antitrust injury the plaintiff may be either be a consumer or a competitor. *Glen Holly*, 352 F.3d at 372, 376-78. Moreover, despite Avago's strained effort to analyze the injurious impact of each of its predatory practices individually, TriQuint is not required to allege antitrust injury separately for each component of the alleged scheme. *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 743 (9th Cir. 1984) (held plaintiff need not prove that each of the alleged overt acts is a separate, direct cause of harm). Further, an antitrust plaintiff must demonstrate only "*some* damage flowing from the unlawful [act]; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio*, 395 U.S. at 114 n.9 (emphasis added). Here, TriQuint can establish injury as both a competitor and a consumer and, having suffered injury as a direct result of Avago's actions (e.g., its decision to shutdown the Infineon BAW line and pursue

1    enforcement of its illegally acquired patents), its injuries flow directly from that which make

2    Avago's actions unlawful and are far from speculative.

3        **2.    TriQuint Has Sufficiently Alleged Antitrust Injury as Both a Consumer
             and a Competitor**

4
         In an effort to avoid suit, Avago ignores TriQuint's status as a consumer of BAW dies

5    despite TriQuint's explicit allegations of such injury in its Counterclaim.  *See, e.g.*, CC ¶ 62.

6    Instead Avago seeks to pigeon hole TriQuint as simply a run of the mill competitor, and

7    further seeks to inaccurately circumscribe the alleged harm by ignoring the very real injury

8    that its targeted efforts to exclude TriQuint and others has (and will have) on both TriQuint

9    and competition.

10
         Although competitors frequently have standing, consumers "are presumptively the

11   proper plaintiffs to allege antitrust injury."  *Glen Holly*, 352 F.3d at 372 (internal quotation

12   omitted).   TriQuint, as a consumer of BAW die from Infineon and then Avago, is

13   presumptively the proper plaintiff.  The Infineon acquisition "detrimentally changed the

14   market make-up" faced by TriQuint in its role as a customer by first, reducing the number of

15   BAW die manufacturers from two to one and, then, by virtue of Avago's decision to shut

16   down the Infineon BAW line, *completely eliminating the only commercial provider of BAW*

17   *dies and depriving TriQuint of its source of supply. Glen Holly*, 352 F.3d at 374.  There can

18   be no greater injury to competition than its complete elimination.  *Id.* at 376-378 (discussing

19   purposeful elimination of product from market and granting purchaser/competitor standing).

20   TriQuint, as a direct purchaser of BAW dies, was precisely within the zone of injury of the

21   type that the antitrust laws were designed to prevent and which flowed from Avago's illegal

22   acquisitions and foreclosure efforts.

23
         TriQuint, in its dual role as a consumer and a targeted competitor has suffered

24   competitive injury and Avago's argument that TriQuint has not been injured by reduced

25   competition, reduced output or higher pricing is nothing but a red herring.  Unlike the case in

26   *Brunswick* and the other cases cited by Avago, TriQuint is not alleging injury to itself from

27   continued or increasing competition (which would not cause anticompetitive injury) or from

28

effects which might benefit TriQuint in its role as a competitor (e.g., higher prices).  Rather, Avago's predatory conduct had the further affect and intent of reducing and foreclosing downstream competition generally, and eliminating TriQuint as a downstream competitor specifically.  Consequently, TriQuint's allegation of "loss stems from a competition-reducing aspect or effect of" Avago's acquisitions and anticompetitive scheme.  *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328, 344 (1990).  The Ninth Circuit has held that such allegations by a purchaser and a competitor in a slightly different market are sufficient to plead antitrust injury.  *Glen Holly*, 352 F.3d at 376-78 (plaintiff, both an upstream consumer and downstream competitor of defendants, sufficiently alleged antitrust injury where defendants' discontinued the upstream product which decreased competition and eliminated plaintiff as a downstream competitor).

Although not required to do so, TriQuint can further show antitrust injury by reference solely to its position as a competitor.  The primary target of Avago's monopolistic scheme was TriQuint, Avago's only real competitor in the PCS CDMA Duplexer Market.  "It is therefore almost tautological to find that [Avago's] intent plus actions with an eye toward monopolization would injure [TriQuint], its chief and perhaps only, competitor. . . This is the stuff of which antitrust cases are made."  *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994-95 (5th Cir. 1983), *disavowed on other grounds*, *Deauville Corp. v. Federated Dept. Stores*, 756 F.2d 1183 (5th Cir. 1985) (antitrust injury established where one competitor engaged in anticompetitive conduct to eliminate its only competitor and gain a monopoly).  "Indeed, protecting a competitor's ability to compete from [anticompetitive conduct], the sole purpose of which is to decrease competition by eliminating that competitor, is clearly in the interest of competition. . . [and are injuries] the antitrust laws were designed to prevent."  *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 274, 275 n.1 (3d Cir. 1999) (internal quotation omitted).  "[T]he instant case is not one in which it is alleged that a competitor fell prey to competition; it is one in which it is alleged that competition fell prey to a competitor."  *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 754 (10th Cir. 1999) (antitrust injury

adequately alleged on motion to dismiss; where facts alleged involved reduction of competitors from two to one, it was "hard to imagine a closer connection between anticompetitive effect and injury" than the destruction of the one competitor and the loss of competition in the market).

TriQuint's alleged injuries as a competitor are precisely the types of injuries the antitrust laws were intended to prevent. *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996) (antitrust injury established; competitor of an alleged attempted monopolist had standing where it was either driven out of business or suffered reduced profits because of the alleged anticompetitive acts of the attempted monopolist); IIA Areeda et al., *Antitrust Law* ¶ 348, pp.207-08 (3d ed. 2006) ("Standing is clear and seldom challenged when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff, to preclude its entry or raise its costs, so that the defendant could maintain or create a monopoly.").

With all or substantially all of its competitors out of the way, including TriQuint, Avago is and will be able to charge supra-competitive prices that harm consumers and deprive them of choice. Where such action simultaneously, and necessarily, injures TriQuint it is, therefore, axiomatic that TriQuint has sufficiently alleged antitrust injury.

### 3. TriQuint's Injuries Were Directly Caused by Avago's Antitrust Violations and Are Not Speculative

TriQuint has sufficiently alleged that its injuries were directly caused by that which made Avago's conduct unlawful: Avago's illegal acquisition activity and its use of those illegally acquired assets to maintain its monopoly position and eliminate and foreclose competition. Avago's only argument on this point, relying on *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1557-58 (Fed. Cir. 1997), is that TriQuint's injuries are a fact of Avago's patents and not due to that which made the patent acquisitions anticompetitive. In doing so, Avago conveniently ignores its non-patent related conduct (e.g. the discontinuance of supply) directly resulting from its acquisitions. This has caused injury to TriQuint through the loss of sales and its ability to compete and, having already occurred,

cannot be deemed speculative.  CC ¶ 62.[9]  As discussed above, TriQuint is not required to allege antitrust injury separately for each component of the alleged scheme and upon proof of "*some* damage flowing from the unlawful [act]" the inquiry simply goes to the amount and not the fact of damage.  *Zenith Radio*, 395 U.S. at 114 n.9 (emphasis added).  TriQuint has adequately alleged such injury; no more need be shown for TriQuint to have standing.

Even if the Court examines only the patent related conduct, *Eastman Kodak* is not applicable here either as a matter of law or fact.  Standing is an issue of Ninth Circuit law not Federal Circuit law and *Eastman Kodak* was decided as a matter of Sixth Circuit law.  *Eastman Kodak*, 114 F.3d at 1557.  Furthermore, the rationale of *Eastman Kodak* does not apply here.  In *Eastman Kodak*, the court focused on the fact that the plaintiff's only alleged injury was expenses in defending patent litigation and pursuing indemnification and a potential loss in the value of the business upon sale.  *Id*. at 1557-58.  The court determined that on the facts of the case, which involved the acquisition of a single patent by a party without monopoly power (Goodyear only alleged attempted monopolization) and no anticompetitive enforcement activity or other foreclosure efforts, that Goodyear would have suffered the same injury (e.g. costs of defending the litigation) by any other purchaser.

TriQuint's injuries are not so limited and Avago is not a typical purchaser.  This case involves multiple acquisitions (not a single patent acquisition) by a monopolist intent on securing its position by amassing a portfolio with preclusive effect to eliminate actual and potential competition in an entire market through discontinuance of supply, threatened litigation and coercive demands for illegal agreements not to compete.  No other purchaser of Infineon's BAW assets was positioned or would have been motivated to do this, because no other entity had dominant market positions in either Market or would have been able to amass a dominant patent portfolio.

The anticompetitive harm arising from the purchase of patents by a monopolist,

---

[9] While Avago seeks more detail as to the "who, when and where," TriQuint's allegations clearly describe the fact of such injury (e.g. lost sales) and the reason for and circumstances surrounding the lost sales.  This is all that is required under *Twombly*.

particularly a competitor intent on amassing a patent portfolio with preclusive effects, is drastically different than that which arises from other patent acquisitions.  Thus, in *In re Matter of Ciba-Geigy Ltd.*, the FTC found that the merger of the two leading competitors who controlled crucial patents in a highly concentrated market violated the Clayton Act because the merger would increase the merged firm's ability to exercise market power, would heighten barriers to entry through the combined "killer" patent portfolio, and would create a disincentive for the merged firm to license its patents as compared to pre-merger incentives. 123 F.T.C. 842, 851-52, 897-98 (1997); *see also* III Areeda et al., *Antitrust Law* ¶ 707a, p.282 (3d ed. 2006) ("Acquisition by a monopolist of exclusive rights in related patents should presumptively be a §2 'exclusionary practice….'"); ¶ 707b p.284-85 ("Each additional patent possessed by the monopolist lessens the possibility of competition from others."  A competitor may not enter at all when faced with "the monopolist's large and possibly growing hoard blanketing its field.").  And, as with Avago's actions in this case, such a purchaser simply does not have the same incentive to license patents on competitive terms. *See, e.g., In re Matter of Amgen Inc.*, 134 F.T.C. 333, 406 (2002) (merger violated Clayton Act where it would eliminate Amgen's most significant potential competitor and Amgen, as the dominant market player, would be more likely to use the acquired patents in combination with its own to block the only other potential competitor.)[10]  As such, courts in similar situations have found antitrust standing. *Dairy Foods*, 297 F.2d at 808-09 (allegation that competitor was threatened by plaintiffs, who agreed to pool patents, and their threat of an infringement action if the competitor did not agree to a license that would deprive it of the opportunity to compete sufficiently alleged antitrust injury to the competitor); *Kobe*, 198 F.2d at 425 (held that plaintiff's monopolization by acquiring all present and future patents relevant to an industry,

---

[10] *See also In re Matter of Chevron Corp.*, 140 F.T.C. 100, 118-19 (2005) (acquisition of patents to upstream input necessary for refiners to produce gasoline violated Clayton Act where the purchase was by a significant market player in the downstream market who could use the patents to negatively impact competition); *In re Matter of Roche Holding Ltd.*, 1990 WL 606607 (Compl. ¶ VII (e)) (Aug. 1990) (found merger violated Clayton Act, in part, because it would enhance the dominant firm's patent protection and eliminate actual and potential competition in highly concentrated markets).

publicizing its infringement suits throughout the industry, and threatening suits against any trading with its competitor established antitrust injury by the competitor).

Avago now has a nearly 100% share of the BAW Technology Market and controls more than 90% of the PCS CDMA Duplexer Market. Therefore, it has no incentive to engage in normal licensing behavior and instead has every incentive to, and in fact has, increased barriers to entry through the use and enforcement of its patents and its efforts to obtain anticompetitive agreements not to compete in the PCS CDMA Duplexer Market. This is an injury that is not caused solely by virtue of the fact of the patents but by the fact that they are held by Avago, a monopolist intent on foreclosing all competition in the PCS CDMA Duplexer Market and who paid a supra-competitive price for the patents to ensure that it could do so. CC ¶ 34. Prior to the Infineon acquisition TriQuint had a source of BAW die and an understanding that it could obtain a license if necessary. CC ¶ 64. As a direct result of the Avago purchase and Avago's decision to discontinue supply, TriQuint no longer has a source of BAW die which it could rely upon and avoid any assertion of the patents. Instead, Avago's actions have forced it to rely solely on its own internally developed die. And, in so doing, TriQuint must face a patent holder unlike any other—one that has no incentive to license the patents on commercially reasonable terms and in fact is refusing to license the patents absent a coercive and illegal agreement not to compete.

In its position as a consumer and a targeted competitor TriQuint has standing and has suffered competitive injury directly as a result of Avago's illegal acquisitions and its anticompetitive conduct aimed at foreclosing competition.

**E.     Judicial Economy Is Not Served by Avago's Request for Bifurcation and Stay**

Avago argues that bifurcation of the patent infringement claims and antitrust claims is warranted under Fed. R. Civ. P. 42(b) because such bifurcation is "common practice" and that "a favorable determination of the infringement issues for Avago will likely moot the antitrust counterclaims, or at least limit them significantly . . . ." Mot. at 24-26. Avago both misunderstands and misapplies the standard for bifurcating antitrust/patent claims.

1    First, the facts of this case are far different from those in cases from which the

2    "common practice" of bifurcation of antitrust and patent claims developed, and it is necessary

3    for the Court to consider Avago's motion in the context of the facts of this case and under the

4    standards set forth in Rule 42(b).  *In re Theodor Groz & Sohne*, 972 F.2d 1352, 1992 WL

5    188908, *2 (Fed. Cir. May 18, 1992).  Here, TriQuint's antitrust claims stem from Avago's

6    unlawful acquisition activity, including its acquisition and enforcement activity of the

7    unlawfully acquired patents.  It does not rely, as it might in a typical *Noerr* sham exception

8    case, on a determination of the merits of the patent claim.  In fact, a decision on the antitrust

9    claims may well moot or limit the patent cases by confirming that Avago illegally acquired

10   the patents and thus has no ability or right to pursue enforcement of the patents.  At the least,

11   the enforcement of the patents and the antitrust claims are intertwined and the evidence will

12   substantially overlap.

13   Where as here, the claims have some commonality and resolution of the patent case

14   will not moot or limit the antitrust case, courts have denied motions to bifurcate.  *Matsushita*

15   *Elec. Indus. Co., Ltd. v. CMC Magnetics Corp.*, 2007 WL 219779, *2 (N.D. Cal. Jan. 29,

16   2007) (denying bifurcation as premature and because of potential overlap of evidence where

17   defendant claims plaintiff "foreclosed competition by wiping out competing technology");

18   *Netflix, Inc. v. Blockbuster, Inc.*, 2006 WL 245717, *10 (N.D. Cal. Aug. 22, 2006) (denying

19   bifurcation because evidence relevant to antitrust and patent claims overlapped).

20   In contrast, the cases Avago cite grant bifurcation because resolution of the defendant's

21   invalidity defense to a claim of patent infringement would resolve the antitrust

22   counterclaims.[11]  As discussed, not only is that situation not present here, this case presents

23   nearly the opposite scenario: the antitrust claims are based on an assertion that Avago

24   illegally acquired and enforced its patents, *not* that the patents claim is baseless due to lack of

25   infringement or invalidity.

26

27   _____

[11] The Ninth Circuit case cited by Avago is completely irrelevant, as it addresses
compulsory antitrust counterclaims in patent infringement cases, not bifurcation.

28   *Hydranautics v. Filmtec Corp.*, 70 F.3d 533, 536 (9th Cir. 1995).

In sum, Avago has failed to point to any basis for asserting that bifurcation will result in any efficiencies in this case and in fact the opposite is true. Avago is seeking discovery on a lost profits claim that will necessarily overlap significantly with the antitrust case. *See, e.g.*, *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed Cir. 2003) (recognizing that lost profits claim required "sound economic proof of the nature of the market" and assessing market definition, market share and barriers to entry). And of course, having sued on ten patents and asserting that it may amend the complaint to add additional patent claims and a claim for trade secret infringement (Prop. Case Management Plan, Dkt. 33 at 14, n.3), Avago is in no position to talk about simplifying a complex case. Here, the antitrust and patent claims and evidence substantially overlap, and resolution of the antitrust claims will have a direct impact on the infringement claims. Bifurcation must therefore be denied.

## IV.    CONCLUSION

This case involves acquisitions which "kill[ed] off a product in order to end competition, and a case where the plaintiff's business which used that product was directly and intentionally strangled. . .." *Glen Holly*, 352 F.3d at 377. There can be no clearer example of a violation of the antitrust laws and of TriQuint's antitrust standing. Avago's motion to dismiss and request for bifurcation and stay should be denied.

Dated: December 22, 2009

Respectfully submitted,


/s/Susan E. Foster
Susan E. Foster, *(Pro Hac Vice)*
Chun M. Ng *(Pro Hac Vice)*
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
Telephone:  (206) 359-8000
Facsimile:  (206) 359-9000
sfoster@perkinscoie.com
cng@perkinscoie.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan M. James
Perkins Coie Brown & Bain P.A.
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
Telephone:  (602) 351-8000
Facsimile:  (602) 648-7032
Email:  jjames@perkinscoie.com

Attorneys for Plaintiff/Counterdefendant
TriQuint Semiconductor, Inc., a Delaware
corporation

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2009, I electronically transmitted

TRIQUINT'S OPPOSITION TO AVAGO'S MOTION TO DISMISS to the Clerk's office

using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to

those registered as of December 22, 2009.


                   /s/ Rose Kelly
                   Legal Secretary