**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TriQuint Semiconductor, Inc., a Delaware corporation, | No. CV 09-1531-PHX-JAT |
| Plaintiff/Counter-Defendant, | **ORDER** |
| vs. | **UNDER SEAL** |
| Avago Technologies Limited, a Singapore corporation; Avago Technologies U.S., Inc., a Delaware corporation, Avago Technologies Wireless IP (Singapore) Pte., Ltd., a Singapore corporation, | |
| Defendants/Counter-Claimants. | |

Pending before the Court are TriQuint's Motion for Partial Summary Judgment (Docs. 307, 415), Avago's Motion for Summary Judgment (Docs. 313, 420), TriQuint's Motion to Strike Avago's Reply Statement of Facts, Exhibits, and Declarations (Doc. 377), Triquint's Motion for Leave to File Supplemental Declaration of Jonathan M. James (Doc. 369), Avago's Motion for Leave to File Reply Declarations and Reply Statement of Facts (Doc. 387), Avago's Motion to Preclude Margaret Meyer's Deposition Testimony (Doc. 316), Avago's Motion for Spoliation Sanctions (Docs. 318, 319), Avago's Motion to Preclude Argument that TriQuint and Dr. Aigner did not Have Notice and Knowledge of Potential Litigation when TriQuint Destroyed Evidence and Motion for Expedited Consideration (Docs. 375, 434), TriQuint's Motion to Strike Avago's Motion to Preclude Argument (Doc. 385), Avago's Motion for Leave to Supplement the Record with Newly Discovered Evidence

(Doc. 444), and Avago's Motion to Seal Exhibits to Its Motion to Supplement the Record (Doc. 447). Having considered all the evidence and heard oral argument on January 30, 2012, the Court issues the following Order:

## **BACKGROUND**

Plaintiff/Counterdefendant TriQuint Semiconductor, Inc. ("TriQuint") alleges that Defendants/Counterclaimants Avago Technologies Limited, Avago Technologies U.S., Inc., and Avago Technologies Wireless IP (Singapore) Pte., Ltd. (collectively, "Avago") have infringed three of TriQuint patents and have violated the antitrust laws. Avago filed a counterclaim against TriQuint for alleged infringement of ten Avago patents, misappropriation of Avago trade secrets, and infringement of Avago copyrights. The parties both design, manufacture and sell high-performance radio frequency filters, and power amplifier integrated circuits (chips) and modules (multiple chips on a circuit board) for use in wireless communications products, such as mobile telephone handsets.

The technology at issue in this case concerns bulk acoustic wave ("BAW") products used in mobile telephones to filter transmitted and received radio frequency signals and the manufacturing processes used to design and produce those products. BAW filters are incredibly small, and as a result, manufacturing BAW filters is a highly technical process. The several patents at issue in this case concern the construction and composition of BAW filters and the parts that make up BAW filters, such as resonators. The trade secret and copyright claims involve source code, computer layout files, and design and manufacturing processes that are used to produce BAW products. Finally, the antitrust claims are directed at what TriQuint alleges to be Avago's monopolization, attempted monopolization, and lessening of competition in various BAW product markets both through its acquisition of the BAW business of Infineon, a former manufacturer of BAW products, and through its actions in the marketplace.

## PRELIMINARY MOTIONS AND ISSUES

**I.    Avago's Motion for Spoliation Sanctions (Docs. 318, 319), Avago's Motion to Preclude Argument and Motion for Expedited Consideration (Docs. 375, 434), and TriQuint's Motion to Strike Avago's Motion to Preclude (Doc. 385)**

In connection with its trade secrets claims, Avago has moved for spoliation sanctions against TriQuint. Avago alleges that three TriQuint employees, Dr. Aigner, Dr. Fattinger, and Dr. Volatier, destroyed key evidence in this case by permanently deleting computer files from their computers' hard drives. Furthermore, Avago alleges that the deletion of the files occurred in early July 2009, at a time when the doctors were aware of TriQuint's pending litigation with Avago and of their obligation to preserve evidence for the pending litigation. Thus, Avago asks this Court to impose spoliation sanctions on TriQuint including an entry of default judgment against TriQuint on Avago's trade secret claims. As a lesser alternative, Avago asks for at least an imposition of an adverse inference against TriQuint with respect to the content of the destroyed evidence. Avago also asks the Court to award attorneys' fees incurred by Avago to investigate TriQuint's conduct and to prepare Avago's motion for spoliation.

The Court has discretion under its inherent powers to sanction a party who causes the spoliation of evidence. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). This discretion is broad and can range from minor sanctions, such as the awarding of attorneys' fees, *Leon*, 464 F.3d at 961, to more serious sanctions, such as dismissal of claims, *id.* at 958, or instructing the jury that it may draw an adverse inference. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386-387 (9th Cir. 2010). Sanctions under these "inherent powers must be exercised with restraint" and should be appropriate to the conduct that triggered the sanction. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

Destruction of evidence or the failure to preserve property for another's use as evidence in pending litigation constitutes spoliation. *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). Specifically, failure to "preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of

evidence and its consequences." *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d. 997, 1005 (D. Ariz. 2011) (quoting *Thompson v. U.S. Dep't. of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003)); *see also Leon*, 464 F.3d at 959 (noting willful destruction of electronic files constituted spoliation).

"A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]" *Surowiec*, 790 F. Supp. 2d at 1005 (quoting *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009)). The Court will now examine each of these elements to determine if Avago has sufficiently established that TriQuint and its employees engaged in conduct that led to the spoliation of evidence and warrants sanctions.

## A. Obligation to Preserve Evidence

TriQuint has admitted in its separate briefing for Avago's Motion to Preclude Argument (Doc. 385), and at oral argument, that the company and its employees were aware of the duty to preserve evidence at the time that the files were permanently deleted from the doctors' hard drives. Therefore, the Court finds that an obligation to preserve evidence did exist in early July 2009 when the files were deleted.

## B. Culpable State of Mind

"Courts have not been uniform in defining the level of culpability—be it negligence, gross negligence, willfulness, or bad faith—that is required before sanctions are appropriate." *Surowiec*, 790 F. Supp. 2d at 1006 (internal quotation and citation omitted). "Nor is there consensus as to how the level of culpability is to be determined, or what prejudice, if any, may be presumed from culpable conduct." *Id.* at 1006-1007. However, it is clear that "[a]n allegedly spoliating party's culpability must be determined case-by-case." *Id.* at 1007. Furthermore, "[a] party's destruction of evidence qualifies as willful spoliation if the party

has 'some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (emphasis in original) (internal citation omitted).

In this case, the deletion of the files was particularly egregious. The manner in which the files were deleted clearly points to a finding that the conduct was willful. There is no dispute that Drs. Fattinger and Volatier did not merely delete the files from their hard drives. Rather, the doctors admit that they used secure deletion programs that go by the names of "O&O SafeErase" and "File Shredder." These programs remove all traces of the deleted files in an attempt to hide the fact that the files ever existed. Indeed, the parties subsequent attempts to recover, or even identify the deleted files through sophisticated computer forensic examination proved futile. Furthermore, as mentioned, TriQuint was under obligation to preserve evidence at the time the files were deleted. The record indicates that, prior to the deletion of the files, Dr. Aigner had been in fairly regular contact with TriQuint's attorneys regarding any potential litigation with Avago, and that Dr. Aigner subsequently gave the orders to Drs. Fattinger and Volatier to securely delete the computer files.

When considered against these facts, TriQuint's arguments that the doctors were not acting with a "culpable state of mind," but rather were deleting the files with other motives in mind, such as to comply with TriQuint's policy against using the source code of the employees' previous employers, are unavailing. Therefore, the Court finds that TriQuint and its employees had notice of the potential relevance of the files on their computers at the time they were deleted and that the deletion of the files using secure deletion programs was willful.

## C. Relevance to the Claims

With regard to willful spoliation of documents, the Ninth Circuit has endorsed the view that "because 'the relevance of . . . destroyed documents cannot be clearly ascertained because the documents no longer exist,' a party 'can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon*, 464 F.3d at 959 (internal citation omitted). Nevertheless, TriQuint attempts to argue that Avago has not demonstrated that the contents

of any of the deleted files were relevant to this litigation.  TriQuint further argues that any files TriQuint could have misused would have necessarily been kept on its servers rather than on the doctors' computers and that Avago's extensive arguments in its summary judgment motions indicate that Avago believes it has sufficient evidence to make its case, thereby rendering the deleted evidence irrelevant.  However, in light of the doctors extreme actions to remove any traces of the files from their computers after the duty to preserve evidence had arisen, these arguments are hardly credible.  Therefore, the Court finds that the deleted files were relevant to this case.

### D.  Appropriate Sanction

In light of the foregoing, the Court must determine what, if any, sanction is appropriate in this case.  Specifically, the Court "must determine which sanction best (1) deters parties from future spoliation, (2) places the risk of an erroneous judgment on the spoliating party, and (3) restores the innocent party to their rightful litigation position." *Surowiec*, 790 F. Supp. 2d at 1008 (internal citation and quotation omitted).

Furthermore, there is a five-part test to determine whether a sanction determining liability in favor of one party is just: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the [party seeking sanctions]; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions."  *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011) (internal citation omitted).

The first two factors favor judgment for Avago on liability.  Both the Court and the public have a strong interest in judicial efficiency and the prompt resolution of this case; thus, TriQuint's deletion of the computer files, which has resulted in discovery disputes and the instant motion for sanctions, weigh in favor of a liability-determining sanction against TriQuint.

Conversely, the final two factors do not favor a judgment for Avago on liability.  Certainly, the desire to resolve a case on its merits always weighs against such a sanction.

- 6 -

Moreover, here, less drastic sanctions are available, including the imposition of an adverse inference against TriQuint, which Avago has sought as an alternative sanction to entry of a default judgment.

The third factor, however, requires closer analysis. That factor, prejudice, "looks to whether the spoliating party's actions impaired the non-spoliating party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (citation and brackets omitted). In this case, the question of whether Avago has been prejudiced by the deletion of the computer files largely revolves around whether any of those files were duplicated on TriQuint's servers and thus subsequently among the more than 91,000 MATLAB and GDS files produced to Avago during the course of this litigation.

The only real evidence that TriQuint offers to support its theory that most, if not all, of the deleted files were backed up on its servers comes in the form of the testimony from the doctors themselves. That is, both Drs. Fattinger and Volatier testified that, to the best of their knowledge, every file that they deleted from their computers with the secure deletion software had already been uploaded to and stored on TriQuint's servers. TriQuint further asserts that the results of the neutral forensic examiner support the doctors' assertions because, in accordance with Dr. Fattinger's testimony, the forensic report showed only that files were deleted from a "MATLAB" directory on his computer.

In response, Avago points out that the neutral forensic examination produced no evidence that any files were deleted from Dr. Volatier's computer, even though he has admitted to deleting files, and that therefore the forensic examination is very limited in both its capability and reliability. That fact further underscores the general thrust of Avago's argument, which is that there is no longer any way to determine the exact files that were deleted from the doctors' computers, other than by accepting the testimony of Drs. Fattinger and Volatier. Though Avago urges the Court to simply exclude the testimony and impose sanctions, the Court finds that Avago has not sufficiently demonstrated a valid reason for excluding the testimony from evidence.

Under these circumstances, the Court cannot accurately determine whether Avago actually suffered any prejudice without also making a determination of the credibility of the doctors' testimony. Thus, the Court must refrain from making a final determination on prejudice and instead allow the jury to decide whether the doctors testimony is to be believed. *See FMC Techs., Inc. v. Edwards*, 2007 WL 1725098, at *10 (W.D. Wash., June 12, 2007) (refusing to impose sanctions for alleged destruction of computer files because most of the allegations hinged on witness credibility that required evaluation by a jury). Moreover, while the doctors' conduct certainly calls their credibility into question, it cannot be said that no reasonably jury would believe the doctors' description of which files they personally deleted.

Without a determination of prejudice to Avago, the Court must also refrain from imposing any sanctions at this time. While Avago has likely satisfied the test for imposition of at least an adverse inference with regard to any permanently deleted evidence, the Court is unwilling to impose such a drastic measure without further assurance that the evidence in question was, in fact, permanently deleted. Conversely, prejudice is likely absent or lessened if any or all of the deleted files resurfaced in this litigation by way of back-up copies on TriQuint's servers. Thus, depending on the jury's finding with regard to whether or not any of the deleted files were backed up on TriQuint's servers, then the issue of prejudice to Avago can be revisited and any appropriate sanctions can be imposed at that time. For now, however, Avago's motion for spoliation sanctions must be DENIED.

Furthermore, as previously mentioned, TriQuint has admitted that the deletion of the files from the doctors' computers occurred after the duty to preserve arose, meaning that TriQuint admits that both it and its employees had notice of potential litigation when the files were deleted. Therefore, Avago's Motion to Preclude Argument and Motion for Expedited Consideration (Docs. 375, 434) are DENIED as moot. Also, TriQuint's Motion to Strike Avago's Motion to Preclude (Doc. 385) is DENIED as moot.

## II. TriQuint's Motion to Strike Avago's Reply Statement of Facts, Exhibits, and Declarations (Doc. 377), Triquint's Motion for Leave to File Supplemental Declaration of Jonathan M. James (Doc. 369), and Avago's Motion for Leave to File Reply Declarations and Reply Statement of Facts (Doc. 387)

Avago attached materials to its Reply in Support of Summary Judgment. Specifically, Avago attached the Declarations of Richard Ruby, Robert J. Dolan, Ph.D. and Roger T. Howe, Ph.D., a Controverting Statement of Facts to TriQuint's Additional Statement of Facts and Reply Statement of Facts in Support of Its Statement of Facts, and several exhibits. TriQuint has moved to strike the Statements of Facts, the Declarations, and all of the exhibits. (Doc. 377).

Additionally, TriQuint has filed in conjunction with its Reply in Support of Partial Summary Judgment a Motion for Leave to File Supplemental Declaration of Jonathan M. James in Support of Its Motion for Partial Summary Judgment. (Doc. 369). The Declaration includes several exhibits that TriQuint argues it has good cause to submit because they are necessary to respond to new issues raised in Avago's Response to TriQuint's Motion for Partial Summary Judgment. In its opposition to TriQuint's motion to strike, Avago alternatively moves for leave to file the materials it attached to its Reply, or in the second alternative, to strike TriQuint's motion for leave. (Doc. 387).

Local Rule of Civil Procedure 56.1(a) requires the party moving for summary judgment to file a separate statement of facts with its motion. The non-moving party must then file a statement, separate from its memorandum, that specifically responds to each of the moving party's statements of fact and that sets forth any additional facts that make summary judgment inappropriate. L.R.Civ.P. 56.1(b). Local Rule 56.1 does not provide for a reply statement of facts or a response to the non-moving party's separate statement of facts.

The Local Rules do not contemplate attaching additional exhibits to replies in support of summary judgment[1] or filing a separate response to the non-moving party's statement of

---

[1]Local Rule of Civil Procedure 7.2(e) provides that a reply shall not exceed eleven pages, exclusive of attachments; perhaps raising an inference that the Rule contemplates the

facts. "This is consistent with the moving party's need to show no genuine issue of material facts exists and that there is no need for a trier of fact to weigh conflicting evidence, assuming the non-moving party's evidence is true." *See, e.g., EEOC v. TIN Inc.*, 2008 WL 2323913, at *1 (D. Ariz. June 2, 2008), *rev'd on other grounds*, 349 Fed. App'x 190 (9th Cir. 2009). Avago has provided no sufficient reason for deviating from the Local Rules in this case. Because Avago improperly filed an additional statement of facts and attached additional exhibits to its Reply, the Court will strike all the exhibits and attachments to the Reply and ignore all references to them found in the Reply. Similarly, the Court does not find that good cause exists to grant leave to either party to file the documents noted above.

Therefore, TriQuint's Motion to Strike Avago's Reply Statement of Facts, Exhibits, and Declarations (Doc. 377) is GRANTED; Avago's Motion for Leave to File (Doc. 387) is DENIED; and TriQuint's Motion for Leave to File (Doc. 369) is DENIED.

**III.    Avago's Motion to Preclude Margaret Meyer's Deposition Testimony (Doc. 316)**

Avago has moved to preclude TriQuint from relying on the deposition testimony of Margaret Meyer, an employee of Kyocera and thus a third-party witness in the present litigation. Avago primarily contends that TriQuint failed to provide "reasonable notice" of the Meyer deposition, as is required under Rule 30(b)(1) of the Federal Rules of Civil Procedure. The notice provided by TriQuint was not reasonable, in Avago's view, because TriQuint did not serve a subpoena on Avago naming Ms. Meyer as a third-party witness, scheduled the deposition to occur on a federal holiday and only two days prior to the end of fact discovery, served notice of the deposition on May 19, 2011, which was eleven calendar days and seven business days prior to the scheduled deposition date of Monday, May 30, 2011, and did not include Avago in any communications with Ms. Meyer to set the date, time, and location of the deposition.

---

filing of attachments. But Local Rule 7.2(e) is a general rule for all motions and memoranda and does not apply specifically to motions for summary judgment, which have different burdens of proof.

1    TriQuint is quick to point out in its Response that under the parties' scheduling

2    agreement, it was only required to give seven calendar days' notice of the deposition.

3    Furthermore, with regard to any scheduling communications with Ms. Meyer regarding the

4    deposition, TriQuint states that the only written communication was the subpoena it served

5    on her.   Moreover, TriQuint correctly points out that the Federal Rules did not require

6    TriQuint to serve a copy of that subpoena on Avago.   Avago does not dispute TriQuint's

7    assertions.

8          Thus, Avago has not demonstrated that TriQuint did not provide reasonable notice of

9    the Meyer deposition.  Rather, if any party acted unreasonably it was Avago.  Though Avago

10   acknowledges that TriQuint provided more than the seven calendar days notice required by

11   the parties, Avago failed to follow up on the notice simply because it mistakenly presumed

12   that TriQuint was noticing a deposition of an Avago employee.  Because Avago's attorneys

13   could not identify an employee named Margaret Meyer, they simply ignored the notice rather

14   than make any attempt to determine Ms. Meyer's true identity.  A simple phone call or email

15   to opposing counsel likely would have been sufficient to avoid this misunderstanding.

16          Furthermore, even when TriQuint's counsel sent an email to Avago's counsel the

17   morning of the deposition to let Avago's counsel know that the deposition of Ms. Meyer was

18   about to start, the response from Avago's counsel later that day was not one that could be

19   deemed reasonable.  The attorney for Avago merely stated that no Avago employee named

20   Margaret Meyer existed, and thus she could not be produced for the deposition.  The attorney

21   neglected to inquire how the deposition of this allegedly non-existent witness was "about to

22   begin," as counsel for TriQuint had stated in the initial email.  (Doc. 316, Ex. B.)

23          Additionally, though TriQuint's counsel clarified in a subsequent email response later

24   that same day that the deposition of Ms. Meyer had indeed already taken place, Avago's

25   counsel did not immediately contact TriQuint's counsel to assert any belief that the notice

26   of the deposition was improper or to attempt to arrange an opportunity to cross-examine her.

27   Nor did Avago attempt to promptly bring this issue to the Court's attention prior to the close

28

of discovery. Rather, Avago waited more than two months, well after discovery had closed, to raise this issue, first directly with TriQuint and, when that failed, through this motion.

Avago nevertheless claims that its actions were not untimely because it acted as soon as it learned the extent to which TriQuint was intending to rely on Ms. Meyer's testimony. This explanation, however, is unavailing. Had Avago truly been concerned about Ms. Meyer's testimony and the extent to which TriQuint might rely on it, Avago should have promptly raised the issue after first learning that the deposition had taken place. Moreover, even if Avago was not very concerned about Ms. Meyer's deposition after learning that it had taken place, it nevertheless could have immediately raised this issue as a precaution, thereby ensuring that it was acting more in accordance with the Court's ordered deadlines rather than according to its own schedule.

Avago has thus not established that there was anything unreasonable about the notice it received regarding Ms. Meyer's deposition. Further, the cases on which Avago relies cannot support its allegations that TriQuint's actions, which were proper under this Court's orders and the parties' scheduling agreement, somehow failed to meet the "reasonable notice" standard of Rule 30(b)(1). *See Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 2008 WL 449972, at *2 (E.D. La. Feb. 14, 2008) (party that "effectively provided one business day of notice" did not provide sufficient notice); *Tucker v. Tangipahoa Parish Sch. Bd.*, 2007 WL 1989913, at *2 (E.D. La. July 3, 2007) (six days of notice of deposition was not reasonable); *Vardon Golf Co., Inc. v. Supreme Golf Sales, Inc.*, 1989 WL 153335, at *1-2 (N.D. Ill. Nov. 2, 1989) (four working days' notice not sufficient). Furthermore, even to the extent that Avago could have demonstrated that TriQuint's eleven-day notice was not reasonable, which it has not done in its motion, Avago's failure to raise the issue promptly weighs heavily against finding that it has been prejudiced in any way by TriQuint's actions. *Cf. In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 320, 327-28 (N.D. Ill. 2005) (ten business days of notice not reasonable when noticed party promptly expressed concern about the timeliness of the notice and party noticing deposition failed to promptly respond to noticed

party's concern).

TriQuint also urges the Court to deny Avago's motion because it is improper under Local Rule 7.2(m)(2). However, because the Court finds that Avago's motion lacks merit, it need not consider any procedural impropriety of the motion. Hence, Avago's motion to strike Margaret Meyer's Deposition Testimony (Doc. 316) is DENIED.

**IV. TriQuint's Motion to Strike Avago's Expert Declarations and Objection to the Expert Report of Dr. Lueder Elbrecht**

In its Response to TriQuint's motion for summary judgment, Avago has included new declarations from each of its expert witnesses. TriQuint argues that these new expert declarations introduce new matter and theories of infringement that were not contained in the original expert reports. The new declarations, in TriQuint's view, violate this Court's scheduling orders, and therefore much, if not all, of the content of the new declarations should be stricken. Avago, on the other hand, does not offer much explanation for these new expert declarations. Rather, Avago merely states that "with the filing of this response, [Avago's experts] have supplemented their opinions to rebut TriQuint's new arguments, as they are obligated to under Fed R. Civ. P. 26(e)." (Doc. 424, at 45).[2]

Indeed, Rule 26(e) does require an expert to supplement his or her report or deposition testimony if the original report or testimony under Rule 26(a) was "incomplete or incorrect." However, the Ninth Circuit stated the following in a recent unpublished opinion:

> Rule 26(e) creates a "duty to supplement," not a right. Nor does Rule 26(e) create a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed. Rather, supplementation under the Rules means correcting inaccuracies, or filing the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.

[2] Avago made additional arguments regarding the declaration of Dr. Elbrecht in its improper Controverting Statement of Facts (Doc. 412-1). However, because the Court has stricken that document, and because Local Rule 7.2(m) requires Avago's reply to appear in its reply memorandum, the Court will not consider those additional arguments.

*Luke v. Family Care and Urgent Med. Clinics*, 323 Fed. App'x 496, 499 (9th Cir. 2009) (internal citation and quotations omitted). Additionally, Rule 37(c)(1) authorizes the exclusion of evidence that was not disclosed as required by Rule 26(a) or (e), unless the failure to comply with the Rule was substantially justified or harmless.

Here, Avago has failed to demonstrate that the new expert declarations are valid supplemental reports under Rule 26(e). Its passing reference to "TriQuint's new arguments" is not at all sufficient to show that these declarations were necessary to correct "incomplete or incorrect" information in the original expert reports. Moreover, because Avago cites to these declarations primarily to support its theories of infringement, theories on which it bears the burden of proof, any "new arguments" made by TriQuint could not possibly affect the completeness or correctness of those theories as they were required to have been presented in Avago's original reports.

Indeed, the declarations read more like full-length expert reports than mere supplements. To that end, it is notable that Avago almost exclusively cites to these new declarations to support its arguments and theories of infringement. Avago rarely states where any of its arguments or theories might be supported in the original expert reports or in the experts' deposition testimonies. Moreover, the new declarations themselves rarely, if ever, reference those original expert reports and depositions.

Thus, in light of the substantial length and content of the declarations and Avago's failure to provide a sufficient explanation for them, the Court can only conclude that Avago is essentially seeking a "do-over" on its original expert reports under the guise of Rule 26(e) supplemental reports. However, as stated in the Court's Rule 16 scheduling order, the original Rule 26(a) expert reports were due on April 15, 2011. (Doc. 40, at 4). Avago's new declarations were not filed until September 10, 2011, nearly 5 months after that deadline. Thus, the Court can find no basis or substantial justification for considering these declarations in support of Avago's response to TriQuint's motion under either Rule 26(a) or (e).

Additionally, the Court acknowledges that, due to the great length of the declarations, they likely do contain information that was properly disclosed in the experts' original reports and depositions. However, because Avago has completely failed to identify which portions of the declarations are purportedly supplementary and which portions merely restate previously disclosed information, the Court has no way to determine whether it can validly consider any portions of the declarations. Thus, the Court also cannot determine whether any portions of the declarations are harmless. Rather, in light of their substantial length and the timing of their filing, the Court must assume that the declarations are not harmless. Therefore, the Court will exclude the entire declarations of Dr. Elbrecht (Doc. 425), Dr. Muralt (Doc. 426), Dr. Milsom (Doc. 427), and Dr. Howe (Doc. 428). TriQuint's motion to strike these declarations is GRANTED.

TriQuint similarly objects to the expert report of Dr. Elbrecht, which Avago did not produce until July 29, 2011, after the deadline for expert reports had passed. The only explanations Avago offers for this untimely report appear in its stricken Controverting Statement of Facts (Doc. 412-1) and thus will not be considered. Therefore, the Court will not consider Dr. Elbrecht's untimely report in resolving the pending motions.

**V.    Avago's Objection to TriQuint's Statement of Facts under Rule 56.1(a)**

In its Response to TriQuint's Motion for Partial Summary Judgment (Doc. 424), Avago asserts that TriQuint includes "more than one hundred citations to facts" in its motion that are not included in its separate statement of facts, in violation of Local Rule 56.1(a). (Doc. 424, at 2). Avago argues that those facts should therefore be treated as non-material, stricken, and disregarded. However, Avago makes no attempt to identify any of these allegedly non-material facts. Thus, the Court will not strike any facts from TriQuint's motion for summary judgment.

**VI.   TriQuint's Objection to Avago's Statement of Facts under Rule 56.1(a)**

In its Responsive and Additional Statement of Material Facts in Opposition to Avago's Motion for Summary Judgment (Doc. 423), TriQuint asserts that Avago has

included several facts in it Statement of Facts that Avago does not cite in its brief. TriQuint objects to any subsequent use of these facts by Avago in its Reply brief. However, TriQuint does not cite to any support for its objection in the Federal or Local Rules. Nor do the cases cited by TriQuint support its argument. *See Nolte v. Astrue*, 2008 WL 2561936, at *5 n.3 (D. Ariz. June 26, 2008) (stating that *issues* raised only in the separate statement of facts, and not raised and briefed in the motion, will not be considered); *Melcher v. City of San Luis*, 2008 WL 691853, at *1 n.1 ("Local Rule of Civil Procedure 56.1(e) requires that a memorandum of law filed in opposition to a motion for summary judgment 'include citations to the specific paragraph in the statement of facts that supports factual assertions made in the [memorandum].'"). Thus, the Court will not strike any of Avago's citations to its Separate Statement of Facts in its Reply brief.

**VII.    Avago's Motion for Leave to Supplement the Record with Newly Discovered Evidence (Doc. 444) and Motion to Seal Exhibits to Avago's Motion to Supplement the Record (Doc. 447)**

On January 30, 2012, the same day the parties presented oral argument on the several pending motions addressed in this order, Avago filed a motion to supplement the record with additional evidence. Avago claims that it has good cause to introduce the evidence because the evidence came into existence after the close of briefing and will allow the Court to rely on a more complete record in rendering its decision on the parties' motions for summary judgment with respect to TriQuint's antitrust claims.

A court has wide discretion to grant a party leave to supplement the record. *See LimoStars, Inc. v. New Jersey Car and Limo, Inc.*, 2011 WL 3471092, at *3 n.5 (D. Ariz. Aug. 8, 2011). However, the Court finds that Avago has not shown sufficient good cause to introduce this evidence so long after the close of briefing nor has Avago shown that the evidence is necessary for the Court to render a decision on the parties' motions. Avago's motion is therefore DENIED. The Court will, however, grant Avago's motion to seal the exhibits to its motion to supplement the record.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). To defeat a motion for summary judgment, the non-movant must show that genuine factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

When ruling on a motion for summary judgment, the Court draws all reasonable inferences in favor of the party opposing the motion. *Finish Eng'g Co. v. Zerpa Indus.*, 806 F.2d 1041, 1043 (Fed. Cir. 1986). The Court must resolve all doubt regarding the existence of a genuine issue of material fact in favor of the non-movant. *Chore-Time Equip. v. Cumberland Corp.*, 713 F.2d 774, 778 (Fed. Cir. 1983).

## ANTITRUST ISSUES

TriQuint claims that Avago, through its acquisition of Infineon and other activities, has violated both section 7 of the Clayton Act and section 2 of the Sherman Act. TriQuint has moved for summary judgment only on the Clayton Act claim, while Avago has moved for summary judgment on all claims. The Supreme Court has cautioned that "summary judgment procedures should be used sparingly in complex antitrust litigation . . . ." *Poller v. Columbia Broad. Syst., Inc.*, 368 U.S. 464, 473 (1962); *see also Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1171 (9th Cir. 1988) ("[S]ummary judgment generally is disfavored in antitrust litigation . . . ."). Indeed, in light of the extensive briefing by both parties in this case, and the several issues of material fact therein raised with regard to the antitrust issues, the Court must deny the parties' motions on these claims.

### I. TriQuint's Antitrust Claims

Section 7 of the Clayton Act prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such

acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Section 2 of the Sherman Act prohibits both monopolization and attempted monopolization. 15 U.S.C. § 2. Section 4 of the Clayton Act provides that a private party may seek treble damages for violations of the antitrust laws, 15 U.S.C. § 15., which include both section 7 of the Clayton Act and section 2 of the Sherman Act. Similarly, section 16 of the Clayton Act provides that private parties may seek injunctive relief for such violations. 15 U.S.C. § 26.

Here, TriQuint is seeking both monetary damages and injunctive relief for Avago's alleged antitrust violations. However, as described below, triable questions of material fact exist with regard to the definition of the relevant product market, which is a necessary element of all of TriQuint's claims. These fact issues preclude summary judgment for either party on any of the antitrust claims.

## A. Relevant Product Market

The Supreme Court has stated that "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition. Substantiality can be determined only in terms of the market affected." *U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (internal citations and quotations omitted). Similarly, "[m]arket definition is crucial" to proving a violation of section 2 of the Sherman Act. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). Moreover, though summary judgment is available on this issue, "the definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility." *Rebel Oil*, 51 F.3d at 1435.

TriQuint proposes that its evidence establishes three relevant markets, including a BAW filter die market, a BAW band 2 duplexer market, and a PCS CDMA duplexer market. Avago counters that TriQuint's evidence of its proposed markets is insufficient because it does not take into account cross-elasticity of demand and interchangeable substitute products, namely with regard to surface acoustic wave ("SAW") products. In TriQuint's view, however, SAW products are not viable substitutes.

There are thus several factual disputes underlying the parties' various definitions of the relevant market. Specifically, these questions of material fact relate to the demand for SAW products in PCD CDMA and WCDMA applications, the interchangeability of SAW and BAW products and any cost advantage of SAW products over BAW products, and the presence of SAW duplexers in handsets using the WDCMA standard (Doc. 420, at 42-43). Moreover, though TriQuint points to testimony from customers downplaying the significance of SAW as a substitute for BAW products, Avago points to evidence that TriQuint's own BAW experts have recognized the potential of SAW products to compete against BAW duplexers. (Doc. 420, at 47).

With regard to expert testimony, the parties vigorously dispute the credibility of the report of TriQuint's expert, Dr. Hayes. While TriQuint asserts that Dr. Hayes adequately demonstrated, through analysis of price and margin data, that SAW products should be excluded from the relevant product market, Avago contends that Dr. Hayes' analysis was not sufficient because he failed to perform a proper regression analysis and further misinterpreted his data regarding prices and margins. (Doc. 420, at 48-49). Therefore, summary judgment is not appropriate on this issue because that determination would require the Court to resolve questions of credibility and conflicting inferences with regard to the expert testimony. *See Rebel Oil*, 51 F.3d at 1435. Thus, because defining a relevant product market is essential to all of TriQuint's antitrust claims, there are triable issues of fact with respect to all of TriQuint's claims that preclude the possibility of summary judgment for either party.

Nevertheless, with regard to its section 7 claim, TriQuint argues that no determination

of a relevant market is necessary because, under any proposed market, Avago's market share is sufficiently high that it is subject to a presumption that its acquisition of Infineon violated section 7 under the standard elucidated in *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963). Under the *Philadelphia National Bank* presumption, once a plaintiff shows that a proposed merger or acquisition will result in undue concentration of the relevant market, a presumption of a Section 7 violation arises, and the burden of production shifts to the defendant to rebut the presumption. *Id.* at 363.

Regardless of whether that presumption applies to Avago in any of the proposed markets and whether Avago can successfully rebut any such presumption, TriQuint has not demonstrated that its Clayton Act claim can proceed without proof of a relevant product market. The cases TriQuint cites in support of its theory do not stand for the proposition that a finding of a section 7 violation can proceed without first defining a relevant *product* market. *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 549-550 (1966) (choosing a precise geographic market was not necessary); *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993) (either of the defined product markets identified by the Commission were likely acceptable); *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1505-06 (D.C. Cir. 1986) (any of the Commissions six alternatively defined product markets were likely acceptable); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1306 (5th Cir. 1971) (unnecessary to choose precise geographic market); *United States v. Kimberly-Clark Corp.*, 264 F. Supp. 439, 455-56 (N.D. Cal. 1967) (unnecessary to choose precise geographic market). Thus, in each of those cases, though a precise geographic market may have been left undefined, it was clear that there was at least one properly defined product market. TriQuint has therefore not provided any support for its assertion that it may be relieved of its burden to prove a specific "line of commerce," as is explicitly required by the language of section 7. 15 U.S.C. § 18.

Alternatively, TriQuint argues that the relevant market proposed by Avago's expert, Dr. Dolan, consisting of Band 2 duplexers that includes both BAW and SAW duplexers is

also subject to the *Philadelphia National Bank* presumption. TriQuint states that Avago has a market share of approximately 65% in that market, which in TriQuint's view is more than sufficient to invoke the *Philadelphia National Bank* presumption. *See Phila. Nat'l Bank*, 374 U.S. at 364 (finding a 30% market share sufficient to apply the presumption). However, even assuming that this is the relevant market, which TriQuint must still prove at trial, and assuming also that the presumption applies to this market, it is nevertheless possible that Avago has presented sufficient evidence to rebut a presumption of a section 7 violation.

To rebut the presumption, Avago points, in part, to evidence of post-merger competition. Though the use of such evidence to ascertain competitive effects of a merger has been questioned, it nevertheless may be considered in a section 7 case. *See F.T.C. v. Consolidated Foods Corp.*, 380 U.S. 592, 598 (1965) ("The Court of Appeals was not in error in considering the post-acquisition evidence in this case, [b]ut we think it gave it too much weight."); *see also United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990). Thus, Avago's evidence of its decreased market shares, TriQuint's increased market shares, declining prices, and increased output in the potential relevant markets must be weighed with other evidence, including evidence directed toward the existence of barriers to entry and efficiencies, to determine whether Avago has rebutted the presumption, and ultimately whether it has violated section 7. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) ("It is a foundation of section 7 doctrine . . . that evidence on a variety of factors can rebut a prima facie case.").

In light of these several triable fact issues, the Court cannot grant either party's motion for summary judgment on TriQuint's antitrust claims. Hence, TriQuint's motion for summary judgment on its Clayton Act claim is DENIED, and Avago's motion for summary judgment on TriQuint's Clayton Act and Sherman Act claims is also DENIED.

# TRADE SECRET AND COPYRIGHT ISSUES

## I.  Avago's Trade Secret Claims

Avago alleges that TriQuint has misappropriated various trade secrets that Avago acquired when it purchased Infineon's BAW business.  Specifically, Avago alleges that former Infineon employees, Drs. Aigner and Fattinger, obtained these trade secrets while working at Infineon's German facilities and used them in their subsequent employment at TriQuint's facilities in Florida.  Avago alleges that the trade secrets include confidential and proprietary source code, GDS layout files, and design and manufacturing processes.

### A.  Choice of Law

The parties dispute whether California law or Florida law governs Avago's Trade Secret Claims.  The parties both agree, however, that as the forum state, Arizona's choice-of-law rules must be applied to make this determination.  Furthermore, both parties agree that Arizona follows section 145 of the Restatement (Second) of Conflicts of Laws ("Restatement").  *See Bates v. Superior Court*, 156 Ariz. 46, 48-49 (1988) ("Arizona courts apply the principles of the Restatement (Second) of Conflict of Laws (1971) to determine the controlling law for multistate torts.").

Under section 145 of the Restatement, the local laws of the state that "has the most significant relationship to the occurrence and the parties" will determine the rights and liabilities of the parties with respect to an tort issue.  *See Bates*, 156 Ariz. at 48-49.  Furthermore, the relevant contacts to be considered in determining which state has the most significant contacts include:

1) the place where the injury occurred;

2) the place where the conduct causing the injury occurred;

3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

4) the place where the relationship, if any, between the parties is centered.

*Id.* at 49.  Furthermore, comment (f) to section 145 of the Restatement suggests that when

misappropriation of a plaintiff's trade secrets is involved, the place of injury does not play as important of a role for choice-of-law purposes. Instead, the principal location of the defendant's conduct is typically the factor that is given the greatest weight.

Under the test adopted by the Arizona Supreme Court in *Bates*, and following the Restatement's guidance for cases involving trade secrets, the Court finds that Florida law governs Avago's trade secret claims because Florida was the principal location of the conduct that gave rise to the claims. Though the alleged theft of any trade secrets likely occurred in Germany, any alleged misuse of those trade secrets by TriQuint could not likely have occurred until the former Infineon employees, who allegedly stole the trade secrets, arrived at and began working at TriQuint's facilities in Apopka, Florida.

Avago nevertheless argues that California law should apply because Avago's United States headquarters are located in California, and thus California is the place where the injury occurred. Avago further argues that this determination under the "place of injury" factor is a more straightforward determination because the accused doctors' alleged conduct took place in more than one location, namely Florida, Germany, and to some extent, Texas.

The Court, however, finds Avago's argument unpersuasive. First, at the time that the alleged theft of any trade secrets actually took place, in 2006, Avago had not yet acquired Infineon. Thus, any connection between California and Avago's claims did not arise until 2008, when Avago acquired Infineon and any trade secrets that Infineon owned. Second, even after the acquisition, it is undisputed that Avago is a global organization with offices and employees located throughout several continents and countries. Thus, to the extent that TriQuint's and its employees' alleged conduct is spread out among multiple locations, the location of Avago's injury is even more so spread out. Additionally factoring in the modified weighting of the factors that the Restatement suggests for trade secret cases, it is clear that Florida has a more significant relationship to Avago's claims than does California.

Finally, the parties do not argue that the final two factors listed in *Bates* are as significant as or should be given as much weight as the first two factors. The Court

accordingly finds that any further analysis of the final two factors will not alter the conclusion that Florida law governs Avago's trade secret claims.

### B. The Parties' Motions under Florida Trade Secret Law

Florida has adopted a version of the Uniform Trade Secrets Act ("FUTSA") Fla. Stat. § 688.001. "Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (citing Fla. Stat. § 688.002(4)). "Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Id.* (internal citation omitted). "Moreover, an employer may not preclude its former employee from 'utilizing contacts and expertise gained during his former employment.'" *Id.* (internal citation omitted). Finally, for there to be actionable misappropriation of trade secrets under Florida law, "the party asserting trade secret protection bears the dual burden of describing the alleged trade secret information and also showing that it has taken reasonable steps to protect this secrecy." *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007) (internal citation omitted). Thus, "the party asserting trade secret protection must describe the allegedly misappropriated trade secrets with reasonable particularity." *Id.*

Avago has asserted trade secret claims with respect to three different categories of alleged trade secrets: source code, layout files, and design and manufacturing processes. The parties' motions with respect to each of these categories are discussed below.

#### 1. Source Code

Avago has moved for summary judgment on its claims that TriQuint has misappropriated trade secrets contained in Avago's source code. TriQuint has not moved for summary judgment with regard to these claims, but does assert that questions of material fact exist that preclude the Court from granting Avago's motion.

TriQuint first asserts that Avago has not described any trade secrets in its source code

with reasonable particularity.  Indeed, the Ninth Circuit has stated that a "plaintiff should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998) (quotation marks and citations omitted) (emphasis in original).  Furthermore, as the Seventh Circuit has commented, "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX Systs. Corp. v. Epic Systs. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002).

Here, Avago has not described its source code trade secrets with sufficient particularity to meet its burden on summary judgment.  Instead, Avago generally describes, in very broad terms, two aspects of the source code: processing of BAW production data and trimming of BAW products.  With respect to processing of BAW production data, Avago merely states that it is an indispensable part of large-scale BAW production.  Avago does not, however, state with any particularity what aspect of its source code, in respect to processing BAW data, can be separated from the general knowledge of the trade.

Similarly, with respect to trimming, Avago merely states that trimming generally involves removing thin layers of material from BAW resonators and the trimming steps must be precisely controlled and properly performed.  Again, Avago fails to suggest particular aspects of its trimming steps that differ from those generally known in the trade, such that they may qualify as trade secrets.  Furthermore, in its Reply, Avago responds to the arguments that it has not particularly described which aspects are known and not known in the trade by stating that if any of its source code was publicly known, it would not have been necessary for TriQuint's employees to misappropriate them.  Of course, this argument does nothing to get Avago past the requirement to describe its trade secrets with reasonable particularity.

Moreover, Avago's failure to describe the trade secrets in its source code with reasonable particularity makes it impossible to determine whether Avago derives any

economic value from them.  That is, while Avago's source code, in general, undoubtedly has economic value, it is unclear whether any economic value is derived from portions of the source code not being generally known in the trade because, as stated above, Avago has not identified which portions of its source code are not so generally known.  Furthermore, TriQuint has raised questions of fact with regard to whether Avago actually uses the code, the level of skill required to write the code, the routine nature of the code, and whether the code utilizes "built-in" MATLAB techniques.

Therefore, because Avago has failed to identify portions of its code with sufficient particularity, it is not possible to determine whether Avago owns any trade secrets in its source code under Florida law.  Therefore, with respect to its source code, Avago's motion for summary judgment of trade secret misappropriation is DENIED.

### 2.  Layout Files

Avago has also moved for summary judgment on its claims that TriQuint has misappropriated trade secrets contained in Avago's GDS layout files.  TriQuint too has moved for summary judgment with regard to these claims; however, because GDS layout files may be among those deleted from Drs. Fattinger's and Volatier's computers and thus potentially not produced during discovery, TriQuint may be subject to a spoliation sanction with regard to any GDS files that were permanently deleted.  For the purposes of these summary judgment motions, however, the parties have limited their arguments to only the GDS layout files for Infineon's N0010 and N0011 devices, which apparently were produced in the course of this litigation.  Therefore, the Court will consider both TriQuint's and Avago's motions for summary judgment only in relation to these two GDS files.

As an initial matter, TriQuint argues that Avago's trade secret claims regarding the GDS layout files are preempted by the Semiconductor Chip Protection Act ("SCPA"), 17 U.S.C. §§ 901 *et seq.*, because the GDS layout files constitute mask works.  However, even assuming that the GDS files constitute mask works under the SCPA, TriQuint has not established that the SCPA preempts Avago's trade secret claims.  Though the SCPA certainly

does preempt state laws to the extent those state laws provide rights or remedies "which are equivalent to those rights or remedies provided by" the SCPA, 17 U.S.C. § 912(c), TriQuint does not point out which section of the SCPA allegedly provides the same rights or remedies as Florida's trade secret laws.

Furthermore, the SCPA itself anticipates the possibility that the mask works it covers might also be subject to trade secret laws. Specifically, the rules and regulations which govern the deposit of materials for registration clearly anticipate the assertion of trade secret protection in layers of a mask work fixed in a semiconductor chip. 37 C.F.R. § 211.5. These deposit guidelines apply to works that are both commercially exploited and not commercially exploited. *Id.* Therefore, because the SCPA recognizes the possibility that mask works may be subject to trade secret protection, but does not grant such protection itself, and without determining whether the GDS files actually constitute mask works for the purposes of the SCPA, the Court finds that the SCPA does not preempt Avago's claims.

TriQuint also argues, as it did with the source code, that Avago has failed to describe any trade secrets in the layout files with sufficient particularity. Here, Avago has mostly used general terms to describe the content of its layout files and any trade secrets contained therein. Thus, Avago merely describes in broad terms that the layout files contain a "known good design" for arranging resonators within a filter and that the resonators generally should possess particular desirable characteristics, such as a high Q factor, a high effective coupling coefficient, minimal spurious modes, and small effect of temperature on frequency response. (Doc. 420, at 6-8). These descriptions are simply not particular enough to separate any information in the layout files from the information generally known in the trade. Thus, they do no sufficiently identify any valid trade secrets.

Avago also identifies the dimensions of the resonator structures, which are contained within the layout files, as potential trade secrets. Furthermore, Avago acknowledges that approximate dimensions of the resonator structures can be derived through physical examination or reverse engineering. Nevertheless, Avago states that it is the exact

dimensions contained within the layout files that constitute trade secrets. Avago does not, however, state at all, let alone with any particularity, the exact dimensions alleged to be trade secrets.

TriQuint argues that Avago's descriptions, including the reference to any "dimensions," are too vague to satisfy the requirement of reasonably particularity. TriQuint further cites to a case in which the Ninth Circuit found that a plaintiff's mere reference to "dimensions and tolerances" was not sufficiently particular to identify any alleged trade secrets. *Imax*, 152 F.3d at 1164-67. In that case, the district court held that the plaintiff, Imax, had failed to identify "the precise numerical dimensions and tolerances" that it claimed to be trade secrets. *Id.* at 1166.

On appeal, Imax argued that its identification of "dimensions and tolerances" was sufficient under the level of specificity approved by the Ninth Circuit in *Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045, 1057 (9th Cir. 1982). In the *Forro* opinion, the Ninth Circuit held that a plaintiff's reference to "dimensions and tolerances" specifically contained in blueprints acquired by the Defendant was sufficient to identify those dimensions and tolerances as trade secrets. *Id.*

In *Imax*, the Ninth Circuit rejected Imax's argument and affirmed the district court's holding. *Imax*, 152 F.3d at 1167. The appellate court distinguished *Forro* by stating that the reference to "dimensions and tolerances" in *Forro* was "sufficient because it clearly referred to trade secret material, i.e., engineering drawings and blueprints." *Id.* In contrast, a mere reference to "dimensions and tolerances," disconnected from such trade secret material, is not sufficient to identify trade secrets in precise numerical dimensions and tolerances. *Id.* Thus, because Imax merely used a catchall phrase generally referring to "every dimension and tolerance that defines or reflects" the design of a patented projector system, Imax did "not *clearly refer* to tangible trade secret material" and thus did not meet *Forro*'s degree of specificity. *Id.* (emphasis in original).

Here, the Court finds that Avago's general references to "dimensions" meet *Forro*'s

level of specificity because Avago has clearly referred to tangible trade secret material, i.e., the GDS layout files, that contain the dimensions. (Doc. 420, at 6-8). Specifically, Avago has stated that "[i]t is only possible to know the exact dimensions and design rules for the BAW filter by access to the Layout Files themselves." (*Id.* at 7). Even though Avago claims trade secrets in the "exact" dimensions, by referring to the layout files that contain those exact dimensions, Avago has sufficiently identified those exact dimensions as potential trade secrets.

Avago also attempts to claim "design rules" in the layout files as trade secrets. Though Avago does refer to the design rules in conjunction with tangible trade secrets, Avago never clearly identifies with any particularity what those design rules might include. Thus, unlike the resonator dimensions, which undoubtedly are represented as exact numerical measurements in the layout files, it is not clear to the Court what a design rule might encompass or how it could be represented with any greater particularity in the layout files. Therefore, the Court finds that, to the extent that any trade secrets exist in its layout files, Avago has only identified such potential trade secrets with respect to the exact dimensions of the resonators contained within the files.

Even so, Avago cannot establish that the exact dimensions of the resonators in the N0010 and N0011 files are not readily ascertainable, or to the extent that they are only readily ascertainable to within a certain variance level, that Avago derives any economic value from difference between the actual dimensions and the readily ascertainable approximate dimensions. Avago does not dispute that, through reverse engineering, the dimensions of its filters can be determined to between 1-3% variance from Avago's GDS layout file. Such reverse engineering can be sufficient to defeat an argument that the dimensions are not "readily ascertainable." *See Levenger Co. v. Feldman*, 516 F.Supp. 2d 1272, 1287 (S.D. Fla. 2007) (recognizing that reverse engineering could render alleged trade secrets to be readily ascertainable by others under Florida law).

TriQuint contends that the variance is no more than 1% and that such a small variance

between the actual design and the reverse engineered design means that the dimensions in the GDS layout files are readily ascertainable. TriQuint also states that such a small variance would not have affected the results of the benchmarking tests it performed in fall 2007 using the N0010 and N0011 layouts. Thus, TriQuint argues that, because of the low variance, the reverse-engineered dimensions are equivalent to the actual dimensions with regard to the filters' performance.

Because Avago has established that only the exact dimensions contained in the GDS layout files can possibly constitute trade secrets, only its arguments regarding the reverse engineering of those dimensions will be considered. To that end, though Avago counters that the variance may be as high as 3%, it nevertheless concedes that reverse-engineering can provide dimensions that are extremely close to the actual dimensions. Thus, as TriQuint points out, any trade secrets that exist in the resonator dimensions in the GDS files can only exist if Avago derives economic value from the small 1-3% variance from the actual dimensions that cannot be determined through reverse engineering, and thus is maintained as secret. *See Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 264 F. Supp. 2d 1064, 1076 (S.D. Fla. 2003) ("[T]o qualify as a trade secret, information that the Plaintiff seeks to protect must derive economic value from not being readily ascertainable by others . . . .").

Avago, however, has failed to establish that it actually does derive such economic value from the small level of variance between the actual dimensions and the reverse-engineered dimensions, which is the only aspect of the layout files that both was identified with reasonable particularity and is potentially not readily ascertainable by others. As is the case with its insufficiently particular descriptions of many of its alleged trade secrets, Avago has directed the bulk of its economic value arguments toward the layout files in general and the alleged "known good design" they contain. Avago further argues that the economic value of any of its trade secrets is established simply by the fact the TriQuint allegedly acquired and used them. Avago, however, offers no facts, and not even any argument, that it derives

any economic value from allegedly maintaining the secrecy of the dimensions in the GDS layout files, let alone from the small variance between the actual dimensions and the reverse-engineered dimensions.

Avago has therefore failed to establish that any trade secrets exist in the N0010 and N0011 layout files. Thus, Avago's trade secrets claims with regard to those files must fail, and TriQuint's motion for summary judgment with regard to those files is GRANTED. Consequently, Avago's motion for summary judgment with regard to those files is DENIED.

### 3. Design and Manufacturing Processes

Avago has also moved for summary judgment on its claims that TriQuint has misappropriated trade secrets contained in Avago's design and manufacturing processes. TriQuint has also moved for summary judgment with regard to these claims.

TriQuint again alleges that Avago has not identified any alleged trade secrets in it design and manufacturing processes with sufficient particularity. As is stated above, a "plaintiff should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax*, 152 F.3d at 1164 (quotation marks and citations omitted) (emphasis in original).

Here, Avago has again failed to describe its alleged trade secrets with sufficient particularity. Rather, Avago relies on very broad descriptions, stating that its design and manufacturing processes consist of specifications and details for its "layer stack." Avago further describes, again in general terms, various considerations that go into the design of a layer stack, and states that developing a good design is a difficult, time-consuming process. Avago further includes a figure illustrating an example of a "typical Infineon stack," though Avago provides no precise description of the figure or of what trade secrets it might depict. Finally, Avago also alleges that its design and manufacturing processes include "know-how" that generally relates to the use of trimming machines in high-volume BAW manufacturing.

Unlike in *Forro*, Avago cannot tie any of these vague references to design and

manufacturing processes to any tangible trade secret material. *See Imax*, 152 F.3d at 1167.

Thus, as was the case in *Imax*, Avago's descriptions are not sufficiently particular to identify

an potential trade secrets. *Id.* Moreover, even assuming that Avago's descriptions of its

design and manufacturing processes are sufficiently particular, which they are not, TriQuint

has presented evidence that, at least at the low level of particularity used by Avago to

describe its processes, Avago's processes are likely readily ascertainable through reverse

engineering and various publications.

Avago has failed to identify any potential trade secrets in its design and manufacturing

processes with the reasonable particularity required to prove its claims of trade secret

misappropriation. Therefore, its motion for summary judgment with regard to those claims

is DENIED, and TriQuint's motion for summary judgment with regard to those claims is

GRANTED.

## II.     Avago's Copyright Claims

Avago has also moved for summary judgment that TriQuint is liable for direct,

contributory, and vicarious copyright infringement. Avago's claims are based on the copying

of source code, for which Avago claims it owns the copyrights. Specifically, Avago alleges

that Drs. Aigner and Fattinger created source code while working at Infineon, and that this

source code became the intellectual property of Infineon through the work-for-hire doctrine.

*See JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010) (describing "works made for

hire" as works in which an author's employer, rather than the author, may properly be

deemed the copyright owner of a work when the work was prepared by the author-employee

within the scope of his or her employment). Avago further alleges that it acquired the rights

to the source code through its acquisition of Infineon's BAW business line in August 2008.

Also, prior to presenting its case for infringement, Avago further asserts that "[g]iven that

the copyrighted works at issue here originated in Germany, Avago need only prove

ownership, which it has done, and not registration, to establish the first prong for a valid

copyright infringement claim." (Doc. 420, at 23).

Indeed, as Avago points out earlier in its brief, a proper claim for copyright infringement requires a party to establish "(1) ownership of a valid copyright and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright owners by the Copyright Act." *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1178 (9th Cir. 2011). Though Avago believes the facts described above plainly establish its ownership of the copyrighted source code at issue, TriQuint asserts that Avago has not properly established that it owns the copyrights on which its motion is based.

Particularly, TriQuint argues that the Infineon-Avago Asset Purchase Agreement, which describes the transfer of any assets between those parties, did not in fact transfer any copyright ownership from Infineon to Avago. The Purchase Agreement defines "Intellectual Property Rights" as "all intellectual property rights arising from (i) Patents, (ii) Copyrights and (iii) Trademarks." (Doc. 420, Ex. 8, at 10). Furthermore, while section 2.3 of the Purchase Agreement, entitled "Sale of Patents; License to Intellectual Property Rights," transfers Patent rights from Infineon to Avago, that section does not describe a sale of any Copyrights. (*Id.* at 21-22). Because there is no explicit mention of such a sale, TriQuint argues that Copyrights must fall under the "Licensed Intellectual Property" described in section 2.3.2 of the Purchase Agreement. Thus, in TriQuint's view, Avago has at most a non-exclusive license to any intellectual property rights in the source code created by Drs. Aigner and Fattinger during their employment at Infineon, and has therefore failed to establish copyright ownership.

Avago nevertheless asserts that the Purchase Agreement did in fact transfer copyright ownership to Avago. Under Avago's reading of the document, the disputed copyrights were transferred as part of the "Purchased Know How" in section 2.1.3. That section defines "Purchased Know How" as "all Know How owned by Seller or a Selling Subsidiary which is Exclusively Used for the Business . . . ." (Doc. 420, Ex. 8, at 21). Though, as Avago points out, this "Purchased Know How" is licensed back to Infineon under section 2.3.3, and is thus lumped together with the transfer and licensing of intellectual property rights

described in section 2.3, Avago ignores the Purchase Agreement's definition of "Know How," which explicitly "exclud[es] any Intellectual Property Rights . . . ." (*Id.* at 10-11).

Thus, the Court cannot find, under Avago's interpretation of the Purchase Agreement, that ownership of any copyrights was transferred from Infineon to Avago. Nor does Avago put forth any other theory by which it might have standing to sue TriQuint on these claims of copyright infringement. Moreover, though not argued in the parties' briefs, the Court notes that it is unclear whether, even under Avago's interpretation of the Purchase Agreement, Infineon had ever acquired ownership of the copyrights at issue because there is no indication that the "work-for-hire" doctrine under United States law, or any similar doctrine under German law, would have applied to vest those rights in Infineon. Therefore, the Court need not reach the question of infringement, and Avago's motion for summary judgment that TriQuint is liable for copyright infringement is DENIED.

Furthermore, the Court notes that it has "the power sua sponte to grant summary judgment to a non-movant when there has been a motion but no cross-motion." *Kassbaum v. Steppenwolf Prod., Inc.*, 236 F.3d 487, 494 (9th Cir. 2000). But before doing so, the Court must determine that "the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." *Ramsey v. Coughlin*, 94 F.3d 71, 73 -74 (2d Cir. 1996).

Here, TriQuint did not move for summary judgment on Avago's copyright infringement claims with respect to source code in its filed motion, though TriQuint's counsel stated at oral argument that TriQuint believes it is entitled to summary judgment on this issue. Moreover, Avago clearly had a full and fair opportunity to brief, and did brief, the issue of copyright infringement. Thus, because the Court finds that, for the reasons discussed above, TriQuint is entitled to summary judgment on Avago's source code copyright claims as a matter of law, TriQuint's non-filed cross-motion for summary judgment is GRANTED.

Finally, TriQuint has moved for summary judgement that Avago did not properly state

a claim of copyright infringement with respect to GDS files. However, Avago stated in its response that its copyright claims are limited only to information contained in the source code. Therefore, to the extent that Avago has ever or plans to ever argue that any of its copyrights claims cover any of the GDS files described in TriQuint's brief, TriQuint's motion for summary judgment is GRANTED.

## III. Avago's Common-Law Tort and Unfair Competition Claims

### A. Avago's Common-Law Tort Claims

Avago has asserted common-law claims of unjust enrichment, conversion, and intentional interference with prospective economic disadvantage against TriQuint. These claims are based on facts that are very similar, if not identical to Avago's trade secrets claims. Both parties have filed summary judgment motions on these claims, though Avago has limited its motion to only the conversion claim.

Avago asserts that it is seeking these claims as an alternative to its trade secret claims. That is, if any of the materials that it alleges TriQuint stole are not deemed to be trade secrets, Avago then wishes to seek relief under these common-law tort claims. Avago realizes, however, that to the extent these materials are deemed to be trade secrets, these common-law tort claims are preempted by Florida's UTSA, "which displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret." Fla. Stat. § 688.008.

TriQuint argues, on the other hand, that even if the materials are not found to be trade secrets, Avago's common-law tort claims are still preempted because the claims are based on the same underlying facts as the trade secrets claims. Thus, in TriQuint's view, the common-law tort claims should be dismissed.

The Court finds that TriQuint's view is better supported by the relevant case law. The majority of courts have determined that the FUTSA preemption provision preempts a parties' common law claims when those claims are based on the same operative facts as its trade secret claims. *See, e.g., New Lenox Inds., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D.

Fla. 2007) ("[A]s a general proposition other torts involving the same underlying factual allegations as a claim for trade secret misappropriation will be preempted by the FUTSA."); *Am. Honda Motor Co. v. Motorcycle Info. Nework, Inc.*, 390 F. Supp. 2d 1170, 1180-81 (M.D. Fla. 2005) ("[I]f the allegations of trade secret misappropriation *alone* comprise the underlying wrong, only the FUTSA claim will survive the motion to dismiss.") (emphasis in original); *Allegiance Healthcare Corp. v. Coleman*, 232 F.Supp. 2d 1329, 1335-36 (S.D. Fla. 2002) (preemption under FUTSA depends on "whether allegations of trade secret misappropriation alone comprise the underlying wrong"); *see also* 1-1 Milgrim on Trade Secrets § 1.01[3][a] (2011) ("If the 'other' claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation, then dressing those claims up in different clothing, such as common law trade secret misappropriation, conversion, unjust enrichment or unfair competition, is not likely to be found consistent with the preempting dictates of UTSA.")

Here, Avago's common-law claims rely entirely on its assertion that TriQuint misappropriated valuable confidential and proprietary information, i.e., trade secrets. Avago points to no other facts or allegations it has made that materially separate its common-law claims from its trade secret claims. Instead, Avago incorrectly argues only that preemption cannot take effect until Avago "wins" on its trade secret claims. That argument is inconsistent with the plain language of the preemption provision of the FUTSA. Thus, the undisputed facts show that Avago's common-law tort claims are based on the same set of operative facts as its trade secret claims. The FUTSA therefore preempts Avago's common law claims. Moreover, in this case, the Court did not hold that Avago's "secrets" could never be trade secrets within the meaning of FUTSA. Instead, the Court held that Avago failed to meet the elements of proving a trade secret claim. Thus, not only are these claims preempted because they rely on the same facts as the trade secret claims, they are also preempted because nothing herein held that such "secrets" could never be trade secrets as a matter of law.

Accordingly, TriQuint's motion for summary judgment with respect to Avago's tort claims is GRANTED. Avago's motion for summary judgment with respect to its conversion claims is DENIED.

## B. Avago's Unfair Competition Claim

Avago has also asserted a claim against TriQuint under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*. Both parties have moved for summary judgment on this claim. As discussed previously, the Court has found that under Arizona's choice-of-law rules, Avago's trade secret claims are governed by Florida law. Thus, because Avago's unfair competition claim is based on the same conduct that gave rise to its trade secret claims, the Court's previous choice-of-law analysis applies and Florida law must also govern any unfair competition claim. Therefore, Avago's claims under California's unfair competition laws must be dismissed. *See Johnson v. KB Home*, 720 F. Supp. 2d 1109, 1121-22 (D. Ariz. 2010); *see also Norwest Mortgage, Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18, 23-25, 72 Cal. App. 4th 214, 222-25 (Ct. App. 1999) (holding that California's unfair competition laws were not intended to regulate conduct unconnected to California).

Accordingly, with respect to Avago's unfair competition claim, TriQuint's motion for summary judgment is GRANTED and Avago's motion for summary judgment is DENIED.

## PATENT ISSUES

## I. Claim Constructions

The Court held a *Markman* hearing on December 14, 2010 and, after reviewing the parties' briefing and the arguments presented at the hearing, constructed the disputed claim terms in an order issued on January 12, 2011 (Doc. 229, "*Markman* order"). The parties have stipulated to additional constructions of other claim terms. These claim constructions are referred to throughout this Order where appropriate.

## II.    Legal Standard for Patent Infringement

Pursuant to section 271 of the Patent Act, 35 U.S.C. § 271, liability for patent infringement may be imposed on any person who without permission of the patentee, "makes, uses, offers to sell, or sells any patented invention [] within the United States . . . during the term of the patent therefor." The rights granted to the patentee are defined by the patent's claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996). In determining whether an allegedly-infringing device falls within the scope of the claims, a two-step process is used: "the court first determines, as a matter of law, the correct claim scope, and then compares the properly constructed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by a substantial equivalent." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (9th Cir. 1999) (citing *Renishaw PLC v. Marposs Societa per Anzioni*, 158 F.3d 1243, 1247-48 (Fed. Cir. 1998)). Although the second step of the infringement inquiry involves a factual determination, summary judgment is still appropriate when no genuine dispute of material fact exists. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1299 (Fed. Cir. 2004).

The patentee bears the burden of proving infringement by a preponderance of the evidence. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). To prove literal infringement, the patentee must establish that, "every limitation recited in the claim appears in the accused product, *i.e.*, the properly construed claim reads on the accused product exactly." *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1382 (Fed. Cir. 2000) (citing *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996)).

Alternatively, if one of more elements of the claim are not literally present in the allegedly infringing product or process, the patentee may establish infringement under the doctrine of equivalents. *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004). This doctrine allows infringement to be found in some cases where the elements of the accused device are substantially equivalent to the corresponding elements

of the asserted claim. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. at 29. To determine whether infringement exists under the doctrine of equivalents, the Court engages in an element-by-element comparison of the patented invention and the accused device. *Id.* at 40. Toward this end, the Court considers whether the accused device "contain[s] elements that are either identical or equivalent to each claimed element of the patented invention." *Id.* A feature of an accused device is "equivalent" to an element of claimed invention if it performs substantially the same function in substantially the same way to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950). However, this "linguistic framework" may not be appropriate in every case. *See Warner-Jenkinson*, 520 U.S. 17, 39-40 (1997). Instead, "[a]n analysis of the role played by each element in the context of the specific patent claim [must] inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.* at 40. Additionally, "[i]n applying the doctrine of equivalents, the fact finder must determine the range of equivalents to which the claimed invention is entitled, in light of the prosecution history, the pioneer-nonpioneer status of the invention, and the prior art." *Intel Corp. v. U.S. Int'l. Trade Comm'n*, 946 F.2d 821, 842 (Fed. Cir. 1991).

The Court must also be mindful of the limitations of the doctrine of equivalents. Particularly, the doctrine of equivalents cannot allow a patent to encompass subject matter existing in prior art. *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed. Cir. 1990), *overruled on other grounds*, 508 U.S. 83 (1993). The doctrine also may not be used to allow coverage of obvious or "trivial" variations of the prior art. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1580 (Fed. Cir. 1995). Further, "where the patent document expressly identifies a role for a claim limitation, the doctrine of equivalents cannot be used to capture subject matter that does not substantially fulfill that role." *K-2 Corp.*, 191 F.3d at 1367 (citing *Warner-Jenkinson*, 520 U.S. at 40).

Additionally, the doctrine of equivalents is limited by the principle that the patentee

may not use the doctrine to recover subject matter that has been surrendered. *Id.* "For example, prosecution history estoppel will exclude from the doctrine of equivalents any subject matter that was, by amendment or argument during prosecution, relinquished." *Id.* (citing *Warner-Jenkinson*, 520 U.S. at 30-31). These limitations on the doctrine of equivalents are questions of law. *Id.* "Taken together, these concepts - that the doctrine of equivalents is both limited and subject to estoppel - reflects [the Federal Circuit's] (and the Supreme Court's) approach of maintaining the principled application of the doctrine of equivalents while hewing closely to the doctrine's original purpose: to prevent fraud on a patent." *Id.*

## III. Avago's Motion for Summary Judgment

### A. Assignor Estoppel

Avago asserts that TriQuint is barred from asserting that the '922 patent, the '4619 patent, the '340 patent, the '807 patent, the '436 patent, and the '5619 patent are invalid under the theory of assignor estoppel because Dr. Aigner, a TriQuint employee, is listed as an inventor on all of these patents and Dr. Fattinger, another TriQuint employee, is listed as an inventor on one of the patents. In response, TriQuint argues that assignor estoppel does not apply to its invalidity claims.

"Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity." *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). "[I]t is the implicit representation by the assignor that the patent rights that he is assigning (presumably for value) are not worthless that sets the assignor apart from the rest of the world and can deprive him of the ability to challenge later the validity of the patent." *Id.* "To allow the assignor to make that representation at the time of the assignment (to his advantage) and later to repudiate it (again to his advantage) could work an injustice against the assignee." *Id.* Thus, the doctrine is "mainly concerned with the balance of equities between the parties." *Id.* at 1225.

Assignor estoppel also applies to bar parties in privity with the assignor from asserting invalidity challenges. *Id.* at 1224. The determination of privity between parties is also determined upon a balance of the equities. *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990). The Federal Circuit has stated:

> If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

*Id.* Thus, because of the focus on the closeness of the relationship between the parties, a finding of privity is unlikely between a company and an assignor who is a "mere employee" of that company. *Id.* at 794.

Rather, privity is far more likely in cases where, for example, the company alleged to be in privity with the assignor was founded by the assignor. *See Diamond Scientific*, 848 F.2d at 1224. Further, in determining the closeness of the relationship, the significant determination becomes "whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel Corp. v. ITC*, 946 F.2d 821, 839 (Fed. Cir. 1991). All direct and indirect contacts between the assignor and defendant company must be evaluated in making this determination. *Id.* at 838.

Here, TriQuint does not argue that assignor estoppel does not apply to either Dr. Aigner or Dr. Fattinger as individuals. Rather, TriQuint argues that assignor estoppel should not bar TriQuint from asserting its invalidity defenses because neither Dr. Aigner nor Dr. Fattinger exercises substantial control over TriQuint or owns a significant number of shares of TriQuint stock. Therefore, in TriQuint's view, there is no privity between TriQuint and either Dr. Aigner or Dr. Fattinger.

Though control of a company and stock ownership are not necessarily determinative factors, a significant number of cases cite to the presence of these factors as tipping the scales of equity in favor of finding privity. *See Acushnet Co. v. Dunlop Maxfli Sports Corp.*, 2000

WL 987979, at *2-*3 (D. Del., June 29, 2000) (discussing "the handful of cases" where privity was found and how in each case "the assignor [] exercised substantial control over, and/or held considerable financial interest in, the defendant corporation"). Indeed, the Federal Circuit's emphasis on these factors when finding privity in cases of assignor estoppel led one district court to conclude that the policy goal of assignor estoppel is specifically to "prevent[] an assignor from perpetrating in a corporate guise the very injustice the doctrine precludes him or her from accomplishing in a personal capacity." *Id.* at *3. Thus, because the defendant company in that case was not the assignor's "corporate disguise," that court found that extending the doctrine in that instance would not accomplish its goal, but rather "would punish [the defendant company] for hiring [the assignor] and using his talents to compete with [the] plaintiff." *Id.* TriQuint further argues that these policy considerations apply directly to this case and preclude the application of the doctrine to TriQuint.

Avago, on the other hand, argues that TriQuint's focus on control and financial interest in a defendant corporation is misguided and not the proper test under Federal Circuit precedent. Rather, Avago argues that the "knowledge and assistance" determination must be made only in the context of the assignor's role in the defendant company's allegedly infringing activities. Therefore, to the extent that Avago argues that Dr. Aigner and Dr. Fattinger exert any control over TriQuint, that control is solely in terms of their influence over any allegedly infringing products.

To support its argument, Avago relies heavily on the decision in *Synopsis, Inc. v. Magma Design Automation, Inc.*, 2005 WL 1562779 (N.D. Cal., July 1, 2005). That court criticized the *Acushnet* decision, upon which TriQuint relies, for apparently "reject[ing] application of assignor estoppel in any case where the inventor/assignor lacks control over the company alleged to infringe the assigned patent." *Id.* at *7, n. 6. That view, stated the *Synopsis* court, "conflicts with the Federal Circuit's holding in *Intel* that the key factor is whether the infringing company uses the assignor's knowledge and assistance to conduct infringement." *Id.* Thus, Avago argues, it is not relevant whether Dr. Aigner and Dr.

Fattinger exercise substantial control over TriQuint or own significant financial interests in the company; rather, what is relevant in Avago's view is that both Dr. Aigner and Dr. Fattinger "used their knowledge from their patented inventions to develop the accused products." (Doc. 412 at 32).

The Court finds that both parties' arguments have some merit under Federal Circuit precedent. Certainly, "control of the allegedly infringing entity [is not] a prerequisite" to finding privity, *Synopsis*, 2005 WL 1562779, at *7, as TriQuint would seem to have it. Nevertheless, as the *Acushnet* case points out, in several Federal Circuit cases in which privity was found, the assignor was found to have substantial control over or a significant financial relationship with the defendant company. *See Acushnet*, 2000 WL 987979, at *2-*3. Indeed, the Federal Circuit has specifically cited the case of a company founded by an assignor as an example where assignor estoppel would apply. *Diamond Scientific*, 848 F.2d at 1224. Thus, the assignor's control over and financial relationship with a defendant company, or lack thereof, is an important factor that must be considered in determining whether privity exists. *See Intel Corp*, 946 F.2d at 838 (stating that all direct and indirect contacts between the assignor and defendant company must be considered).

Furthermore, in delineating whether a sufficiently close relationship exists to find privity, *Shamrock Techs.*, 903 F.2d at 793, clearly the Court must also ascertain whether TriQuint availed itself of Dr. Aigner's and Dr. Fattinger's knowledge and assistance to conduct any alleged infringement. *Id.* at 794. Of course, in resolving this question, the Court must acknowledge that "[e]very employee provides some knowledge or assistance to his employer." *HWB, Inc.*, 869 F. Supp. at 582. Instead, "the relevant question is whether the assignor/inventor plays such a significant part in his new employer's infringing operations that his new employer could not have initiated the infringing operations without the assistance of the assignor/inventor." *Id.* Therefore, to determine whether TriQuint has availed itself of sufficient knowledge and assistance to support a finding of privity, the Court must ascertain the closeness of the relationship between TriQuint and Drs. Aigner and

Fattinger in light of the alleged act of infringement. *Shamrock Techs.*, 903 F.2d at 793.

With regard to any control that Dr. Aigner or Dr. Fattinger may have exerted over TriQuint, the record indicates that no such control existed. TriQuint points out that Drs. Aigner and Fattinger are not founders, officers, or strategic decision-makers at TriQuint. (Doc. 423, at 322, ¶¶ 136-38). Rather, Dr. Aigner, whose title is "director of research and development in acoustic technologies" is one of about 385 managerial-level employees and is two levels down from the vice president to whom he reports. (*Id.*). Dr. Fattinger, whose title is "BAW R&D manager," is one level below Dr. Aigner. (*Id.*). Avago does not dispute these facts.

With regard to financial interests in TriQuint, both employees participate in TriQuint's standard employee stock option program, and both have been granted options to purchase only small amounts of stock. (*Id.*). Thus, neither Dr. Aigner nor Dr. Fattinger own a substantial percentage of TriQuint stock or exert any significant control over the company as a result of any financial interests in the company. Avago also does not dispute these facts. Therefore, this undisputed evidence clearly demonstrates that Drs. Aigner and Fattinger have no closer of a relationship to TriQuint than any other of the hundreds employees at their respective levels and are therefore "mere employee[s]" with respect to corporate control and financial interests. This weighs strongly in favor of a finding of no privity between either of the doctors and TriQuint. *See Shamrock Technologies*, 903 F.2d at 794.

The parties dispute, however, whether TriQuint availed itself of the knowledge and assistance of Drs. Aigner and Fattinger to a sufficient degree such that there can be privity between TriQuint and the doctors even in the absence of substantial control over the company or significant financial interests. Avago asserts that the relationship was sufficiently close between TriQuint and Drs. Aigner and Fattinger that TriQuint could not have initiated the allegedly infringing activities without the assistance of the doctors. Specifically, Avago alleges that Dr. Aigner exercised "substantial control" over TriQuint's BAW research and development efforts, that he "owned" TriQuint's acoustic development,

that he hired several new employees, including Dr. Fattinger to assist him with BAW research and development, and that he is the ultimate decisionmaker concerning TriQuint's BAW products. (Doc. 420-1 at ¶¶ 380-396). Avago further alleges that Dr. Fattinger, as Dr. Aigner's second in command, was hired by Dr. Aigner because Dr. Fattinger knows all of the dirty tricks of Infineon's BAW processes, and that together the two doctors exercised direct control over TriQuint's BAW research and development operations. (*Id.*). In support of these allegations, Avago points to deposition testimony of TriQuint employees, correspondence between TriQuint employees, and charts illustrating TriQuint's managerial organization. (*Id.*).

TriQuint, on the other hand, correctly asserts that Avago's evidence does not prove that Drs. Aigner and Fattinger have not contributed any greater knowledge and assistance to TriQuint's BAW processes than that which would be contributed by a mere employee in their respective positions at a large corporation. Indeed, the organizational charts cited by Avago merely show that the doctors are each one of a very large number of employees working in what could only be described as a typical multi-level corporate structure. The charts show that there are several other TriQuint employees, at levels above those of Drs. Aigner and Fattinger, to whom both doctors must report. Avago's evidence therefore fails to demonstrate that Dr. Aigner actually had any hiring power or that he ultimately made all of the decisions concerning TriQuint's BAW products. Rather, the evidence demonstrates that TriQuint accepted the input of Dr. Aigner, as a mere employee, with regard to hiring and decision-making.

The statements made by TriQuint employees do not alter this conclusion. In the deposition testimony of Brian Balut, Mr. Balut states that Dr. Aigner "owned total acoustic development." (Doc. 420-16, Ex. 179 at 227:16-17). However, from the context of Mr. Balut's complete statement, it appears more likely that he was merely expressing his opinion that TriQuint hired Dr. Aigner to have responsibility over both its BAW and its SAW research divisions. As the declaration of TriQuint's Vice President of Human Resources,

Debbie Burke, demonstrates, this responsibility likely extended only to typical mid-level managerial control. (Doc. 422, at ¶¶ 4-7). Additionally, when immediately following his statement, Mr. Balut was asked whether Dr. Aigner made the decision to hire Dr. Fattinger, Mr. Balut's reply was, "In the end we hired Dr. Fattinger." (Doc. 420-16, Ex. 179 at 227:22-228:2). Mr. Balut's use of the word "we" undermines Avago's assertion that Dr. Aigner "owned" acoustic development in such a way that he personally controlled TriQuint's BAW business without any direction or input from his superiors or other TriQuint employees. Moreover, Dr. Aigner's statement that Dr. Fattinger knew the "dirty tricks" of Infineon's BAW processes, regardless of what his intentions were when he made the statement, does nothing to prove that Dr. Aigner actually had any control over Dr. Fattinger's subsequent hiring by TriQuint.

Similarly, Dr. Fattinger's acknowledgment in his deposition that he believed Dr. Aigner had "ultimate responsibility for technical decisions that were made with respect to the bulk acoustic wave process . . . ." (Doc. 420-16, Ex. 186 at 47:16-21) does not support Avago's conclusions. Apart from the fact that what the phrase "technical decisions" encompasses is never specified, this statement from one of Dr. Aigner's subordinates does not conclusively demonstrate that Dr. Aigner exercised any control beyond the mid-level managerial responsibilities that TriQuint admits he had.

Of course, all of this evidence does clearly demonstrate that both Dr. Aigner and Dr. Fattinger were involved in TriQuint's BAW research and development. Indeed, TriQuint does not dispute that fact. However, as talented experts in the area of BAW technology, such a conclusion could easily be drawn from the doctors' mere employment at TriQuint. In other words, the Court finds that the evidence in the record, including the doctors' lack of any corporate control over or significant financial interest in TriQuint, does not establish that Drs. Aigner and Fattinger had any closer of a relationship to TriQuint than any other employee at their respective levels within the TriQuint corporate structure would have had. Nor does the evidence demonstrate that their relationships with TriQuint are any closer than engineers

with their respective levels of expertise would generally be expected to have with their employers. Rather, the evidence only shows that TriQuint availed itself of the doctors knowledge and assistance in their capacities as mere employees of TriQuint, and that therefore TriQuint was not in privity with either of the doctors for the purposes of assignor estoppel.

Furthermore, it is notable that two other competitors of TriQuint, one of which was Avago, also pursued Dr. Aigner and offered him employment. (Doc. 423, at 323, ¶¶ 141-142). These firms were essentially competing for Dr. Aigner's talents before his employment at TriQuint began. Together with the other evidence in the record, this fact helps support the conclusion that Dr. Aigner was hired merely for his expertise in his field, and that his role and the closeness of his employment relationship likely would have been no different had he accepted one of the other two employment offers. Thus, the Court finds that to extend assignor estoppel to apply to TriQuint in this case would not comport with the policy goals of the doctrine. That is, "[a]ssignor estoppel was not designed to prevent companies from competing for talented employees; rather, it was intended to prevent the assignor (whether acting individually or through another entity) from 'making [a] representation [of the patent's validity] at the time of assignment (to his advantage) and later . . . repudiat[ing] it (again to his advantage).'" *Acushnet*, 2000 WL 987979, at *3 (citing *Diamond Scientific*, 848 F.2d at 1224).

Therefore, TriQuint may proceed with its invalidity defenses, and Avago's motion to apply assignor estoppel to TriQuint in this case is DENIED.

**B. Laches**

The doctrine of laches refers to "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc). In the context of a patent infringement suit, laches acts to bar the recovery of only those damages accrued

prior to suit. *Id.* at 1041. Furthermore, "where the plaintiff alleges infringement of more than one patent, laches must be determined separately for each." *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459, 1462 (Fed. Cir. 1990), *overruled on other grounds by Aukerman*, 960 F.2d at 1038.

To determine whether to apply the defense of laches, the trial court must "look at all of the particular facts and circumstances of each case and weigh the equities of the parties." *Aukerman*, 960 F.2d at 1032 (citation omitted). Nevertheless, to invoke the defense, an alleged infringer must prove two factors:

> 1. the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and
>
> 2. the delay operated to the prejudice or injury of the defendant.

*Id.* (citations omitted).

Generally, there are no "fixed boundaries" on the length of time that may be deemed an unreasonable delay, but rather the determination will depend on the circumstances of each case. *Id.* However, the Federal Circuit has held that after a delay of six years, a presumption of laches will apply that shifts only the burden of production to the patentee. *Id.* at 1035-39. The patentee may overcome the presumption by "raising a genuine issue respecting either factual element of a laches defense." *Id.* at 1038.

Furthermore, with respect to the second prong, the defendant may show either economic prejudice, which "may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit," or evidentiary prejudice, which "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id.* at 1033.

### 1. TriQuint's Delay and the Presumption of Laches

As previously stated, to determine the length of any delay in bringing suit, and also

whether the presumption of laches applies, the court must ascertain at what point in time "the plaintiff knew or reasonably should have known of its claim against the defendant." *Aukerman*, 960 F.2d at 1032. Thus, either actual or constructive knowledge of the defendant's potentially infringing activities is sufficient to begin the period of delay. *Wanless v. Gen. Electric Co.*, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998). Further, because constructive knowledge may be sufficient to begin the delay period, a duty is imposed on patentees to police their rights. *Id.* at 1338. "For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement." *Id.* Furthermore, in calculating the delay period, the transfer of a patent between parties does not restart the delay clock for the transferee. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) ("A patentee cannot avoid the consequences of his laches by transferring the patent."), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998). Similarly, an alleged infringer that is the transferee of a business or its assets may include any allegedly infringing conduct of the transferor to determine the patentee's period of delay. *R2 Med. Systs., Inc., v. Katecho, Inc.*, 931 F. Supp. 1397, 1412-13 (N.D. Ill. 1996) ("[A] defendant that is the transferee of an entire business or its assets may rely upon the patentee's delay in suing the transferor.").

Here, genuine issues of material fact exist as to the point in time that TriQuint, or its predecessor TFR, first knew of or had reason to know of potential infringement by Avago, or its predecessor Agilent. Avago argues that TFR had both actual and constructive knowledge as early as 2002, when the accused products first became publicly available. Avago further points to evidence of licensing negotiations between TFR and Agilent in 2002 and to evidence that the founder and CEO of TFR, Dr. Kenneth Lakin, examined Agilent's products in 2002.

TriQuint does not dispute that products named similarly to the accused products were

available in 2002; however, TriQuint asserts that because of the many changes made to Avago's products since that time, the products did not actually infringe TriQuint's patents until several years later.  Furthermore, Avago's evidence that Dr. Lakin may have examined any of Agilent's products in 2002 is based solely on testimony from Dr. Richard Ruby, an Avago employee, and thus is subject to a determination of his credibility.  Such determinations are not appropriate on summary judgment.  *See Wanlass v. Fedders Corp.*, 145 F.3d at 1463 ("In determining the propriety of summary judgment, credibility determinations may not be made . . . .").  Similarly, though it is undisputed that Drs. Lakin and Ruby discussed the possibility of a licensing deal between TFR and Agilent, the content of the negotiations, particularly whether the negotiations may have been motivated by TFR's belief that Agilent infringed any of TFR's patents, is disputed by the parties.  Much of Avago's evidence that the negotiations were so motivated also comes only from Dr. Ruby's declaration, which again is subject to a determination of his credibility.  Therefore, a genuine issue of material facts exists as to whether TFR knew or should have known of Agilent's potential infringement in 2002.

Furthermore, because Avago has not established that the delay period began prior to 2003, or six years prior to the beginning of this litigation, the presumption of laches does not apply.  Thus, for the purposes of this summary judgment motion, Avago retains the burdens of production and persuasion on the issues of unreasonable delay and prejudice.  *See Aukerman*, 960 F.2d at 1032.  However, apart from its theory that the delay began in 2002, Avago points to no other potential date on which any delay may have began.  Nor does the evidence in the record indicate that any such date may be properly determined on summary judgment.  Hence, because genuine issues of material fact exists as to whether TriQuint delayed in bringing suit, Avago has failed to carry its burden, and the Court cannot reach the issues of whether any such delay was reasonable and whether Avago was prejudiced by any possible delay.  Therefore, Avago's motion for summary judgment on its laches defense is DENIED.

### C. Non-Infringement of the '647 Patent

TriQuint asserts that Avago infringes United States Patent No. 5,894,647 ("the '647 patent"). Avago has moved for summary judgment of non-infringement of all asserted claims. The '647 patent generally describes a method for fabricating piezoelectric resonators with both a top and a bottom electrode. The patent further discloses the steps of adding a differential layer of conducting material to one of the electrodes and then trimming off misaligned portions of both the initial and differential layers of that electrode to improve the resonator's performance. Of particular relevance to Avago's motion, the claims of the '647 patent all refer to adding the differential layer to and subsequently trimming only the "top" electrode of the resonator.

Though TriQuint alleges that some of Avago's products literally infringe the '647 patent, Avago focuses its motion only on its products that apply a mass-loading layer to the bottom electrode. Avago contends that these products are alleged only to infringe under the doctrine of equivalents. TriQuint, in response, asserts that some of the Avago products applying a mass-loading layer to the bottom electrode also literally infringe the '647 patent because the fabrication of those products include additional steps that apply a so called "innie" layer to the top electrode.

The Court finds that Avago has not moved for summary judgment on the issue of whether any of the accused Avago products that include an "innie" layer step in addition to applying a mass-loading layer to the bottom electrode do not literally infringe the '647 patent. Hence, the Court will only address Avago's argument that, as a matter of law, the step of applying a mass-loading layer to the bottom electrode of its products does not infringe the '647 patent under the doctrine of equivalents.

Avago argues that the disclosure-dedication rule precludes TriQuint from making such an argument under the doctrine of equivalents. Under that rule, "when a patent drafter discloses but declines to claim subject matter, . . . this action dedicates that unclaimed subject matter to the public." *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d

1046, 1054 (Fed. Cir. 2002). In the Federal Circuit's view, "[a]pplication of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would 'conflict with the primacy of the claims in defining the scope of the patentee's exclusive right.'" *Id.* The rule also prevents a patentee from "narrowly claim[ing] an invention to avoid prosecution scrutiny by the PTO, and then after patent issuance, us[ing] the doctrine of equivalents to establish infringement because the specification discloses equivalents." *Id.*

Furthermore, "disclosures implicating the disclosure-dedication rule need not directly relate to the description of the claimed invention or be contained in the 'Detailed Description of the Invention' section of the patent, but may appear merely in the portion of the patent describing the 'Background of the Invention.'" *Toro Co. v. White Consolidated Inds., Inc.*, 383 F.3d 1326, 1334 (Fed. Cir. 2004). However, though the disclosure need not meet the requirements of 35 U.S.C. § 112, the disclosure must be sufficiently specific to invoke the disclosure-dedication rule. *Id.* With regard to the required level of specificity, the Federal Circuit has stated the following:

> We thus hold that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public. . . . The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed.

*Id.* (quoting *PCS Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004)). Finally, application of the dedication-disclosure rule is a question of law. *Id.* at 1331.

Here, the parties agree that Avago's method of applying a mass-loading layer to the bottom electrode is not literally claimed in the '647 patent. However, the parties dispute whether the specification of the '647 patent discloses that method, thereby precluding TriQuint from arguing that such a step infringes the claims of the '647 patent under the doctrine of equivalents.

The relevant portions of the '647 specification that could reasonably be deemed to disclose Avago's method include the following paragraph from the "Background of the

Invention" section of the '647 patent:

> Many techniques exist for fabricating piezoelectric resonators. For some applications a suitable resonator can be fabricated simply by adding conducting electrodes to a thin piezoelectric crystal "blank" obtained from commercial sources which "blank" may have been further thinned by processing. Another technique is to first fabricate a bottom electrode on a supporting substrate such as silicon. Next, a thin film of piezoelectric material is deposited over the electrode and substrate. The supporting substrate is then removed in some regions so as to expose the bottom electrode, which leaves the electrode and piezoelectric film in the form of a membrane or plate supported at the edges. The top electrode is then fabricated on the top surface of the membrane. The equivalent of a thin membrane may also be created by fabricating a sequence of quarter-wavelength thick layers of material upon a suitable substrate. A bottom electrode is then fabricated upon the uppermost quarter-wavelength reflector followed by a layer of piezoelectric material and finally by the top electrode. The quarter-wavelength thick layers of material act as reflectors and mechanically isolate the acoustic motion of the bottom electrode and of the piezoelectric material from the underlying substrate.

('647 patent, at 1:55-2:10). Additionally, the "Detailed Description" section of the patent begins with the following: "Referring to FIGS. 3 and 4, to fabricate a device having two resonators in accord with this invention, a thin substrate 10 is fabricated by any of the various methods known in the prior art." ('647 patent, at 4:46-49). Finally, the patent states the following in reference to its description of figures 3 and 4:

> It should be understood that the differential fabrication technique could[] be applied to electrode 12 instead of to electrode 16. In the latter instance, a differential layer of metal would, instead, be added to that portion of electrode 12 that overlaps with electrode 16, either before or after the primary layer of metal for electrode 12 is fabricated on the substrate. In this latter instance, the areas of electrode 12 that coincided with electrode 16 and in which the metal thickness was not equal to the sum of the primary layer of metal and the differential layer of metal, would then be removed in a manner similar to that described above for the removal of such non-uniform areas of electrode 16.

('647 patent, at 6:26-37).

In Avago's view, these portions of the '647 patent, when combined, disclose the method used by Avago. Specifically, Avago's method involves the second fabrication technique described in the cited background portion of the '647 patent, whereby a bottom electrode is first fabricated on a supporting substrate, a piezoelectric layer is deposited over the bottom electrode, a portion of the supporting substrate is removed, and the top electrode is then fabricated on the top surface of the piezoelectric layer.

While those general steps are clearly in the prior art, Avago further modifies its method by adding a mass-loading layer, which the parties agree is equivalent to the differential layer described in the '647 patent, to the bottom electrode either before the bottom electrode is fabricated on the substrate or before the piezoelectric layer is deposited over the bottom electrode. Avago further trims the misaligned portions of its bottom electrode and its mass-loading, or differential, layer.

In contrast, the '647 patent describes and depicts its claimed method in terms of the first fabrication technique described in the cited portion of the background section, whereby conducting electrodes are simply added to the top and bottom sides of a thin piezoelectric crystal "blank." However, Avago asserts that its method is nevertheless disclosed by the '647 patent because the portions of the detailed description cited above state that figures 3 and 4 also refer to "any of the various methods known in the prior art," which Avago argues includes the second fabrication technique described in the background section. Hence, because the detailed description also describes, in reference to figures 3 and 4 and thus potentially to any of the described fabrication techniques, applying a differential layer to the bottom electrode (electrode 12) rather than the top electrode (electrode 16), Avago argues that the '647 patent discloses Avago's method of applying a mass-loading layer to the bottom electrode utilizing the second fabrication technique.

In response, Triquint asserts that one of ordinary skill in the art could not reasonably read the specification of the '647 patent to disclose Avago's method because Avago's method requires that the bottom electrode and the mass-loading layer are to be fabricated and trimmed before the top electrode even exists. In contrast, TriQuint asserts that the alternative method disclosed in the detailed description of the '647 specification requires that the top electrode already exist at the time that the differential layer is added to the bottom electrode. Specifically, TriQuint points out that the '647 specification states in the detailed description that when applying a differential layer to bottom electrode 12, "a differential layer of metal would, instead, be added to that portion of electrode 12 that overlaps with electrode 16."

- 54 -

('647 patent, at 6:28-30). That portion of the specification further states that "the areas of electrode 12 that coincided with electrode 16 and in which the metal thickness was not equal to the sum of the primary layer of metal and the differential layer of metal, would then be removed . . . ." ('647 patent, at 6:32-35).

In TriQuint's view, one of ordinary skill in the art could not possibly interpret this language to apply to either the second fabrication technique described in the background section or Avago's method because those methods do not allow for the top electrode to exist at the same time that the differential layer would be added to the bottom electrode. Rather, those methods both required that the bottom electrode is buried prior to fabrication of the top electrode. Hence, TriQuint asserts that this language is only directed to resonators that use the first fabrication technique, whereby the resonator is built on a "blank," which allows both the top and bottom electrodes to exist prior to adding a differential layer to either electrode.

The Court finds that a person of ordinary skill in the art could only reasonably accept TriQuint's interpretation of the '647 specification. Avago's strained interpretation is not well-supported and does not meet the level of specificity required to apply the dedication-disclosure rule. *See Toro*, 383 F.3d at 1334 ("The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed."). For, example, though the statement about "various methods known in the prior art," ('647 patent, at 4:46-49), clearly refers to methods for fabricating *substrates*, Avago interprets that passage to refer back to the paragraph in the background section about fabricating *resonators*. In fact, to the extent that the quoted excerpt is referring to the background section, it is far more likely that the excerpt is referring to the preceding paragraph in the background section, which states that "[t]he substrate may consist entirely of a piezoelectric material, or may consist or layers of piezoelectric and non-piezoelectric materials." ('647 patent, at 1:49-54). Indeed, both excerpts conclude with an identical citation to a scientific article. The paragraph about fabricating resonators to which Avago refers does not, however, refer to the article.

Moreover, because the graphical depictions of the design in figures 3 and 4 of the '647 patent and the graphical depiction of Avago's design are so different, as is demonstrated in TriQuint's response brief (Doc. 421, at 74-75), it is unlikely that one of ordinary skill in the art would interpret the figures and described design as disclosing any designs other than those using a piezoelectric blank. This is especially true considering that the only way to connect the figures to any other designs is via Avago's reading of the reference to the background section, which as described above is not correct.

Finally, as TriQuint notes, its interpretation of the disclosure in the '647 patent is even further bolstered by the language used in the patent, which strongly suggests that the top and bottom electrodes both exist at the time the differential layer is added and trimmed. While Avago is correct that the cited excerpts do not conclusively indicate that electrodes 12 and 16 must exist at the same time, TriQuint's plain-language reading of the excerpts, in light of the other pertinent parts of the specification described above, is far more likely to be the one accepted and understood by those of ordinary skill in the art.

Because the '647 patent does not disclose the bottom mass-loading design used by Avago, TriQuint may proceed with its claims of infringement under the doctrine of equivalents. Avago's motion for summary judgment of non-infringement of the '647 patent is therefore DENIED.

**IV.    TriQuint's Motion for Summary Judgment**

    **A.    Avago's Allegations of Infringement under the Doctrine of Equivalents**

TriQuint argues that Avago's experts have not provided sufficiently particularized testimony to support Avago's claims of infringement under the doctrine of equivalents, and therefore all of Avago's infringement claims should be limited to only claims of literal infringement.

As described above, "[t]he 'essential inquiry' in any determination under the equivalents doctrine is whether 'the accused product or process contains elements identical or equivalent to each claimed element of the patented invention.'" *Am. Calcar, Inc. v. Am.*

*Honda Motor Co., Inc.*, 651 F.3d 1318, 1338 (Fed. Cir. 2011) (quoting *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Amgen Inc. v. F. Hoffman-LA Roche Ltd*, 580 F.3d 1340, 1382 (Fed. Cir. 2009) (quoting *Warner-Jenkinson*, 520 U.S. at 40). "Insubstantiality may be determined by whether the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation." *Id.* (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

Under Federal Circuit precedent, "a patentee must still provide particularized testimony and linking argument as to the 'insubstantiality of differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996). The patentee must present the evidence "on a limitation-by-limitation basis." *Id.* "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.*

However, this "particularized testimony" standard is not without limitations. For example, it does not require an expert to "re-start his testimony at square one when transitioning to a doctrine of equivalents analysis." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007). Rather, it is "desirable for a witness to incorporate earlier testimony in order to avoid duplication." *Id.* Nevertheless, "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989).

TriQuint asks the Court to preclude all of Avago's arguments under the doctrine of equivalents. However, the Court will not simply exclude all of Avago's doctrine of

- 57 -

equivalents arguments, and instead will evaluate each of Avago's theories of infringement under the doctrine of equivalents, using the standards elucidated above, on a claim-by-claim basis.

**B.   Non-Infringement of the '907 Patent**

Avago claims that TriQuint has infringed U.S. Patent No. 6,051,907 ("the '907 patent"). TriQuint has moved for summary judgment of non-infringement on claims 10 and 11 of the '907 patent. The abstract of the '907 patent states that the patent is directed to "[a] method for tuning a Thin Film Bulk Acoustic Wave Resonator (FBAR) located on a wafer." Independent claim 10 of the '907 patent requires the following:

> A method for simultaneously tuning a plurality of Thin Film Bulk Acoustic Wave Resonators (FBARs) before the FBARs are separated from a wafer, comprising steps of:
>
> measuring a frequency at which selected ones of the FBARs exhibit a resonance, the frequency being a function of thicknesses of the selected FBARS;
>
> calculating an average of the measured frequencies;
>
> calculating an amount (A) by which the thicknesses of the selected FBARs need to be altered in order to substantially minimize a difference between the calculated average of the measured frequencies and a reference frequency; and
>
> simultaneously altering the thicknesses of each of the plurality of the FBARs by the amount (A) before the plurality of FBARs are separated from the wafer for reducing the difference between the reference frequency and the calculated average of the measured frequencies.

Claim 11 depends from claim 10, requiring "[a] method as set forth in claim 10, wherein the number of selected ones is less than a total number of the plurality of FBARs fabricated on the wafer."

TriQuint puts forth three arguments supporting its motion for non-infringement of these claims, including that TriQuint does not alter the thicknesses of its resonators simultaneously, TriQuint does not alter its resonator thicknesses by a single amount, and TriQuint does not average measured frequencies.

- 58 -

### 1. "Simultaneously Altering" Limitation

Claim 10 requires, in part, "simultaneously altering the thicknesses of each of the plurality of the FBARs by the amount (A)." In the *Markman* order, the Court construed this term to mean "altering the thickness of each film bulk acoustic resonator to be detuned on a wafer by the same amount (A) at the same time." (Doc. 229, at 72). In construing this element of the claim, the Court rejected TriQuint's proposed construction wherein "all the FBARs" on a wafer must be altered at the same time. *Id.* Rather, under the Court's construction, "each film bulk acoustic resonator to be detuned on a wafer" must be altered at the same time. Though this construction could in certain instances refer to all resonators on a wafer if all resonators on a wafer are *to be detuned*, this construction could also refer to only a small subset of resonators on the wafer that are *to be detuned*, where the remaining resonators on the wafer will not be detuned. Thus, determining infringement of this element turns on a factual question of whether all resonators to be detuned on a wafer in TriQuint's allegedly infringing process are altered at the same time.

TriQuint argues that it does not literally infringe the claims of the '907 patent because it does not alter the thicknesses of each resonator to be detuned on its wafers at the same time. Instead, TriQuint contends that its Ion Beam Etching (IBE) tool "moves the beam over the surface of the wafer and trims different locations on a wafer at different times." (Doc. 415, at 46). Thus, because the different locations are trimmed at different times, and each of the locations that is trimmed corresponds to a location "to be detuned," in TriQuint's view it cannot be liable for literal infringement of this element. TriQuint further argues that Avago has failed to properly allege infringement of this element by equivalents.

In response, Avago points primarily to statements included in Dr. Howe's excluded declaration to support its arguments of literal infringement and infringement by equivalents. Because the Court has excluded Dr. Howe's declaration, arguments based on that document will not be considered. Furthermore, in Dr. Howe's expert report, he states only that "each of the TriQuint Products/Processes meets all of the limitations of claim 10 of the '907 Patent

by the doctrine of equivalents and, therefore, infringes claim 10 of the '907 Patent." (Doc. 417-16, Ex. 95 at ¶ 143). Dr. Howe makes an almost identical statement in his report with respect to claim 11. (*Id.* at ¶ 149). Furthermore, in his deposition testimony, Dr. Howe stated that, under the Court's construction of this element, TriQuint could only infringe under the doctrine of equivalents. (Doc. 417-15, Ex. 93 at 63:3-64:5). Thus, the Court finds that the undisputed facts show that TriQuint does not literally infringe this element. Any theory to the contrary that may be included in Dr. Howe's excluded declaration was submitted too late for the Court to consider.

Similarly, any analysis under the doctrine of equivalents in Dr. Howe's excluded declaration will not be considered. Further, though Dr. Howe did to some degree discuss infringement by equivalents in his deposition testimony, he provided no discussion of such infringement in his expert report, which under Rule 26(a) must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Thus, Dr. Howe could not overcome the inadequacies of his report through deposition testimony. *See MOSAID Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 362 F. Supp. 2d 526, 543 (D.N.J. 2005) ("MOSAID's argument that the inadequacies of these expert reports can be shored up by posing questions to its own experts during expert depositions concerning their position on equivalency is incorrect."); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 289 F. Supp. 2d 493, 500 (D. Del. 2003) ("Since Honeywell's position on the doctrine of equivalents is only supported by Dr. Hansman's deposition testimony on direct examination and is not contained in his expert report, Honeywell is precluded from relying on his deposition testimony to argue infringement by equivalents.").

The Court therefore finds that Avago has not sufficiently alleged infringement of this element either literally or by equivalents. Since this element is required by both claims 10 and 11 of the '907 patent, TriQuint's motion for summary judgment of non-infringement of those claims is GRANTED. Accordingly, the Court need not consider the parties' arguments regarding any other limitations of those claims.

## C.  Non-Infringement and Invalidity of the '807 Patent

Avago claims that TriQuint infringes U.S. Patent 6,933,807 ("the '807 patent").  In response, TriQuint argues that the '807 patent is invalid and that TriQuint therefore cannot infringe the patent.  TriQuint bases its invalidity argument in part on its assertion that the claims of the '807 patent are indefinite.

Patent claims are subject to a statutory requirement of definiteness.  The second paragraph of 35 U.S.C. § 112 states "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  "The 'distinctly claiming' requirement means that the claims must have a clear and definite meaning when construed in light of the complete patent document. . . . Section 112 thus ensures definiteness of claim language."  *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 874-75 (Fed. Cir. 1993) (citations omitted).

Only those claims that are "not amenable to construction" or "insolubly ambiguous" are indefinite.  *Haliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008).  Furthermore, determination that a patent is invalid for indefiniteness is a question of law.  *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001).  A single indefinite limitation will invalidate any claim that includes that limitation.  *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366-67 (Fed. Cir. 2008); *Halliburton Energy Servs.*, 514 F.3d at 1249-55.  Additionally, any claim depending from such an invalid claim also necessarily incorporates the indefinite limitation, and is therefore also invalid.  *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1356 (Fed. Cir. 2005) ("'Aesthetically pleasing,' as it is used in the only independent claim of the '137 patent, fails to 'particularly point[] out and distinctly claim [] the subject matter which the patentee regards as his invention.' . . . We therefore affirm the district court's grant of summary judgment of invalidity of all claims of the '137 patent.").

Avago's '807 patent is generally directed to "a BAW resonator with an acoustic reflector whose performance at the resonance frequency is improved."  ('807 patent, at 6:8-

10). The patent includes two independent claims, claims 1 and 10. Claim 1 requires, in part, a BAW resonator with an acoustic reflector, while claim 10 requires, in part, a filter circuit with a plurality of BAW resonators, each of which comprises an acoustic reflector. Notably, both claim 1 and claim 10 include the following limitation:

> . . . wherein the performance of the acoustic reflector is determined by its reflectivity for a longitudinal wave existing in the BAW resonator at the resonance frequency of the BAW resonator and by its reflectivity for a shear wave existing in the BAW resonator at the resonance frequency of the BAW resonator . . .

After the *Markman* hearing, this Court determined in its subsequent order that this claim term was "indefinite and incapable of construction." (Doc. 229, at 38). Therefore, because both claims 1 and 10 include this indefinite limitation, both claims 1 and 10 are invalid. Moreover, because claims 2-9 depend, either directly or indirectly, from claim 1 and claim 11 depends from claim 10, those additional claims also incorporate this indefinite limitation and are therefore also invalid.

Avago nevertheless argues that rather than finding this limitation indefinite, the Court found this limitation "unnecessary." (Doc. 424, at 51). Avago then puts forth new testimony from its expert, Dr. Milsom, to argue that the limitation is not indefinite to one of ordinary skill in the art. Thus, Avago essentially asks the Court to reconsider its previous construction of this limitation.

However, as the Court noted in the *Markman* order, Avago argued at that time that no construction of this term was necessary and merely directed the Court to the patent specification without any elaboration to support that argument. (Doc. 229, at 38). The Court clearly rejected Avago's argument. (*Id.*). Avago cannot now take a "mulligan" and seek a new construction of this limitation. Claim construction is a question of law, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), and this Court decided, after a hearing and full briefing by both parties, that the "performance" limitation was indefinite as a matter of law.

Furthermore, though the Court is not willing to revisit construction of this claim, the

Court will clarify some remarks made in the *Markman* order. The Court compared its analysis of this claim limitation's indefiniteness to the analysis of whether a preamble is limiting, stating that "deletion of the disputed claim term from claims 1 and 10 does not affect the remaining terms, claims or invention." (Doc. 229, at 38). The Court further stated that "[t]he disputed claim term is invalid and must not be considered in determining whether the '807 patent has been infringed." (*Id.*).

The Court acknowledges that this statement, by seeming to leave open the potential for an infringement finding, was not entirely accurate. The Federal Circuit has held that infringement and validity are "entirely separate" questions. *Medtronic, Inc., v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983). Nevertheless, "an invalid claim cannot give rise to liability for infringement." *Id.*; *see also Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (finding the district court erred in concluding that invalidity for indefiniteness should be found only in the alternative to its finding of non-infringement and thus vacating the district court's finding of non-infringement and affirming the district court's finding of invalidity). As discussed above, by finding a term of claims 1 and 10 of the '807 patent to be indefinite, the Court necessarily found that those entire independent claims, and the remaining dependent claims that depend from claims 1 and 10, were invalid under Section 112, second paragraph. Thus, there can also be no liability for infringement of the '807 patent.

All of the eleven claims of the '807 patent are therefore invalidated for indefiniteness under 35 U.S.C. § 112, second paragraph, and TriQuint's motion for summary judgment of invalidity and non-infringement of the '807 patent is GRANTED. Accordingly, the Court need not reach TriQuint's alternative argument for invalidity based on inadequate enablement under 35 U.S.C. § 112, first paragraph.

### D. Non-Infringement of the '340 Patent

#### 1. Aspect ratios that are "the same"

Avago claims that TriQuint infringes claims 1-4 and 9-12 of United States Patent

6,909,340 ("the '340 patent"). In response, TriQuint has moved for summary judgment of non-infringement of those claims. TriQuint also argues that Avago has presented no allegations of infringement of claim 11. In its controverting statement of facts, Avago confirms that it does not assert infringement of claim 11. Thus, with respect to claim 11 of the '340 patent, TriQuint's motion for summary judgment of non-infringement is GRANTED. The remaining asserted claims are discussed below.

The '340 patent is directed to bulk acoustic wave filters in which the spurious modes are attenuated. Claims 1 and 12, the only two independent claims of the '340 patent, each require, in part, "[a] bulk acoustic wave filter, comprising . . . a plurality of bulk acoustic wave resonators . . . said plurality of bulk acoustic wave resonators having effective resonator surfaces . . . [and] the effective resonator surfaces of all of said plurality of bulk acoustic wave resonators having different aspect ratios."

In the *Markman* order, this Court noted that the parties stipulated that the phrase "[a] bulk acoustic wave filter, comprising: a plurality of bulk acoustic wave resonators" means "[a] bulk acoustic wave filter having at least two bulk acoustic wave resonators." (Doc. 229, at 47). Additionally, the Court construed "aspect ratios" to mean "the smallest dimension of the resonator within the surface plane divided by the largest dimension of the resonator within the surface plane. The directions of these two dimensions need not be perpendicular to each other." (*Id.* at 51). Further, the parties stipulated that "the effective resonator surfaces of all of said plurality of bulk acoustic wave resonators having different aspect ratios" means "no two resonators in the filter have effective resonator surfaces with the same aspect ratio." (Doc. 209, at 3). TriQuint argues that it does not infringe any of the claims of the '340 patent because all of its accused products contain at least two resonators with the same aspect ratio.

Though the Court's claim constructions and the parties' stipulations regarding the terms of these claims give guidance as to what an aspect ratio is and how it should be measured, there is little guidance as to when two aspect ratios are "the same." Hence,

TriQuint's argument is directed toward establishing that its products all include at least two resonators with aspect ratios that can be shown to be "the same," when the degree of sameness is measured with fewer significant digits and thus less precise measurements. Avago, conversely, argues that a greater number of significant digits must be used when calculating aspect ratios and that when a higher level of precision is used, TriQuint's resonators can be shown to all have different aspect ratios and therefore infringe the '340 patent. The parties additionally use two different formats to recite aspect ratio measurements, with each party's format being the inverse of the other's format.

More specifically, TriQuint argues that the aspect ratio measurements taken by Avago's expert, Dr. Muralt, should be compared in the format of "1:x" with "x" limited to the tenths digit beyond the decimal point because that is how aspect ratios are recited in the '340 specification and claims (e.g., 1:1.5). Nevertheless, TriQuint further argues that its products can be shown to contain resonators with the same aspect ratio even when an extra significant digit, the hundredths digit, is included (e.g., 1:1.50). Finally, when including the thousandths digit in the inverse format (e.g., 0.667 instead of 1:1.50) with respect to accused product EG9504, TriQuint argues that it can show that this product has two resonators with the same aspect ratio. TriQuint additionally contends that "measurement deviation" in Dr. Muralt's measurements further supports a finding that at least two resonators in each accused TriQuint product have the same aspect ratio.

In response, Avago argues that limiting aspect ratio measurements to only the tenths or hundredths place leads to "illogical results," even allowing resonators that are intended to have different aspect ratios to be measured with sufficient imprecision to have the same aspect ratio. Thus, in Avago's view, aspect ratios of the resonators in TriQuint's products must be compared using at least the thousandths place. Avago alternatively states this required level of precision as including five significant digits, though it is unclear how Avago calculates this number of significant digits. Finally, Avago contends that TriQuint overstates the impact of "measurement deviation" on the calculated aspect ratios, and that any

uncertainties in the measurements would not preclude a finding that all resonators in TriQuint's products have different aspect ratios.

Essentially, the parties' arguments with regard to comparing aspect ratio measurements boil down to determining how one of ordinary skill in the art would compare aspect ratio measurements. Specifically, at least the format preferred by one of ordinary skill in the art, the number of significant digits one of ordinary skill in the art would include in the measurements, how one of ordinary skill in the art would calculate the number of significant digits, and how one of ordinary skill in the art would weigh uncertainties in measurements all must be determined before it can be said with any certainty whether one of ordinary skill in the art would consider two aspect ratio measurements to be "the same."

These issues all present questions of material fact. And based on the evidence submitted by the parties, including conflicting expert testimony, a reasonable finder of fact could decide in favor of either party on any one of these questions. For example, though TriQuint is correct in asserting that the '340 patent itself only includes the tenths digit beyond the decimal point when reciting aspect ratios, it never does so in the context of comparing two aspect ratios to determine if they are "the same." Thus, to the extent that the '340 patent itself provides any guidance on the comparison of two aspect ratios, it remains unclear whether one of ordinary skill in the art would employ this same level of precision for purposes of determining infringement of this patent. TriQuint therefore has failed to establish that no question of material fact exists with regard to whether any of its resonators have aspect ratios that one of ordinary skill in the art would deem to be "the same." Its motion for summary judgment of non-infringement is DENIED with respect to this claim limitation.

### 2. Claimed Aspect Ratio Range in Claim 12

Claim 12 further requires, in part, that "the aspect ratios of the effective resonator surfaces be[] between 1:1.5 and 1:3." TriQuint claims that its products do not infringe this element because each of its products contains at least one resonator with an aspect ratio

below 1:1.5 and therefore outside of the ranged claimed in claim 12.  Specifically, TriQuint points to measurements taken by Avago's expert Dr. Muralt that show that its accused products EG9503, EG9504, EG9505, EG9506, and EG9422 each contain a resonator with an aspect ratio that is below 1:1.5.  Avago does not dispute this fact, and instead asserts that each of these products nevertheless infringe under the doctrine of equivalents.  Thus, with respect to products EG9503, EG9504, EG9505, EG9506, and EG9422, TriQuint's motion for summary judgment of non-infringement is GRANTED with regard to literal infringement of claim 12.

With respect to products EG9515, EG9421, and EG9423, TriQuint asserts that Dr. Muralt did not analyze these designs in his report.  Furthermore, TriQuint claims that its expert, Dr. Kim, showed that these designs have aspect ratios that are outside of the range claimed in claim 12.  In its response, Avago does not dispute TriQuint's assertions and rather maintains only that all of TriQuint's accused products infringe this element under the doctrine of equivalents.  Therefore, with respect to products EG9515, EG9421, and EG942, TriQuint's motion for summary judgment of non-infringement is GRANTED with regard to literal infringement of claim 12.

### 3. Infringement under the Doctrine of Equivalents

Though TriQuint does not literally infringe the aspect ratio range elements of claim 12, Avago also asserts that TriQuint does infringe that element under the doctrine of equivalents.  In its motion for summary judgment of non-infringement, TriQuint argues first that Avago has not properly asserted infringement under the doctrine of equivalents.  Rather, in TriQuint's view, Avago has only "made a passing effort" at arguing such infringement and has thus failed to provide the particularized testimony and linking argument required to make out a proper claim.

TriQuint also argues that Avago is barred by prosecution history estoppel from claiming infringement of claim 12 under the doctrine of equivalents.  Under the principle of prosecution history estoppel, a patentee risks surrendering subject matter when making a

narrowing amendment to a claim such that the patentee will be estopped from using the doctrine of equivalents to recapture the surrendered subject matter in subsequent litigation. *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) (en banc).

The Federal Circuit has held that application of prosecution history estoppel relies on a multi-step test. The first inquiry is "whether an amendment filed in the Patent and Trademark Office . . . has narrowed the literal scope of a claim." *Id.* at 1366. If it has, then the next inquiry is "whether the reason for that amendment was a substantial one relating to patentability." *Id.* If it was, then the third and final inquiry "addresses the scope of the subject matter surrendered by the narrowing amendment." *Id.* at 1367. At that point a presumption is imposed that "the patentee has surrendered all territory between the original claim limitation and the amended claim limitation." *Id.* On the other hand, if the amendment did not narrow the claim, it was not made for a substantial reason related to patentability, or the patentee successfully rebuts the presumption of surrendered territory, then prosecution history estoppel will not apply. *Id.* at 1366-67. Finally, "[q]uestions relating to the application and scope of prosecution history estoppel . . . fall within the exclusive province of the court. Accordingly, the determinations concerning whether the presumption of surrender has arisen and whether it has been rebutted are questions of law for the court, not a jury, to decide." *Id.* at 1368.

TriQuint argues that narrowing amendments were made to the '340 patent at the prosecution stage when specific numerical aspect ratio ranges were added to claims 1 and 12 and that these amendments were made specifically to overcome the examiner's rejection of the original claims. Thus, TriQuint contends that Avago is limited to arguing only literal infringement of those specific ranges and that the ranges cannot be expanded through the doctrine of equivalents.

The prosecution history of the '340 patent supports a finding that adding these ranges to the claims constituted narrowing amendments and that these amendments were made for

a substantial reason relating to patentability. First, in the office action dated July 13, 2004, the examiner states that original claims 7 and 8, which included the range limitations of current claims 1 and 12, "would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claim." (Doc. 196-3, Ex. 20 at 8). In that same office action, the examiner rejected the remaining claims as either being anticipated by or obvious in view of the prior art. (*Id.* at 3-7).

In response, the applicants amended claim 1 to include the limitations of claims 6 and 7. (Doc. 196-4, Ex. 21 at 5, 12-13). The applicants also amended claim 8 to include the limitations of claims 1 and 6. (*Id.* at 6-7, 13). Additionally, with respect to claim 1, the applicants stated "[s]ince claim 7 contains allowable subject matter as indicated by the Examiner in item 11 on page 8 of the office action, claim 1 is now believed to be allowable." (*Id.* at 12-13). The applicants further stated that "[a]pplicants acknowledge the Examiner's statement . . . that claims 7-8 would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." (*Id.* at 13). Claims 1 and 8 from that amendment are identical to current claims 1 and 12, respectively.

There is no dispute that the addition of the aspect ratio ranges to the independent claims of the '340 patent narrowed the scopes of those claims. Furthermore, the prosecution history clearly demonstrates that those amendments were made specifically to overcome the examiner's rejections based on prior art and to thereby get the independent claims in allowable form. The amendments therefore were made for a substantial reason relating to patentability, and thus give rise to a presumption of prosecution history estoppel. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002) ("Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope.").

Thus, under *Festo*, a presumption arises that Avago has "surrendered all territory between the original claim limitation and the amended claim limitation." 344 F.3d at 1367. Specifically, that would include all aspect ratios outside of the specified ranges added to the

claims during prosecution. Avago is entitled to rebut the presumption, but it is limited to three methods: "the patentee must demonstrate that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment, that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question, or that there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." *Festo*, 344 F.3d at 1368.

However, Avago makes no attempt to overcome the presumption using these methods. Instead, Avago merely states that though "it is conceivable" that TriQuint's prosecution history estoppel arguments could apply to claim 1, they cannot apply to claim 12 because claim 12 requires a range that is narrower than claim 1. (Doc. 424, at 59). In Avago's view, that fact indicates that the limitation of claim 12 could not have been made to overcome the prior art.

This argument is clearly not sufficient to rebut the presumption of patent history estoppel under the methods outlined in *Festo*. Moreover, though this argument appears to be directed more to the second inquiry of the *Festo* test, Avago offers no alternative interpretation of the prosecution history, which as described above, appears to clearly demonstrate that the patent applicants made the amendments at issue specifically to overcome the prior art and to put the claims in allowable form. Thus, Avago has failed to rebut the *Festo* presumption and is barred from relying on the doctrine of equivalents with respect to the aspect ratio ranges of claims 1 and 12. *Festo*, 344 F.3d at 1367. TriQuint's motion for summary judgment of non-infringement is therefore GRANTED with respect to infringement of claim 12 of the '340 patent under the doctrine of equivalents.

In sum, Avago may proceed to trial on its infringement claims with respect to claims 1-4 and 9-10 of the '340 patent, but not claims 11 and 12.

**E.  Non-Infringement of the '637 Patent**

Avago claims that TriQuint infringes claims 1-3, 6, 7, 10, 13, 14, 16, 20, and 21 of United States Patent No. 6,262,637 ("the '637 patent"). TriQuint has moved for summary

judgment of non-infringement of these claims and further argues that Avago's assertion of claims 6, 16, and 20 were untimely. The '637 patent is directed to a duplexer made using FBAR filters. Several of the asserted claims require a "90° phase shifter,"which the Court has construed to mean "a phase shifter that shifts the phase of a signal by 90 degrees." (Doc. 229, at 67-68). Also, claims 6, 7, 13, 14, 16, 20 and 21 of the '637 patent each require "an auxiliary inductor," a term that has not been construed by the Court or the parties. TriQuint claims that none of its accused products contains a 90 degree phase shifter and that Avago's assertions of claims that include an auxiliary inductor were untimely and thus should be barred.

### 1. The "Auxiliary Inductor" Claims

With respect to the auxiliary inductor claims, Avago first asserted these claims in its Final Infringement Contentions dated April 15, 2011, the same day that final infringement and invalidity contentions were due under the Court's modified scheduling order. (Doc. 246). TriQuint argues that this belated assertion of these new claims violates the Court's scheduling order and is substantially prejudicial to TriQuint, depriving it of the opportunity to take proper discovery and necessitating the reopening of expert discovery. TriQuint further argues that the parties disagree over the scope of the newly asserted claims, thus requiring the Court to revisit construction of any disputed claim terms.

In its Rule 16 Scheduling Order dated October 29, 2009, the Court ordered that Preliminary Infringement Contentions were due by April 10, 2010 and that Final Infringement Contentions were due on March 18, 2011. (Doc. 40, at 2-4). The Court later extended the deadline for Final Infringement Contentions to April 15, 2011. (Doc. 246, at 1). Under Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." Furthermore, Rule 16(f) provides that a court may impose on a party sanctions that are consistent with Rule 37(b)(2)(A)(ii) for failure to comply with a scheduling order, including "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."

With regard to infringement contentions in a patent case, the general purpose of preliminary infringement contentions is "to provide defendants with notice of infringement beyond the claim language itself." *Shurtape Techs., LLC v. 3M Co.*, 2011 WL 4750586, at *2 (W.D.N.C. October 7, 2011) (citing *Shared Memory Graphics LLC v. Apple, Inc.*, 2010 WL 5477477, at *3 (N.D. Cal. Dec. 30, 2010)); *see also Whipstock Servs., Inc. v. Schlumberger Oilfield Servs.*, 2010 WL 143720, at *1 (E.D. Tex. Jan. 8, 2010)). Final infringement contentions, on the other hand, generally provide parties the opportunity to amend their preliminary infringement contentions in response to a court's claim constructions, if necessary. *Cf. 02 Micro Intern. Ltd. v. Monolithic Power Systems, Inc.*, 467 F.3d 1355, 1362-63 (Fed. Cir. 2006) (discussing the role of preliminary and final infringement contentions under the local rules for patent cases in the Northern District of California).

Here, Avago admits that it did not assert claims 6, 7, 13, 14, 16, 20 and 21 of the '637 patent until April 15, 2011. Thus, Avago did not provide TriQuint with notice of infringement of these claims until that date. Avago nevertheless argues that TriQuint anticipated that these infringement assertions were coming, alleging that TriQuint asked for constructions of terms in claims 20 and 21 during *Markman* briefing, questioned the inventors of the '637 patent about "auxiliary inductors," and submitted expert reports on both invalidity and infringement of claims having "auxiliary inductors." (Doc. 424, at 64). However, Avago does not cite specifically to any part of TriQuint's *Markman* briefing, and all of the deposition transcripts and expert reports to which it refers are dated after April 15, 2011, when Avago first asserted claims 6, 7, 13, 14, 16, 20 and 21. Thus, there is no support for Avago's assertion that TriQuint, prior to April 15, 2011, somehow anticipated that these infringement claims would eventually be asserted. Therefore, Avago's new infringement contentions with regard to these claims, as they appeared in Avago's Final Infringement Contentions, served merely to provide TriQuint with notice of infringement. Hence, the Court will view them as preliminary infringement contentions, rather than final infringement

contentions.

As previously stated, the Court set April 10, 2010 as the deadline for preliminary infringement contentions. Thus, Avago did not assert its preliminary infringement contentions regarding claims 6, 7, 13, 14, 16, 20, and 21 until more than one year beyond the deadline. Rule 16 therefore requires Avago to show good cause for this delay. *See also 02 Micro Intern.*, 467 F.3d at 1366 ("The burden is on the movant to establish diligence rather than on the opposing party to establish a lack of diligence."). However, Avago's only attempt to explain its untimeliness is to state that at the time of its belated infringement contentions, TriQuint had "only recently provided" certain product samples and had still not provided other product samples. (Doc. 424, at 63). Avago offers no further discussion of these assertions, let alone any evidence to support them. Therefore, the Court finds that Avago has failed to show good cause for its untimely infringement contentions regarding claims 6, 7, 13, 14, 16, 20, and 21.

Furthermore, Avago's attempt to assert these claims at such a late stage in this litigation clearly prejudices TriQuint, which was not provided adequate time to assess these claims or to complete discovery on them. Moreover, as TriQuint argues, allowance of these claims likely would require the Court to revisit claim construction and potentially reopen expert discovery. The Court is not willing to do so because of Avago's lack of diligence in asserting its infringement contentions. Thus, the Court, under the authority to impose sanctions granted by Rules 16(f) and 37(b), bars Avago from asserting that TriQuint has infringed claims 6, 7, 13, 14, 16, 20 and 21 of the '637 patent.

## 2. 90 Degree Phase Shifter

Claim 1 and all of its dependent claims of the '637 patent require a "90° phase shifter." As previously stated, the Court has construed this term to mean "a phase shifter that shifts the phase of a signal by 90 degrees." (Doc. 229, at 67-68). In its analysis of this term, the Court rejected constructions in which the 90 degree phase shift must occur "at the center frequency of the other band pass filter," in which the phase shift could occur "by

approximately 90°," and in which additional intent limitations were read into the term. (*Id.* at 67-68).

In its motion for summary judgment, TriQuint does not argue that its accused products do not contain phase shifters, but rather it argues that the phase shifters that its products do contain shift the signal phase by an amount other than 90 degrees. Therefore, TriQuint argues that its products do not literally infringe the '637 patent. Further, TriQuint asserts that Avago has completely failed to present any evidence that the TriQuint phase shifters shift the signal phase by 90 degrees. Rather, as TriQuint points out in its brief, Avago's expert, Dr. Howe, limited his remarks on this claim term to stating in his expert report that TriQuint circuits contain "an inductor and capacitors serving as a 90 degree phase shifter," (Doc. 418-5, Ex. 237 at ¶ 99), and estimating in his deposition testimony that TriQuint's phase shifters would shift the phase of the signal "somewhere between 85 and 95 degrees." (Doc. 417-15, Ex. 93 at 282-83). Thus, TriQuint argues that Dr. Howe's statements are merely unsupported conclusions that are insufficient to support a finding of infringement, either literally or by equivalents.

To rebut these arguments, Avago relies heavily on statements made by Dr. Howe in his declaration which Avago attached to its response to TriQuint's motion. However, as previously described, the Court has excluded this declaration in its entirety because it is untimely. Thus, in responding to TriQuint's allegations that Dr. Howe's statements are merely conclusory assertions, Avago fails to point to any evidence in Dr. Howe's expert report or his deposition testimony that supports his assertion that the TriQuint circuits contain phase shifters that shift the phase of a signal by 90 degrees.

The Court therefore finds that Dr. Howe's statements regarding the '637 patent are not sufficiently supported to establish a material question of fact as to whether any of the TriQuint circuits contains "a phase shifter that shifts the phase of a signal by 90 degrees," as is required by the Court's claim construction. Rather, Dr. Howe's statements in both his report and his deposition testimony merely constitute bare assertions on the issue of

infringement. Such unsupported conclusory assertions are insufficient to support a finding of infringement. *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) ("[I]t is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact."). Therefore, Avago has failed to establish that a genuine issue of fact exists with regard to literal infringement of claims 1-3 and 10 of the '637 patent, and thus TriQuint's motion for summary judgment of non-infringement with respect to literal infringement of those claims is GRANTED.

Similarly, with regard to potential infringement under the doctrine of equivalents, TriQuint again argues that Avago has failed to provide sufficient particularized testimony and linking argument to support such a claim. In response, Avago points only to statements in Dr. Howe's excluded declaration to support its doctrine-of-equivalents claim. Thus, the Court finds that Avago has failed to sufficiently support its doctrine-of equivalents claims by providing the required particularized testimony and linking argument. *See Texas Instruments*, 90 F.3d at 1567. Therefore, TriQuint's motion for summary judgment of non-infringement with respect to infringement of claims 1-3 and 10 of the '637 patent under the doctrine of equivalents is GRANTED.

### F. Non-Infringement of the '5619 Patent

Avago claims that TriQuint infringes claims 1-20 of United States Patent No. 7,365,619 ("the '5619 patent"). TriQuint has moved for summary judgment of non-infringement of claims 1-10.

### 1. "Electrically Operated in Inverse Phase" Element

Each of claims 1-10 of the '5619 patent requires, in part, a BAW filter comprising "a first BAW resonator and a second BAW resonator connected antiparallel," wherein "the first BAW resonator and the second BAW resonator are electrically operated in inverted phase." The parties have stipulated that the term "electrically operated in inverted phase" means "operated such that the electrical signals applied to the first BAW resonator and the second BAW resonator have the same magnitude, but when the voltage of one signal is positive, the

other is negative, and vice versa." Additionally, the Court has construed "antiparallel" to mean "[t]he first electrode of the first resonator is electrically connected to the second electrode of the second resonator, and vice versa; where the first and second electrodes of a resonator are determined by the direction of polarization of the resonator." (Doc. 229, at 27).

TriQuint argues that Avago has failed to prove that any of TriQuint's resonators are electrically operated in inverted phase. Rather, TriQuint asserts that the report by Avago's expert, Dr. Muralt, only relates to the physical, and not the electrical, characteristics of the resonators. TriQuint further argues that Dr. Muralt has admitted that the voltages applied to the TriQuint resonators are "the same," which is inconsistent with the Court's construction of the claim, and thereby precludes infringement. TriQuint additionally argues that its interpretation of Dr. Muralt's remarks are supported by the report of its own expert, Dr. Kiaei, who stated that the small size of and distance between the accused resonators would cause the signal applied to each resonator to have "a practically identical magnitude and sign at all times," (Doc. 417-16, Ex. 114 at ¶ 131), thereby precluding infringement.

Avago responds by arguing that it is TriQuint's interpretation of the stipulated construction that leads to impossible results. Specifically, Avago states that TriQuint's interpretation would require that the voltage of the first electrode of the first resonator be the opposite of the voltage on the second electrode of the second resonator. However, because under the Court's construction of "antiparallel" those two electrodes must be connected, those two electrodes must also have the same voltage, in terms of both magnitude and sign. Thus, Avago argues that one of ordinary skill in the art would correctly interpret the stipulated construction to mean that "the electrical signal applied to each BAW resonator refers to the electrical signal applied across the top electrode and the bottom electrode of the resonator–not the voltage at just one of the electrodes–such that the overall voltage of the electrical signal applied to each resonator is simply the top electrode voltage minus the bottom electrode voltage." (Doc. 424 at 66). Avago further states that this interpretation is supported by Dr. Muralt's expert report, wherein he stated that TriQuint's first and second

BAW resonators are electrically operated in inverted phase, and offered images from an acoustic image microscope as proof. (Doc. 417-16, Ex. 104 at ¶ 53).

In its reply, TriQuint states that Dr. Muralt's report only demonstrates that the resonators are acoustically out of phase, rather than electrically out of phase. Also, TriQuint implies that the Court's construction of "antiparallel," which was urged by Avago, is not consistent with the parties' stipulated construction of "electrically operated in inverted phase." Thus, TriQuint argues that to accept Avago's theory would require the Court to revisit claim construction.

The Court finds, however, that no such revisiting of claim construction is necessary. TriQuint's arguments fail to show that Avago has not made out a proper case of infringement. Rather, the evidence presented by Avago is not only consistent with both the Court's construction of "antiparallel" and the parties' stipulated construction of "electrically operated in inverted phase," but also sufficient to create a genuine issue of material fact. Moreover, TriQuint has failed to demonstrate that one of ordinary skill in the art would not interpret the acoustic microscope images as evidence that TriQuint infringes these elements of the '5619 patent. Thus, TriQuint has failed to show that it is entitled to judgment as a matter of law on Avago's theory of infringement, and its motion for summary judgment of non-infringement of the "electrically operated in inverted phase" element of the '5619 patent is DENIED.

## 2. "Related to a Common Ground" Element

TriQuint also moves for summary judgment of non-infringement of the "related to a common ground" element of claims 1-10 of the '5619 patent. Specifically, those claims require that the BAW filter further comprises "a signal input and a signal output related to a common ground." The Court has construed this term to simply mean "related to a common electrical ground." (Doc. 229, at 24-25). In its reply brief, TriQuint summarizes the parties' arguments on this element. Specifically, TriQuint contends that "the grounds connected to its filters' signal input and signal output are separate." TriQuint summarizes Avago's

response as arguing "that the split grounds are eventually connected (grounded) outside the filter on the circuit boards on which the filter chips are mounted." (Doc. 411, at 32). TriQuint does not make an attempt to dispute that Avago has provided sufficient evidence to support its argument. Thus, TriQuint concludes that "[t]he parties' dispute . . . is not an issue of fact, but an issue of law: whether the claimed 'common ground' must be located within the claimed 'BAW filter' or not." (*Id.*).

The Court finds that TriQuint's characterization of the parties' arguments to be accurate, and further finds that the parties have provided sufficient evidentiary support for their respective arguments. However, the Court does not agree with TriQuint's view that the dispute over this claim term is a question of law. As is noted in the Court's *Markman* order, TriQuint originally argued for a construction of this claim term that included the limitation that the common ground is located within the filter: "using a shared terminal within the filter that electrically connects the reference voltages of the input and output signals to the device's ground voltage." (Doc. 229, at 24). However, as is stated in the *Markman* order, the Court rejected the additional concepts in TriQuint's proposed construction, including the "within the filter" language, because they would require further unnecessary construction. Rather, the Court concluded that "[a] person of ordinary skill in the art would understand 'related to a common ground' to mean 'related to a common electrical ground." (*Id.* at 24-25).

Thus, in accordance with the *Markman* order, the Court finds that a question of material fact remains in determining whether TriQuint's accused filters infringe the '5619 patent. Based on the evidence submitted, a reasonable jury could conclude that any of TriQuint's accused filters, regardless of whether its common ground is within the filter or not, meets the claim limitation of "related to a common electrical ground." TriQuint's motion for summary judgment of non-infringement with respect to the "related to a common ground" element of claims 1-10 of the '5619 patent is therefore DENIED, and Avago may proceed to trial on all claims of infringement of the '5619 patent.

**G. Non-Infringement of the '137 Patent**

Avago claims that TriQuint infringes claims 1, 4-10, 16-18 and 20 of United States Patent No. 6,377,137 ("the '137 patent"). TriQuint has moved for summary judgment of non-infringement of all of the asserted claims.

**1. Removal of Material from Bottom Surface of Substrate**

Claim 1 of the '137 patent requires, in part, "[a] method for batch processing acoustic resonators, comprising . . . removing material from a bottom surface of said substrate to reduce the thickness of the substrate and to reduce an electromagnetic influence in a resulting filter." The Court has construed this claim term to mean "removing material from a bottom surface of said substrate to reduce the thickness of the substrate and to reduce the effects caused by currents flowing through the filter." (Doc. 229, at 62). Claims 4-10 depend from claim 1 and thus incorporate the same requirement.

TriQuint argues that Avago has only alleged that TriQuint thins its wafers, but has presented no evidence regarding the purpose of why TriQuint thins its wafers. Specifically, Avago's expert, Dr. Howe, stated in his expert report that "[t]he wafer is thinned from the backside from its initial thickness of 525 μm to a final thickness of 150 μm (transmit filters) or 110 μm (receive filters)." (Doc. 417-16, Ex. 95 at ¶ 30). Furthermore, though TriQuint does not dispute that it thins its wafers, TriQuint asserts that it does so solely for the purpose of making them smaller. (Doc. 417-16, Ex. 114 at ¶ 42).

In response, Avago first states that determining TriQuint's intent in thinning its wafers is not an appropriate inquiry for summary judgment. In support of this assertion, Avago cites to cases that do not involve patent claims. Rather, the cases to which Avago cites involve circumstances where intent may be an element necessary to prove a fraud claim, *Garter-Bare Co. v. Munsingwear, Inc.*, 650 F.2d 975, 981 (9th Cir. 1981), to prove an employee's claim that her employer terminated her in violation of her First Amendment rights, *Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006), or to prove the intended beneficiary of a deceased person's life insurance policy, *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d.

Cir. 1993).  However, "[i]ntent is not an element of infringement," *see Hilton Davis Chem.*
*Co. v. Warner-Jenkinson Co., Inc.*, 62 F.3d 1512, 1519 (Fed. Cir. 1995) (en banc), *rev'd on*
*other grounds*, 520 U.S. 17 (1997), and the cases cited by Avago are clearly not on point.

Furthermore, the parties' focus on TriQuint's subjective motivation in thinning its
wafers is misguided.  Under established Federal Circuit law, "the motive of the accused
infringer when performing a claimed method is simply not relevant." *Dow Chem. Co. v. Mee*
*Industs., Inc.*, 341 F.3d 1370, 1380 (Fed. Cir. 2003) (citation omitted).  Notably, though the
claimed method at issue in the *Dow* case required "the mass flow rate of the liquid droplets
being increased over time *to avoid destructive thermal stresses*," *id.* at 1375 (emphasis
added), the Federal Circuit emphasized that the pertinent issue was "whether by increasing
the amount of water over time in the systems sold by Mee, destructive thermal stress was
avoided." *Id.* at 1380.  Therefore, "[e]ven if an operator increased water over time in a Mee
system for an entirely different reason, that would not avoid infringement . . . ." *Id.*

The claim language at issue here presents a similar question.  Thus, it is not relevant
whether TriQuint's motivation in thinning its wafers is to reduce the thickness of the
substrate and to reduce the effects caused by currents flowing through the filter.  Rather, the
relevant inquiries, in addition to whether TriQuint actually thins its wafers, are whether, in
doing so, the thickness of the substrate and the effects caused by currents flowing through
the filter are, in fact, reduced.

To that end, Avago's only properly cited evidence to support infringement is Dr.
Howe's statement from his expert report.  Avago does refer to several other statements made
by Dr. Howe in his declaration; however, as described previously, that declaration has been
excluded in its entirety as untimely.  With regard to the statement in Dr. Howe's infringement
report, it is clear that Dr. Howe has alleged that TriQuint thins its wafer.  Indeed, TriQuint
does not dispute that it does so, and further admits that it does so to reduce the thickness of
the substrate.  However, Dr. Howe's statement in his report makes no mention of the effects
caused by currents flowing through the TriQuint filter, if any, and whether TriQuint reduces

them by thinning its wafers. Thus, Avago has not provided sufficient evidence to support its assertion of infringement of this element of the '137 patent. Therefore, TriQuint's motion for summary judgment of non-infringement of claims 1 and 4-10 of the '137 patent is GRANTED.

### 2. "Die Cavity" Element

Claims 5-7, 16-18, and 20 of the '137 patent each require a "die cavity." Specifically, the methods of claims 5-7 require the step of "mounting said die in a die cavity of a package." Claims 16-18 and 20 require "a package having a die cavity formed therein, said die substrate being mounted in said die cavity." The Court has construed the term "die cavity" to mean "a hollow area in a package where the die is mounted." (Doc. 229, at 63).

TriQuint argues that Avago's evidence only shows that TriQuint mounts its die on the surface of a flat laminate structure, and then uses a process known as "overmolding" to cover the die and substrate with a plastic material. (Doc. 417-15, Ex. 93 at 255-56). Thus, to the extent that any cavity is formed, it is immediately occupied by the die itself upon formation. TriQuint therefore argues that its process does not include a "hollow area in a package where the die is mounted" because a "cavity" which is formed from, and always occupied by the die cannot properly constitute a "hollow area."

In response, Avago argues that TriQuint has improperly read a new construction into the claim, one that requires a preexisting cavity and a particular order of manufacture. Thus, Avago asserts that contrary to TriQuint's alleged new construction, there is no requirement that "a cavity (i.e., a hollow area) exist *before* the die is encapsulated." (Doc. 424 at 70). Rather, Avago asserts that the construction of the claim would allow for a die cavity to be formed by encapsulating or "overmolding" the die itself. Furthermore, with regard to the apparatus claims, Avago argues that any process of making the apparatus, and more importantly any sequence of steps within that process, is irrelevant to the question of infringement.

There is some basis for Avago's assertion that the steps of a claimed process need not

be performed in the order written unless that order is explicitly or implicitly required. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001). Nevertheless, Avago's focus on the order in which steps of a process are performed is misguided. Implicit in Avago's argument that a cavity, or hollow area, need not exist *before* the die is encapsulated is the requirement that, at some point, the hollow area must simply exist. Avago does not cite to any evidence of the existence of a hollow area in TriQuint's "overmolding" process. Furthermore, based on the statements of Dr. Howe, no reasonable jury could conclude that the "overmolding" process he describes ever includes a hollow area. Instead, as TriQuint asserts, the "cavity" described by Dr. Howe always contains the mounted and encapsulated die. Nor does Dr. Howe's description indicate that the encapsulated die might ever be removed, thereby potentially leaving in its place a hollow area.

Avago points to no other evidence, other than Dr. Howe's excluded declaration, to support its infringement claim. Moreover, Avago also only cites to that untimely and excluded declaration to support its last-minute assertion of infringement under the doctrine of equivalents. Therefore, TriQuint's motion for summary judgment of non-infringement of the "die cavity" element of claims 5-7, 16-18, and 20 is GRANTED.

In sum, the Court has granted summary judgment in favor of TriQuint with respect to all asserted claims of the '137 patent.

**H. Non-Infringement of the '922 Patent**

Avago claims that TriQuint infringes United States Patent No. 6,841,922 ("the '922 patent"). TriQuint has moved for summary judgment of non-infringement of claims 1-5 and 7-9. Claim 1, the only independent claim of the '922 patent, requires, in part, a "resonator apparatus" comprising "an acoustic reflector comprising a sequence of stacked layers having alternating low and high acoustic impedance . . . wherein the thickness of one layer is set different from a quarter of the acoustic wavelength in this layer at the operating frequency due to technological limitations in the manufacturing of this layer." In the *Markman* order,

the Court gave "due to technological limitations in the manufacturing of this layer" its plain and ordinary meaning.

TriQuint does not dispute that it varies the thickness of its layers. However, it argues that Avago's evidence is not sufficient to show that TriQuint varies the thickness of its layers *due to technological limitations in the manufacturing of the layers.* Instead, TriQuint asserts that, though Avago's expert Dr. Milsom has identified general limitations involved in manufacturing tungsten layers, he has failed to specifically demonstrate that TriQuint actually faces any of these manufacturing difficulties. Furthermore, TriQuint argues that Avago's evidence demonstrates that layer thickness is not a problem for TriQuint because it uses layers that only need to be "half as thick as the problematic layers identified in the '922 patent" for their given operating frequency and that TriQuint chooses to manufacture one of its layers to be thicker than is considered optimal at its 1.875 GHz operating frequency. (Doc. 415, at 73). Also, TriQuint argues that because is uses a different deposition process than was used by the patentee of the '922 patent, TriQuint does not face the same problems that the patentee faced.

In response, Avago notes that during his deposition, TriQuint's expert, Dr. Kim, admitted that one faces technological challenges when depositing tungsten layers because of serious problems like delamination and wafer bow. Specifically, Dr. Kim described how residual stress increases with layer thickness, and that such stress may make the layer more prone to delamination or wafer bow. (Doc. 418-5, Ex. 240 at 207:14-25). Dr. Kim further states that wafer bow is problematic when manufacturing a bulk acoustic wave device. (*Id.* at 209:13-23).

Furthermore, with regard to TriQuint's argument that its choice to manufacture a thicker layer precludes the conclusion that technological limitations are a factor in how it chooses to alter layer thickness, Avago points again to the deposition of Dr. Kim. He testified that placing a thicker layer higher in the stack of layers would subject it to "higher force or stress, force, tensile residual stress," which would make the wafer more prone to

bow or warp.  (*Id.* at 208:1-209:12).  Avago argues that TriQuint therefore places its layer at the bottom of the stack to avoid these problems, which is supported by Dr. Milsom's expert report.  (Doc. 417-17, Ex. 117 at ¶ 269).  Finally, TriQuint records describe "[d]elays due to working the unplanned film stress ([i.e.] bowed wafers) issue."  (Doc. 417-17, Ex. 132 at 6).

In reply, TriQuint argues that Avago has failed to provide evidence that any layer manufacturing problems, including those identified by Dr. Kim in his deposition, figured into TriQuint's decision to depart from one-quarter wavelength thicknesses in its tungsten layers.  However, as discussed with respect to the '137 patent, "the motive of the accused infringer when performing a claimed method is simply not relevant."  *Dow Chem.*, 341 F.3d at 1380 (citation omitted).  Hence, Avago need not present evidence that TriQuint chose to use different layer thicknesses as a result of any technological limitations in manufacturing its layers.  Rather, with respect to the element of the claim at issue, Avago only needs to show that such limitations were present and that TriQuint subsequently varied its layer thicknesses according to the claim language of the '922 patent, the latter of which TriQuint has not disputed.

Therefore, the Court finds that the evidence discussed above demonstrates that a genuine issue of material fact exists with regard to infringement of the '922 patent.  A reasonably jury could certainly conclude from Dr. Kim's deposition testimony, the TriQuint documents, and Dr. Milsom's expert report that TriQuint encountered technological limitations in manufacturing its layers and subsequently varied the thickness of those layers in response.  Therefore, TriQuint's motion for summary judgment of non-infringement of the '922 patent is DENIED.

## I.    Non-Infringement of the '4619 Patent

Avago asserts that TriQuint infringes United States Patent No. 6,864,619 ("the '4619 patent").  TriQuint has moved for summary judgment of non-infringement of claims 1-12.  Claims 1-12 each require a "detuning layer sequence compris[ing] at least a first layer having

a first acoustic impedance and a second layer having a second acoustic impedance in order to shift a resonance frequency of the first piezoelectric resonator relative to the resonance frequency of the second piezoelectric resonator." In the *Markman* order, the Court construed this limitation to mean that "the detuning layer sequence comprises at least a first layer having a first acoustic impedance and a second layer having a second acoustic impedance for the purpose of shifting the resonance frequency of the first piezoelectric resonator relative to the resonance frequency of the second piezoelectric resonator." (Doc. 229, at 58).

TriQuint argues primarily that Avago cannot prove infringement because it has presented no evidence that TriQuint *selected* or *chose* to have detuning layers with different impedances because TriQuint was seeking to shift the resonant frequencies of any of its resonators. However, as discussed previously with respect to the '137 and '4619 patents, "the motive of the accused infringer when performing a claimed method is simply not relevant." *Dow Chem.*, 341 F.3d at 1380 (citation omitted). Thus, TriQuint's focus on whether Avago has produced evidence on *why* TriQuint *selected* detuning layers with different impedances is irrelevant. Rather, the relevant determinations are whether TriQuint does indeed use a detuning sequence comprising at least two layers with different acoustic impedances, which TriQuint does not dispute, and whether TriQuint's use of the detuning sequence comprising those layers is for the purpose of shifting resonance frequency of the first piezoelectric resonator relative to the resonance frequency of the second piezoelectric resonator. In other words, does TriQuint's use of the claimed sequence of layers result in the claimed shift in relative frequencies, regardless of whether TriQuint subjectively wanted or intended that result? *See Dow Chem.*, 341 F.3d at 1380.

By focusing its argument on its own subjective intent in choosing its layers, TriQuint has failed to establish that Avago has not provided sufficient evidence to show that, by using a layer sequence comprising multiple layers with different acoustic impedances, TriQuint achieves a relative shift in the resonant frequencies of its resonators. Moreover, as Avago points out in its brief, Dr. Fattinger stated in his deposition that TriQuint uses a sequence of

aluminum and tungsten layers for the purpose of "offsetting frequency between series and shunt resonators." (Doc. 420-16, Ex. 187 at 90:17-91:23). Furthermore, when specifically asked whether "the layers are put down in order to shift the frequency of the shunt resonators as compared to the series resonators," his response was "yes." (*Id.*). Finally, when TriQuint's own expert, Dr. Kim, was asked at his deposition whether it is "true that TriQuint adds the detuning layer sequence of aluminum copper and tungsten in order to shift the frequency of the shunt resonator as compared to the series resonator," he responded, "Correct. Yes." (Doc. 418-5, Ex. 240 at 98:13-25).

For these reasons, a genuine issue of material fact exists and TriQuint's motion for summary judgment of non-infringement of claims 1-12 of the '4619 patent is therefore DENIED.

## J.    Non-Infringement of the '436 Patent

Avago asserts that TriQuint infringes United States Patent No. 7,268,436 ("the '436 patent"). TriQuint has moved for summary judgment of non-infringement of claims 1-3 and 5. Independent claim 1 of the '436 patent, and its dependent claims 2, 3, and 5, require, in part, an electronic device comprising "contact areas disposed on the top side of the semiconductor chip external to the cavity frame, the contact areas being connected via bonding connections to inner areas of external contacts, wherein the bonding connections of the contact areas and the inner areas of external contacts each include a bonding arc."

In the *Markman* order, the Court construed "wherein the bonding connections of the contact areas and the inner areas of external contacts each include a bonding arc" to mean "wherein each bonding connection formed between the contact areas and the inner area of external contacts includes a bonding arc." (Doc. 229, at 33). The Court also construed "bonding connections" to mean "a connection that bonds two elements," (*id.*), and "bonding arc" to mean "a bond formed by bonding the side of a bond wire to a contact area/inner area of external contact, forming an arc-like shape." (*Id.* at 34).

TriQuint argues that Avago's evidence is insufficient to show that TriQuint infringes

these claims for two reasons: first, the evidence does not show that TriQuint's products are formed by bonding the *side* of a wire to a contact area/inner area of external contact, and second, the evidence does not show that the bonds in TriQuint's accused products form an arc-like shape.

With regard to the first argument, TriQuint argues that its products use thermocompression heads, which are formed from the end of a wire, rather than bonding arcs, which, under the Court's claim construction, are formed from the side of a wire. The parties agreed during the claim construction hearing that bonding arcs and thermocompression heads differ. Furthermore, TrQuint argues that Dr. Howe's analysis of TriQuint's "reverse stand-off stitch bond" ("RSSB") is not sufficient to establish infringement. Specifically, TriQuint states that the RSSB is formed using two thermocompression heads. However, as TriQuint describes in its motion, a wire on one of the thermocompression heads is broken off and replaced by a newly bonded second wire. TriQuint argues that it is the end of this second wire, rather than the side, that is bonded to the modified thermocompression head, or "free-ball."

In his expert report, Dr. Howe referred to diagrams from TriQuint's assembly documents to demonstrate that the RSSB's in TriQuint's products use a bonding arc rather than a thermocompression head. (Doc. 418-5, Ex. 237 at ¶ 84). Nevertheless, TriQuint asserts that these diagrams only confirm its argument that TriQuint uses only thermocompression heads in its products, and does not use bonding arcs.

With regard to TriQuint's second argument, TriQuint states that Dr. Howe provided no evidence regarding the shape of TriQuint's bonding connections and that the diagrams used by Dr. Howe do not show an arc-like shape, as is required by the claim construction. Further, though Dr. Howe claimed at his deposition to have seen photographs of TriQuint parts with "arc-like" shapes, TriQuint states that Dr. Howe has never identified or produced those photographs or the accused TriQuint parts.

In response to TriQuint's first argument, Avago argues that the bonding connection

identified by TriQuint as a "free-ball" is not transformed back into a thermocompression head after the second wire is bonded to it. Rather, Avago argues that the free-ball is simply a "contact area," as described by the '436 patent. Moreover, Avago asserts that there is "no question" that TriQuint forms a bond between the side of a wire and this "free-ball," or contact area. To support this statement, Avago points to the deposition of Dr. Ulrich, TriQuint's expert, during which he was asked whether "according to [his] understanding of the reverse standoff stitch bond, the wire is bonded on its side against the standoff, not against the bond pad." (Doc. 418-1, Ex. 224 at 209:13-16). Dr. Ulrich responded, "Yes, that's correct. What we've been calling a stud bump lately." (*Id.*).

Further, in response to TriQuint's second argument, Avago again cites Dr. Ulrich's deposition, during which he stated that a stitch bond "may or may not have an arc-like shape." (*Id.* at 178:2-3). Further, Dr. Ulrich also identified what he believed to be a bond with an "arc-like" shape in a photograph shown to him during his deposition. (*Id.* at 113:10-114:2). When shown a picture of a bond from one of TriQuint's products, Dr. Ulrich stated that he was "not really sure" whether the bond had an "arc-like" shape. (*Id.* at 184-185).

Dr. Ulrich's statements indicate that TriQuint may use a bonding connection with an "arc-like" shape. He also appears to agree that TriQuint's RSSB includes a wire bonded on its side. Furthermore, because the bond he identified as having an "arc-like" shape shows only a minimal amount of curvature, or arcing, it is reasonable to conclude that one of ordinary skill in the art may also find such an "arc-like" shape in the diagrams or other photographs of TriQuint products discussed above. Therefore, the Court finds that based on the evidence, a reasonably jury could conclude that TriQuint's "free-ball" bonding connection infringes the '436 patent. TriQuint's motion for summary judgment of non-infringement of claims 1-3 and 5 of the '436 patent is DENIED.

### K. Non-Infringement of the '2619 Patent

Avago asserts that TriQuint infringes claims 1, 4, 5, 8-10, 15, 27-30, 32, 33 and 35 of United States Patent No. 6,812,619 ("the '2619 patent"). TriQuint has moved for

summary judgment of non-infringement of all of the asserted claims. All of the asserted claims require, in part, a thin film resonator, wherein "the resonator is adapted in such a way that a width of the frame-like zone and acoustical property means of the layer structure in the frame-like zone are arranged so that displacement relating to the piezoelectrically excited strongest resonance mode is substantially uniform in the center area of the resonator." The Court found that no construction was necessary for this limitation. (Doc. 229, at 59-60).

TriQuint argues that Avago's evidence, namely the report of its expert, Dr. Milsom, shows only that TriQuint uses frame-like zones and that it picks the dimensions of that structure to improve filter performance generally. (Doc. 415 at 81). According to TriQuint, Dr. Milsom stated that this optimization process decreases spurious modes, which in turn provides for substantially uniform displacement. (*Id.*) TriQuint argues that because picking border ring dimensions to improve border performance does not necessarily cause substantially uniform displacement in the center area of a resonator, Avago's evidence is not sufficient to prove infringement.

TriQuint further provides images of TriQuint resonators that have all undergone the optimization process described by Dr. Milsom. These images show varying amounts of displacement among the resonators. TriQuint argues that because, in its view, not all of the resonators demonstrate uniform displacement, Dr. Milsom's theory of infringement, as framed by TriQuint, is not sufficient to withstand summary judgment.

TriQuint's attempt to reframe Dr. Milsom's theory of infringement is not persuasive. In his report, Dr. Milsom stated that

> TriQuint's documents show that they took numerous steps to optimize the width of the border ring . . . The performance of the resonator with an optimized border ring as compared to a resonator without such a border ring will reduce spurious modes. The displacement of the centre [sic] area will be more uniform with a border ring as compared to a resonator without a border ring. As such, with this optimum frame-like zone width the design concept achieves its aim of providing substantially uniform amplitude and therefore maximum electrical coupling to the wanted TE mode (in the centre [sic] region), and minimum electrical coupling to (i.e. suppression of) the unwanted modes.

(Ex. 417-17, Ex. 117 at ¶ 125).  Thus, contrary to TriQuint's argument, Dr. Milsom clearly connected the concepts of optimizing the frame-like zone with suppressing spurious modes and achieving substantially uniform displacement in the center region.  Furthermore, portions of the images TriQuint included in its brief could certainly be reasonably interpreted to show "displacement relating to the piezoelectrically excited strongest resonance mode is substantially uniform in the center area of the resonator."

Thus, the Court finds that a genuine issue of material fact exists with regard to infringement of the '2916 patent, and TriQuint's motion for summary judgment of non-infringement of this patent is therefore DENIED.

**CONCLUSION**

Accordingly,

**IT IS ORDERED** denying Defendant and Counterclaim Plaintiff Avago's Motion for Summary Judgment (Docs. 313, 420).

**IT IS FURTHER ORDERED** denying in part and granting in part Plaintiff and Counterclaim Defendant TriQuint's Motion for Partial Summary Judgement (Docs. 307, 415).  Summary judgment is **DENIED** as to all Antitrust Claims, non-infringement of claims 1-4 and 9-10 of the '340 patent, non-infringement of the '5619 patent, non-infringement of the '922 patent, non-infringement of the '4619 patent, non-infringement of the '436 patent and non-infringement of the '2619 patent.  Summary judgment is **GRANTED** as to Avago's trade secret claims regarding the N0010 and N0011 layout files, Avago's trade secret claims regarding its design and manufacturing processes, Avago's copyright claims with respect to any GDS files, Avago's tort and unfair competition claims, non-infringement of claims 10 and 11 of the '907 patent, invalidity and non-infringement of the '807 patent, non-infringement of claims 11-12 of the '340 patent, non-infringement of the '637 patent, and non-infringement of the '137 patent.

**IT IS FURTHER ORDERED** granting TriQuint's non-filed motion for summary

judgement on Avago's copyright claims with respect to source code.

**IT IS FURTHER ORDERED** denying TriQuint's Motion for Leave to File Supplemental Declaration of Jonathan M. James (Doc. 369) and striking all attachments.

**IT IS FURTHERED ORDERED** granting TriQuint's Motion to Strike Avago's Reply Statement of Facts, Exhibits, and Declarations (Doc. 377) and denying Avago's Motion for Leave to File Reply Declarations and Reply Statement of Facts (Doc. 387). The Clerk shall strike all attachments to Docket 366. The Clerk shall also strike and leave under seal all attachments to Docket 412.

**IT IS FURTHER ORDERED** denying Avago's Motion to Preclude Margaret Meyer's Deposition Testimony (Doc. 316).

**IT IS FURTHER ORDERED** denying without prejudice Avago's Motion for Spoliation Sanctions against TriQuint Semiconductor, Inc. (Docs. 318, 319).

**IT IS FURTHER ORDERED** denying Avago's (1) Motion to Preclude Argument that TriQuint and Dr. Aigner Did Not Have Notice and Knowledge of Potential Litagation when Triquint Destroyed Evidence and (2) Motion for Expedited Consideration (Docs. 375, 434).

**IT IS FURTHER ORDERED** denying TriQuint's Motion to Strike Avago's Motion to Preclude (Doc. 385).

**IT IS FURTHER ORDERED** denying Avago's Motion for Leave to Supplement the Record with Newly Discovered Evidence (Doc. 444).

**IT IS FURTHER ORDERED** granting Avago's Motion to Seal Exhibits to Avago's Motion to Supplement the Record (Doc. 447). The Clerk shall strike and leave under seal the Proposed Declaration of David Hahn (Doc. 445) and the Proposed Declaration of Saul Espino with Exhibits (Doc. 446).

**IT IS FURTHER ORDERED** that, consistent with this Order, the Clerk shall strike the Declaration of Lueder Elbrecht in Support of Avago's Response to TriQuint's Motion for Partial Summary Judgment (Doc. 425), the Declaration of Paul Muralt in Support of

Avago's Response to TriQuint's Motion for Partial Summary Judgment (Doc. 426), the Declaration of R.F. Milsom, Ph.D. in Support of Avago's Response to TriQuint's Motion for Partial Summary Judgment (Doc. 427), and the Declaration of Roger T. Howe, Ph.D. in Support of Avago's Response to TriQuint's Motion for Partial Summary Judgment (Doc. 428).

**IT IS FURTHER ORDERED** that the parties shall confer and redact this Order for public filing. The parties shall then file the joint, redacted version of the Order in the public record within 14 days of the date of this Order.

DATED this 24th day of February, 2012.

James A. Teilborg
United States District Judge

Copies to Only:

All Counsel