1   **WO**

2

3

4

5

6                   **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   TriQuint Semiconductor, Inc.,           )    CV-09-1531-PHX-JAT
                                            )
10              Plaintiff(s),                )
                                            )
11      v.                                  )    **ORDER**
                                            )
12  Avago Technologies Limited, et al.,     )
                                            )
13              Defendant(s).                )
                                            )
14  _____    )

15          Pending before the Court are Defendant and Counterclaim Plaintiff Avago's Motion

16  for Reconsideration (Doc. 466) and Plaintiff and Counterclaim Defendant TriQuint's Motion

17  for Partial Reconsideration or Clarification (Doc. 469).  Both Motions seek reconsideration

18  of the Court's February 24, 2012 Order on Summary Judgment (Doc. 454).  The Court now

19  rules on the Motions.

20  **I.    ANALYSIS**

21          **A.    Legal Standard**

22          Generally, motions for reconsideration are appropriate only if: 1) the movant presents

23  newly discovered evidence; 2) the Court committed clear error or the initial decision was

24  manifestly unjust; or 3) an intervening change in controlling law has occurred.  *School Dist.*

25  *No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  A party

26  should not file a motion to reconsider to ask a court "to rethink what the court had already

27  thought through, rightly or wrongly."  *Above the Belt, Inc. v. Mel Bohannon Roofing, Inc.*,

28  99 F.R.D. 99, 101 (E.D. Va. 1983).  "No motion for reconsideration shall repeat in any

1   manner any oral or written argument made in support of or in opposition to the original

2   motion." *Motorola, Inc. v. J.B. Rodgers Mech. Contractors, Inc.*, 215 F.R.D. 581, 586 (D.

3   Ariz. 2003). The Court ordinarily will deny "a motion for reconsideration of an Order absent

4   a showing of manifest error or a showing of new facts or legal authority that could not have

5   been brought to its attention earlier with reasonable diligence." Local Rule of Civil

6   Procedure 7.2(g)(1).

7             **B.    Avago's Motion for Reconsideration**

8             Avago requests reconsideration on several issues, though it has only met the high

9   standard for reconsideration with respect to the antitrust issues. The Court's reasons for

10  denying or granting Avago's various requests for reconsideration follow.

11            With respect to Avago's spoliation claims, Avago does not meet the high standard for

12  reconsideration. Instead, Avago merely reasserts its arguments regarding any alleged

13  prejudice it may have suffered as a result of TriQuint's alleged spoliation. Doc. 466 at 4-5.

14  However, the Court fully considered the issue of prejudice in the summary judgment order,

15  Doc. 454 at 7-8, and thus must deny Avago's request for the Court "to rethink what [it] has

16  already thought through." *See Above the Belt*, 99 F.R.D. at 101.

17            Avago also does not meet the standard for reconsideration of the Court's ruling that

18  Avago's layout files do not contain trade secrets. Avago contends that the Court erred in its

19  finding that Avago acknowledged that reverse engineering of layout files could be used to

20  determine their approximate dimensions and that the Court also erred in finding that Avago

21  did not establish that the dimensions of the layout files provide economic value. Again, the

22  Court fully considered the parties' arguments with respect to reverse engineering and

23  economic value in the summary judgment order, Doc. 454 at 29-31, and will not revisit its

24  analysis simply because Avago does not agree with the outcome. *See Above the Belt*, 99

25  F.R.D. at 101.

26            The Court will also not reconsider its decision to exclude the declarations of Drs.

27  Elbrecht, Howe, Milsom, and Muralt. As is clear from the summary judgment order, the

28  Court interpreted TriQuint's motion as one to exclude all untimely expert opinions.

1    Furthermore, as the Court noted in that order, it was incapable of determining which, if any,

2    of the opinions in the declarations also appeared in the timely filed expert reports. Indeed,

3    as Avago's "Exhibit A" to its motion for reconsideration demonstrates, a 15-page chart is

4    apparently needed to make that determination. Doc. 466-1. Of course, that chart was not

5    provided with the declarations. Further, as TriQuint's "Exhibit 1" to its response to Avago's

6    motion demonstrates, it can fill another 25-page chart disputing whether such support

7    actually exists in the timely expert reports. Doc. 490-1. Again, this information was also not

8    available to the Court at the time that it would have needed to parse through the declarations,

9    which did not themselves cite to any timely expert reports, to determine what opinions, if

10   any, could fairly be considered. Finally, and most importantly, throughout the summary

11   judgment order, the Court cited repeatedly to the timely expert reports provided by both

12   parties. Thus, it did not err in excluding the declarations.

13          With regard to the Court's ruling on assignor estoppel, Avago has not met the standard

14   for reconsideration. Instead, Avago simply reasserts its arguments related to the alleged

15   knowledge and assistance provided by Drs. Aigner and Fattinger to TriQuint. The Court

16   fully considered this issue in the summary judgment order. Doc. 454 at 40-47. Hence, it

17   must decline Avago's request for the Court "to rethink what [it] has already thought

18   through." *See Above the Belt*, 99 F.R.D. at 101.

19          The Court will also not reconsider its ruling that U.S. Patent No. 6,933,807 ("the '807

20   patent") is invalid for indefiniteness. Avago argues that the Court failed to apply the

21   standard that patents must be proved invalid by clear and convincing evidence. Doc. 466 at

22   14-15. However, in the *Markman* order, the Court repeatedly cited to and applied, including

23   in its discussion of the indefinite claim, the standard in *Metabolite Laboratories, Inc. v.*

24   *Laboratory Corp. of America*, wherein the Federal Circuit stated that "[o]nly when a claim

25   remains insolubly ambiguous without a discernible meaning after all reasonable attempts at

26   construction must a court declare it indefinite." 370 F.3d 1354, 1366 (Fed. Cir. 2004) (citing

27   *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)). The

28   Federal Circuit has held that this standard properly considers a patent's statutory presumption

1    of validity and the need to show invalidity by clear and convincing evidence. *See Datamize,*
2    *LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347-48 (Fed. Cir. 2005) ("'By finding
3    claims indefinite only if reasonable efforts at claim construction prove futile, we accord
4    respect to the statutory presumption of patent validity and we protect the inventive
5    contribution of patentees, even when the drafting of their patents has been less than ideal.'
6    *Exxon Research & Eng'g Co.*, 265 F.3d at 1375. In this way we also follow the requirement
7    that clear and convincing evidence be shown to invalidate a patent."). Thus, the Court
8    applied the proper standard and will not reconsider its ruling that the '807 patent is invalid
9    for indefiniteness.

10    Avago has not met the standard for reconsideration of the Court's ruling that U.S.
11    Patent No. 6,262,637 ("the '637 patent") is not infringed. Avago first argues that the Court
12    erred in excluding Dr. Howe's untimely declaration; however, as discussed above, the Court
13    will not reconsider its decision to exclude Dr. Howe's declaration. Avago's remaining
14    arguments essentially ask the Court to reach a different conclusion regarding Dr. Howe's
15    opinions in his timely expert report. The Court fully considered Dr. Howe's timely opinions
16    regarding the '637 patent in the summary judgment order and thus must decline Avago's
17    request for the Court "to rethink what [it] has already thought through." *See Above the Belt*,
18    99 F.R.D. at 101.

19    Avago's request for reconsideration of noninfringement of U.S. Patent No. 6,377,137
20    ("the '137 patent") must also be denied. Again, Avago asks the Court to reach a different
21    conclusion regarding Dr. Howe's opinions in his expert report. Avago also presents a new
22    argument that the '137 patent itself, in combination with Dr. Howe's opinions, somehow
23    presents a genuine issue of material fact that TriQuint infringes that patent. However, the
24    Court fully considered Dr. Howe's expert opinions in the motion for summary judgment and
25    must deny Avago's request for the Court to revisit its analysis. *See Above the Belt*, 99 F.R.D.
26    at 101.

27

28

**1.  Avago's Motion for Summary Judgment on TriQuint's Antitrust Claims**

In the Summary Judgment Order, the Court held that questions of material fact existed that precluded granting summary judgment for either party.  However, in so doing, the Court did not explicitly discuss its analysis with regard to whether TriQuint had carried its burden on the issues of market power and antitrust injury.  Rather, the Court only provided a detailed discussion of the parties' arguments on the issue of market definition.  Because a failure by TriQuint to carry its burden on any of these issues would result in granting summary judgment in favor of Avago, the Court finds that to not clearly articulate its reasoning on two of these issues leaves open a question of whether its initial decision was manifestly unjust to Avago.  *See ACandS*, 5 F.3d at 1263.  Thus, Avago has met the standard for reconsideration, and the Court will provide a more detailed analysis of the market power and antitrust injury issues.  The Court nevertheless affirms its decision to deny summary judgment to either party on the antitrust issues.  In short, "[t]his case is a complex antitrust matter with several unresolved material issues.  Such a case simply cannot be disposed of in a summary fashion pursuant to Federal Rule of Civil Procedure 56."  *United States v. Syufy Enters.*, No. C-86-3057-WHO, 1987 WL 39931, at *2 (N.D. Cal. Dec. 18, 1987).

**a.  Market Power**

With respect to a plaintiff's burden on the issue of market power, the Ninth Circuit has stated the following:

> Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. . . . The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (internal citations omitted).  In its summary judgment briefs, TriQuint points to several facts in the record that

1   could sufficiently establish that Avago has market power in at least one of the various

2   markets proposed by the parties.

3        The Court initially  notes that "[i]t is impossible to determine market share without

4   first defining the relevant market." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir.

5   1997).   Further, "[t]he additional issues of monopoly power and the maintenance of

6   monopoly power depend upon a resolution of the relevant market question. . . . Whether the

7   defendants engaged in anticompetitive behavior is dependent upon resolution of these

8   issues." *Id.* at 1477.  As mentioned above, the Court found in the Summary Judgment order

9   that several issues of material fact precluded a determination of the relevant market on

10  summary judgment.  Hence, in order for TriQuint to fail to carry its burden on market power,

11  it must have failed to present sufficient facts establishing market power in any (i.e., not even

12  one) of the potential markets.  TriQuint has not failed to do this.

13       First, with regard to direct evidence of market power, TriQuint has offered evidence

14  that Avago has reduced output and raised prices.  TriQuint asserts that by acquiring Infineon

15  and eliminating its production capacity, Avago reduced BAW output.  This, in turn, cut off

16  supply of BAW die to Avago's competitors, thereby further reducing output.  None of these

17  competitors, including TriQuint, were able to sufficiently increase short-term capacity to

18  compete.  Thus, TriQuint argues that had it not been for the acquisition, competition in the

19  relevant market would have proceeded unabated.

20       Also, with regard to circumstantial evidence, TriQuint has offered evidence that

21  Avago's share in various markets has ranged from 65% to 95%.  This includes evidence from

22  TriQuint's expert that Avago has up to a 95.2 percent share in the BAW filter market, up to

23  a 92.1 percent share in the BAW filter die for UMTS Band 2 market, and up to a 76 percent

24  share in the Band 2 duplexers market.  These shares are high enough, particularly when

25  combined with the other evidence presented by TriQuint, to reasonably support a finding of

26  market power.

27       Furthermore, with regard to high barriers to entry and inability of current competitors

28  to expand capacity, Avago's expert, Dr. Robert Dolan, stated that development of BAW

1    technology is "very difficult to do . . . and a number of firms have tried to do it, [but have]
2    been unable to do it." Doc. 417-4, Ex. 29 at 288. Dr. Dolan also described how Infineon
3    required five full years of development between when it "got [it's] first product" and when
4    it had "a mature process." *Id.* TriQuint has further presented evidence that Avago's
5    allegedly illegal acquisition of its BAW patent portfolio and refusal to license that patent
6    technology also presents a barrier to entry in the relevant markets. Thus, TriQuint has
7    presented sufficient evidence that high barriers to entry may exist in the relevant markets and
8    that existing competitors may lack the ability to sufficiently expand capacity in the short run.

9        To be clear, the Court did address this evidence in the summary judgment order with
10   regard to its discussion of the application of the *Philadelphia National Bank* presumption.
11   Doc. 454 at 20-21; *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963). Further,
12   though Avago disputes TriQuint's direct and circumstantial evidence, Avago primarily
13   argues in its motion for reconsideration that, even in light of this evidence, a finding of
14   market power is necessarily foreclosed by the decision in *United States v. Syufy Enterprises*,
15   903 F.2d 659 (9th Cir. 1990) (hereinafter "*Syufy*"), and that the Court did not adequately
16   address this argument in the summary judgment order. The Court will therefore take this
17   opportunity to expand on why it did not find Avago's *Syufy* argument sufficient to grant
18   summary judgment in favor of Avago.

19       Though Avago acknowledges its high market shares, it asserts that overall, the
20   evidence demonstrates that Avago's shares and prices are declining and that output in the
21   relevant markets is increasing. Thus, in Avago's view, competition has not been harmed, and
22   Avago does not have market power. Avago relies on the Ninth Circuit's decision in *Syufy*
23   to support this argument. In that case the defendant operated first-run movie theaters in Las
24   Vegas. After much early success and rapid expansion, the defendant eventually owned all
25   of the first-run movie theaters in Las Vegas. The government then brought claims for
26   antitrust violations. After a bench trial, the trial court held that the defendant did not have
27   market power, largely based on its finding that there were no barriers to entry in the relevant
28   market. *Id.* at 661. The Ninth Circuit affirmed, also resting its decision primarily on the

1    evidence of an absence of barriers to entry in the first-run film market in Las Vegas. *Id.* at

2    666-67.  Thus, even though the defendant at one point controlled a very high market share,

3    he was not able to maintain that market share once new entrants entered the market, which

4    they were able to do very rapidly.  Thus, in the Ninth Circuit's view, there was no harm to

5    competition and the defendant did not have market power. *Id.* at 670-71.

6         However, the facts of *Syufy* can be readily distinguished from those in the present

7    case.  Specifically, after the defendant in *Syufy* gained a 100 percent market share over the

8    first-run film market in Las Vegas, a new competitor emerged in that market almost

9    immediately. *Syufy*, 903 F.2d at 665.  Further, within approximately two years, that new

10   competitor had a larger market share, in terms of total screens, than the defendant. *Id.*  After

11   approximately two more years, the new competitor had sold its business to a large national

12   movie theater chain, which led to further erosion of the defendant's market share. *Id.*  Thus,

13   the *Syufy* court could readily conclude that "Syufy's acquisitions did not short circuit the

14   operation of the natural market forces; Las Vegas' first-run film market was more

15   competitive when [the] case came to trial than before Syufy bought out [its competitors]."

16   *Id.*

17        Based on the evidence in this record, however, the proposed markets have not shown

18   nearly the same competitive resiliency in the wake of Avago's acquisition of Infineon.

19   Indeed, Avago's market shares in the relevant markets do appear to be declining, and thus

20   Avago's heavy reliance on *Syufy* is understandable.  But, as described above, there is

21   evidence in the record that suggest that the proposed markets are not the type in which it is

22   possible for a new competitor to unexpectedly emerge and very rapidly gain a dominant

23   market share within two years, as was the case in *Syufy*.

24        Rather, the evidence in the record, viewed in a light most favorable to TriQuint,

25   indicates that Avago has likely been able to maintain its very high market shares better than

26   the defendant in *Syufy*.  For example, in the markets for BAW filter die, BAW filter die for

27   UMTS Band 2, and Band 2 duplexers, Avago's market share has not dropped below 65

28   percent, and has even been as high as 95 percent.  Meanwhile, according to the data provided

by the parties, TriQuint, as Avago's strongest competitor, has apparently never held a market share in any of these three markets that has exceeded 40 percent of Avago's share.  These numbers, coupled with the additional evidence of barriers to entry and Avago's alleged anticompetitive behavior described above, are sufficient to raise a question of material fact as to whether Avago has the ability to maintain market share.  *See Syufy*, 903 F.2d at 665-66 ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share.") (emphasis in original).  Thus, this issue can only be resolved by weighing the evidence of potential market power against the evidence of potentially increasing competition, which properly lies within the province of a jury.

In sum, TriQuint has provided, *inter alia*, evidence of what it asserts to be high barriers to entry in the relevant markets.  Viewing this evidence in a light most favorable to TriQuint, the Court will assume that high barriers to entry exist in those markets.  TriQuint also has presented evidence of Avago's dominant market shares in the relevant markets.  Though Avago acknowledges its high market shares, it nevertheless ardently asserts that its shares in the relevant markets are declining and that consequently competition in those markets has not suffered.  In considering whether this case may be properly disposed of on summary judgment, the Court is thus left with the following question: Can a jury "reasonably [find] that a firm with a consistently high, albeit declining, market share in a market with high barriers to entry possesse[s] market power[?]"  *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360, 367 (9th Cir. 1988).  In response to this question, the Ninth Circuit has definitively answered "yes."  *Id.*

There is no indication that *Syufy* provides a different answer except in markets where barriers to entry are nonexistent.  *See Syufy*, 903 F.2d at 671 n.21 (noting the determinative influence that "the total lack of entry barriers" in the Las Vegas movie theater market had on the outcome of the "relevant factors" of the case, including that the defendant "lacked the ability to maintain market share, the power to control prices, and the capability of excluding competitors") (internal brackets and quotation omitted).  Thus, at the very least, it appears to this Court that, while the *Syufy* court may not have expressly cabined its holding only to

1    markets with an absence of entry barriers, *see Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d

2    874, 890 (N.D. Cal. 2011), when the question of the existence of high barriers to entry is

3    unresolved, application of *Syufy* in the manner suggested by Avago, and particularly at the

4    summary judgment stage, is not appropriate.  *See United States v. Syufy Enters.*, No. C-86-

5    3057-WHO, 1987 WL 39931, at *2 (N.D. Cal. Dec. 18, 1987) (denying parties' cross-

6    motions for summary judgment and finding that the "most important unresolved issue in

7    [that] case" involved the existence of entry barriers in the relevant market).

8                         **b.    Antitrust Injury**

9           To survive summary judgment, TriQuint must also "offer some evidence

10   demonstrating  the existence of an antitrust injury, which is to say injury of the type the

11   antitrust laws were intended to prevent and that flows from that which makes defendant's

12   acts unlawful."  *Forsyth v. Humana*, 114 F.3d 1467, 1477 (9th Cir. 1997) (citing *Atl.

13   Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)) (internal quotations omitted).

14   Furthermore, a plaintiff's burden "is satisfied by its proof of some damage flowing from the

15   unlawful [act]; inquiry beyond this minimum point goes only to the amount and not the fact

16   of damage.  It is enough that the illegality is shown to be a material cause of the injury; a

17   plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of

18   proving a compensable injury."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S.

19   100, 114 n.9 (1969).

20          Here, TriQuint has presented evidence that it has been injured by Avago's alleged

21   unlawful conduct.  This includes evidence that (1) Avago's acquisition of Infineon's BAW

22   business cut off TriQuint's supply of BAW die; (2) Avago's efforts to issue and enforce the

23   "End of Life" notice regarding Infineon BAW die generated concern among TriQuint's

24   customers; (3) Avago's sending of letters to TriQuint customers warning them of TriQuint's

25   infringement of Avago's intellectual property and threatening legal action; and (4) Avago's

26   refusal to license its intellectual property and its demands for unlawful agreements not to

27   compete.  TriQuint alleges that these actions led to lost sales, increased costs, strained

28   customer relationships, and a hampered ability to develop new competitive products.

Avago, on the other hand, asserts that any injury suffered by TriQuint was of its own making. Specifically, Avago points to evidence of long-running quality and reliability issues with TriQuint's products and internal supply problems that led to an inability to meet demands from customers and strained relationships with those customers. Avago also states that TriQuint had independently decided to rely on its own BAW filters rather than taking advantage of Avago's "End-of-Life" offer, and thus Avago's decision to stop supplying TriQuint with Infineon products could not have injured TriQuint.

Having considered both parties' arguments, the Court finds that TriQuint has sufficiently alleged antitrust injury to survive summary judgment. Though, as Avago's evidence suggests, TriQuint's own decisions and actions may have contributed to some of its alleged injuries, Avago's evidence does not completely rule out the possibility that any potential illegal conduct by Avago may have also injured TriQuint. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1051 (9th Cir. 1981) (finding that plaintiff had introduced sufficient evidence of causation and stating that "the law does not require precision in this area. [Defendant's] pricing need only have been a material cause of [plaintiff's] decline, and causation may be inferred if [plaintiff's] injury was 'the type of loss that the claimed violations of the antitrust laws would be likely to cause.'") (internal citation omitted). Thus, it will be up to a jury to determine and separate any antitrust damages from any damages that resulted from TriQuint's own conduct and decision-making. *See Forsyth*, 114 F.3d at 1478.

### C.    TriQuint's Motion for Reconsideration

TriQuint has also moved for reconsideration or clarification of the Court's Summary Judgment Order. Though the Court does not find that TriQuint has met the standard for reconsideration, its motion is granted to the extent that it seeks clarification of the Court's order.

In its motion, TriQuint asserts that the Court relied on a photograph from Dr. Howe's excluded declaration in determining that an issue of material fact existed with regard to non-infringement of U.S. Patent No. 7,268,436 ("the '436 patent"), and that such reliance was

error. However, as is evident from the analysis in the summary judgment order, the Court relied on several pieces of evidence in reaching its conclusion, including Dr. Howe's timely expert report and deposition testimony of both parties' experts. Doc. 454 at 86-88. Thus, the Court did not improperly rely on any excluded photographs in denying summary judgment to TriQuint on the issue of non-infringement of the '436 patent, and thus to reconsider its decision on that issue would require the Court to improperly "rethink what [it] has already thought through." *See Above the Belt*, 99 F.R.D. at 101.

TriQuint also asserts that the Court failed to address all of TriQuint's arguments regarding whether Avago has properly asserted infringement under the doctrine of equivalents. In its motion for partial summary judgment, TriQuint included a brief section arguing that Avago should be precluded from making any assertions of infringement under the doctrine of equivalents. Doc. 415 at 84-85. The Court refused to grant this blanket request for summary judgment, and instead opted to consider the doctrine-of-equivalents arguments that TriQuint substantively argued on a claim-by-claim basis. Doc. 454 at 56-58. The Court did, in fact, consider and rule on those arguments in the summary judgment order. Thus, the Court will not revisit this issue on a motion for reconsideration. To be clear, the summary judgment order granted summary judgment to TriQuint on the issue of non-infringement under the doctrine of equivalents with respect to the '907, '340, '637, and '137 patents.

### 1.    Clarification of the Court's Claim Constructions

TriQuint bases its request for clarification of the Court's claim constructions on the Court's refusal to find that three of the claim elements considered in the summary judgment order required an element of intent or subjective motivation. Specifically, the Court cited the Federal Circuit's decision in *Dow Chemical Co. v. Mee Industries, Inc.*, wherein that court stated "the motive of the accused infringer when performing a claimed method is simply not relevant." 341 F.3d 1370, 1380 (Fed. Cir. 2003). TriQuint argues that the Court improperly applied this statement, which directly references method claims, to apparatus claims. TriQuint further argues that the Court's application of this decision in the summary judgment

1    analysis is inconsistent with the *Markman* order, wherein the Court stated with regard to the

2    '807 patent that "[w]hile intent may not be automatically imputed into claims, an applicant

3    is not prevented from [including] an intent element in the claims." Doc. 229 at 42. The

4    Court based this statement on citations to Federal Circuit cases in which that court either

5    construed method claims to incorporate a scienter requirement, *Koito Mfg. Co., Ltd. v. Turn-*

6    *Key-Tech, LLC,* 381 F.3d 1142, 1150 n.2 (Fed. Cir. 2004), or construed a preamble to reflect

7    an intentional purpose for which a method must be performed. *Jansen v. Rexall Sundown,*

8    *Inc.*, 342 F.3d 1329, 1333-34 (Fed. Cir. 2003). TriQuint also refers to the Court's analysis

9    of the '4619 patent in the *Markman* order, wherein the court cited a Federal Circuit case that

10   held that a claimed method required deliberate forming of folds. *Combined Sys., Inc. v. Def.*

11   *Tech. Corp. of Am.*, 350 F.3d 1207, 1211-14 (Fed. Cir. 2003). TriQuint has requested the

12   Court to "indicate the claim constructions that will govern at trial," Doc. 469 at 6.

13          First, the Court notes that all of the cases to which TriQuint cites for the proposition

14   that motivation or intent may be incorporated into an apparatus claim involved method

15   claims. *See Koito Mfg.*, 381 F.3d at 1150 n.2; *Combined Sys.*, 350 F.3d at 1211-14; *Jansen*,

16   342 F.3d at 1333-34. Thus, for the Court to similarly apply *Mee Industries*, which also

17   involved a method claim, to negate TriQuint's interpretation of the apparatus claim

18   constructions was not error. Indeed, the only cases this Court has found that have addressed

19   the issue of incorporating an intent limitation into an apparatus claim have refused to do so

20   and have distinguished the line of cases cited by TriQuint. *See 3M Co. v. Avery Dennison*

21   *Corp.*, Civil No. 10-2630, 2012 WL 1004865, at *7 (D. Minn. March 22, 2012); *ADC*

22   *Telecomms., Inc. v. Switchcraft, Inc.*, No. Civ. 04-1590ADMJSM, 2005 WL 2206115, at *9

23   (D. Minn. Sept. 09, 2005). Further, and contrary to TriQuint's assertion in its motion for

24   reconsideration, the Court had not previously considered the *Mee Industries* case in the

25   *Markman* order.

26          Second, none of the claim constructions of the '4619 or '922 patents in the *Markman*

27   order explicitly references any person's subjective motivation or intent when performing a

28   claimed method or infringing an apparatus claim. Thus, TriQuint's interpretation that some

of the claims require an intent element arises from comments the Court made in arriving at those claim constructions. Indeed, as TriQuint noted in its motion for reconsideration, "the Court set forth its holding that design intent may be an element of a patent claim while discussing a limitation of the '807 patent . . . and the same analysis should apply to all claims containing intent limitations." Doc. 469 at 2. The problem with this interpretation of the Court's *Markman* order is that it leaves it to the parties to determine which claims, other than perhaps the '807 patent, contain intent limitations.[1] Thus, because the parties' interpretations of the claim constructions go beyond what the Court intended in its *Markman* order, the Court finds that it is necessary to clarify its claim constructions with regard to any intent limitations prior to trial.[2]

### a.    U.S. Patent No. 6,864,619

With regard to the '4619 patent, the Court construed the term "the detuning layer sequence comprises at least a first layer having a first acoustic impedance and a second layer having a second acoustic impedance in order to shift a resonance frequency of the first piezoelectric resonator relative to the resonance frequency of the second piezoelectric resonator" to mean "the detuning layer sequence comprises at least a first layer having a first

---

[1]Because the Court has held the '807 patent invalid, it will not revisit the claim constructions of that patent. Similarly, with regard to U.S. Patent No. 6,377,137 ("the '137 patent"), which the Court held to be noninfringed in the Summary Judgment Order, the Court will limit its comments to simply reaffirming its analysis in the Summary Judgment Order in which it held that intent or subjective motivation was not incorporated into the claim constructions of that patent. Finally, in its *Markman* briefing, TriQuint also argued for intent limitations for claims in U.S. Patent Nos. 6,812,619 ("the '2619 patent") and 6,262,637 ("the '637 patent"). Though those limitations were not considered in the Court's summary judgment analysis, the Court notes that it refused to incorporate the language "designed to cause" into the '637 patent claim construction and "specifically designed" into the '2619 patent claim construction. Thus, the Court did not recognize any intent limitations in those patent claims.

[2]To the extent that these clarifications might, in the parties' views, alter the claim constructions, the Court notes that a court may "amend[] the claim construction to clarify its original intent." *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1382 (Fed. Cir. 2003).

acoustic impedance and a second layer having a second acoustic impedance for the purpose of shifting the resonance frequency of the first piezoelectric resonator relative to the resonance frequency of the second piezoelecric resonator." Thus, the Court construed the phrase "in order to shift" to mean "for the purpose of shifting."

The claim construction, though its references a "purpose," does not mention any decision making or choices made by one practicing the invention. Further, to the extent that the Court's citation to *Combined Systems* could be construed to read an "intent limitation" into the claim, it could only do so insofar as the limitation requires "foreknowledge of certain facts" or otherwise involves facts that can be "objectively verified and do not depend on a particular person's unfettered, subjective opinion." *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1355-56 (Fed. Cir. 2005) (discussing *Combined Systems* and *Koito Manufacturing*). The case does not stand for the proposition that a choice made by one practicing an invention may be considered in an apparatus claim, and the Court did not intend the interpretation adopted by TriQuint.

In its motion for summary judgment, TriQuint stated that "[a]lthough TriQuint uses an alternating sequence of tungsten and an aluminum-copper alloy and those two materials have different acoustic impedences, TriQuint does not . . . choose layers with two different . . . acoustic impedences for the purpose of shifting the relative frequencies of the resonators." Doc. 415 at 75. TriQuint asserted that its choice to use that sequence of materials instead depends on electrical conductivity, acoustic properties, and manufacturing advantages, which precludes the possibility of infringement. *Id.* However, while TriQuint's use of the sequence of materials and the acoustic impedance of those materials are objectively verifiable, considering whether a structural element in one of TriQuint's products is present because TriQuint subjectively chose to use it for one reason or another falls far closer to construing a claim element to depend on an unfettered, subjective opinion.[3] Rather,

---

[3]The Court further notes that TriQuint's interpretation essentially builds into the apparatus claim a "step" in which TriQuint chooses to use a layer sequence for one reason or another. While such a "step" of expressing intention or foreknowledge may

a determination of infringement of this claim language depends on whether it can be shown that TriQuint's sequence does, in fact, shift the relative frequencies, which would not only constitute the purpose of the sequence, but is also objectively verifiable. In other words, a sequence that is identical to the claimed sequence, except that does not shift the relative frequencies in the manner described in the patent, could not have such shifting as its purpose and thus could not infringe under the Court's claim construction. Thus, the Court's citation to *Combined Systems* does not at all support TriQuint's interpretation of the claim construction.

Further, TriQuint's reading of a person's choice into the claim construction is not consistent with the patent specification. The written description of the patent states the following:

> The detuning layer sequence **52** influences the resonance frequency of the piezoelectric resonator **10**. It *serves for* detuning the piezoelectric resonator **10**, that is for shifting its resonance frequency, with regard to a piezoelectric resonator not having a detuning layer sequence **52** and otherwise not having the same properties.

'4619 patent at 7:43-48 (emphasis added). The only "purpose" that is referenced by the specification is that of the detuning layer sequence, not any intention or choice of one practicing the invention.[4] Thus, the Court's use of the word "purpose" in its claim

_____

appropriately be incorporated into a method claim in limited instances, *see Koito Mfg.*, 381 F.3d at 1150 n.2; *Combined Sys.*, 350 F.3d at 1211-14; *Jansen*, 342 F.3d at 1333-34, doing so in an apparatus claim appears to amount to an improper mixing of classes of invention. *See* 35 U.S.C. § 101 (classes of invention are listed in disjunctive form).

[4]In this regard, the "in order to" phrase in the claim may be better interpreted as a functional limitation to the apparatus claim. *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("Functional language may also be employed to limit the claims without using the means-plus-function format."). Indeed, as the Court noted in the *Markman* order, the phrase "in order to" is simply defined as "for the purpose of." Doc. 229 at 57. Further, though the word "purpose" may refer to "something that one hopes or intends to accomplish," it may also refer to "the action for which a person or thing is specially fitted or used or for which a thing exists" and in that respect is synonymous with the word "function." *See* MerriamWebster Online Thesaurus, http://www.m-w.com (last viewed April 19, 2012). The Court finds that the latter meaning is supported by the patent's intrinsic record, while the former meaning is

1    construction should accordingly be interpreted in the context of the patent's written
2    description.  To that end, the only "design intent" that can be incorporated into the claim
3    construction arises from the fact that for a detuning layer sequence to infringe the claim, it
4    must also shift the resonance frequencies as described in the claim.  A detuning layer
5    sequence that does not do so does not incorporate such "design intent."

6         The Court therefore maintains the language of the original construction of this claim
7    term.  However, to the extent that either party interpreted the *Markman* order to mean that
8    the claim term also incorporated an intent or subjective motivation requirement, the Court
9    now clarifies that such a requirement is inconsistent with the intrinsic record of the '4619
10   patent.  Furthermore, because the Court is not changing the language of the construction, but
11   only clarifying that an additional intent element, which the Court never explicitly built into
12   the construction, is not required, the Court finds that supplemental expert reports on this
13   claim term are not necessary.  Additionally, the Court notes that the analysis of the '4619
14   patent in the summary judgement order did not read an intent element into the claim
15   construction, and thus was consistent with the correct interpretation of the construction.

16        In sum, and to paraphrase *Mee Industries*, the issue is whether by using a detuning
17   layer sequence comprising at least a first layer having a first acoustic impedance and a
18   second layer having a second acoustic impedance, the resonance frequency of the first
19   piezoelectric resonator relative to the resonance frequency of the second piezoelectric
20   resonator was shifted.  Even if a potential infringer chose to use the claimed detuning layer
21   sequence for an entirely different reason, that would not avoid infringement.  *See Mee Indus.*,
22   341 F.3d at 1380.

23

24   not.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc)
25   ("[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks
     transforming the meaning of the claim term to the artisan into the meaning of the term in
26   the abstract, out of its particular context, which is the specification. . . . Thus, there may
     be a disconnect between the patentee's responsibility to describe and claim his invention,
27   and the dictionary editors' objective of aggregating all possible definitions for particular
28   words.").

#### b.      U.S. Patent No. 6,841,922

TriQuint has also asked for clarification of the Court's refusal to recognize an intent limitation in the claim language of the '922 patent. Specifically, in construing the claims of that patent, the Court gave the term "due to technological limitations in the manufacturing of this layer" it plain and ordinary meaning. Doc. 229 at 34-35. Nowhere in the *Markman* order did the court discuss an intent limitation with regard to this claim term. Nor did either of the parties argue for one in the *Markman* briefs. Further, the Court cannot reasonably interpret the plain and ordinary meaning of this apparatus claim term, in the context of the patent specification, to incorporate any consideration of a person's intent or motivation.

To be clear, however, the Court reiterates that this term, as it is used in the claims of the '922 patent, does not incorporate any motive or intent requirement. Consistent with both the construction in the *Markman* order and the analysis in the summary judgment order, one of ordinary skill in the art would understand the plain and ordinary meaning of the claim language to require that technological limitations in the manufacturing of the layer at the quarter-wavelength thickness would be present and that those limitations were minimized or avoided at a decreased thickness of the layer relative to the quarter-wavelength thickness.

This construction is consistent with the patent's specification, which indicates that this limitation generally refers to the knowledge of those of ordinary skill in the art that certain materials can be manufactured at the optimal quarter-wavelength thickness only with difficulty. '922 patent at 2:20-32. Deviating from the optimal thickness can "minimize[] or avoid[]" the "problems associated with the manufacturing of thick layers." *Id.* at 3:7-11. Further, the only reference in the patent to any "deliberate" action is the deliberate deviation from optimum layer thickness. *Id.* at 3:44-49. Thus, to again paraphrase *Mee Industries*, the issue is whether by deviating from quarter-wavelength layer thickness, manufacturing limitations were minimized or avoided. Even if a potential infringer chose to deviate from quarter-wavelength layer thickness for an entirely different reason, that would not avoid infringement. *See Mee Indus.*, 341 F.3d at 1380.

1  **II.     CONCLUSION**

2          Accordingly,

3          **IT IS ORDERED** denying in part and granting in part Avago's Motion for

4  Reconsideration (Doc. 466).  The motion is granted with respect to Avago's motion for

5  summary judgment on TriQuint's antitrust claims and denied with respect to all other issues.

6          **IT IS FURTHER ORDERED** granting TriQuint's Motion for Partial

7  Reconsideration or Clarification (Doc. 469) to the extent that it requests clarification.  To the

8  extent that the motion requests reconsideration, it is denied.  This Order does not change any

9  of the Court's rulings in the Summary Judgment Order dated February 24, 2012 (Doc. 454).

10          DATED this 25th day of April, 2012.

11

12

13                                          _____
                                            James A. Teilborg

14                                          United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28